1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - -x

In the Matter of:

ORLY GENGER,                              Lead Case No.

         Debtor.                          19-13895-jlg

- - - - - - - - - - - - - - - - - - - - -x

GENGER, et al.,

         Plaintiffs,                      Adv. Proc. No.

v.                                        19-01444-jlg

GENGER, et al.,

         Defendants.

- - - - - - - - - - - - - - - - - - - - -x

GENGER, et al.,

         Plaintiffs,                      Adv. Proc. No.

v.                                        19-01445-jlg

GENGER, et al.,

         Defendants.

- - - - - - - - - - - - - - - - - - - - -x

2

- - - - - - - - - - - - - - - - - - - - - -x

KASOWITZ BENSON TORRES LLP, et al.,

       Plaintiffs,              Adv. Proc. No.

v.                      19-01446-jlg

GENGER, et al.,

       Defendants.

- - - - - - - - - - - - - - - - - - - - - -x

MICHAEL OLDNER, AS TRUSTEE OF THE ORLY GENGER 1993,

       Plaintiff,              Adv. Proc. No.

v.                      19-01447-jlg

GENGER, et al.,

       Defendants.

- - - - - - - - - - - - - - - - - - - - - -x

GENGER,

       Plaintiff,              Adv. Proc. No.

v.                      20-01010-jlg

GENGER, et al.,

       Defendants.

- - - - - - - - - - - - - - - - - - - - - -x

United States Bankruptcy Court

One Bowling Green

New York, New York


May 5, 2020

12:40 PM

B E F O R E:

HON. JAMES L. GARRITY,  JR.

U.S. BANKRUPTCY JUDGE

**4**

Doc #219 Case Conference

Doc #222 Letter Filed by Thomas A. Pitta on behalf of Sagi Genger

Doc #224 Letter Filed by Rocco A. Cavaliere on behalf of Deborah Piazza

Doc #225 Letter Filed by Thomas A. Pitta on behalf of Sagi Genger

Doc #232 Status Report Filed by Paul J. Labov on behalf of Dalia Genger

Doc #233 Letter Filed by Rocco A. Cavaliere on behalf of Deborah Piazza

Doc #234 Status Report of Pending Actions Filed by Rocco A. Cavaliere on behalf of Deborah Piazza

Doc #235 Letter Filed by Thomas A. Pitta on behalf of Sagi Genger, TPR Investment Associates, Inc.

Doc #236 Status Report Filed by Adam Pollock on behalf of The Orly Genger 1993 Trust

Doc #237 Joint Position Letter by debtor Orly Genger and creditors Kasowitz Benson Torres, Eric Herschmann, the Genger Litigation Trust, ADBG LLC, and Arie Genger

Adversary proceeding 19-01444-jlg Genger, et al v. Genger, et al.
1) Case Conference

Adversary proceeding 19-01445-jlg Genger, et al v. Genger, et al.
1) Complaint (Doc #1)

Adversary proceeding 19-01446-jlg Kasowitz Benson Torres LLP, et al. v. Genger, et al.
1) Case Conference

Adversary proceeding 19-01447 jlg Michael Oldner, as Trustee of The Orly Genger 1993 v. Genger, et al.
1) Case Conference

**6**

Adversary proceeding 20-01010-jlg Genger v. Genger, et al.

1) Pre-Trial Conference

Transcribed by: Hana Copperman

eScribers, LLC

352 Seventh Avenue, Suite #604

New York, NY 10001

(973)406-2250

operations@escribers.net

A P P E A R A N C E S (ALL TELEPHONIC):

REITLER KAILAS & ROSENBLATT LLC

     Attorneys for Debtor

     885 Third Avenue, Twentieth Floor

     New York, NY 10022


BY:   JEANNETTE LITOS, ESQ.

     YANN GERON, ESQ.



TARTER KRINSKY & DROGIN LLP

     Chapter 7 Trustee

     1350 Broadway

     New York, NY 10018


BY:   DEBORAH PIAZZA, ESQ.



TARTER KRINSKY & DROGIN LLP

     Attorneys for Deborah Piazza, Chapter 7 Trustee

     1350 Broadway

     New York, NY 10018


BY:   ROCCO A. CAVALIERE, ESQ.

8

CULLEN AND DYKMAN LLP

Attorneys for Michael Oldner, Trustee of The Orly Genger

1993 Trust

100 Quentin Boulevard

Garden City, NY 11530


BY:   ELIZABETH M. ABOULAFIA, ESQ.




EMMET, MARVIN & MARTIN LLP

Attorneys for Sagi Genger and TPR Investment Associates,

Inc.

120 Broadway

New York, NY 10271


BY:   THOMAS A. PITTA, ESQ.

JOHN DELLAPORTAS, ESQ.

HUGHES HUBBARD & REED LLP

      Attorneys for ADBG LLC

      One Battery Park Plaza

      New York, NY 10004


BY:   CHRISTOPHER GARTMAN, ESQ.



KASOWITZ BENSON TORRES LLP

      Attorneys for Eric Herschmann, Esq.

      1633 Broadway

      New York, NY 10019


BY:   ERIC D. HERSCHMANN, ESQ.



KASOWITZ BENSON TORRES LLP

      Attorneys for Kasowitz Benson Torres LLP

      1633 Broadway

      New York, NY 10019


BY:   ANDREW KURLAND, ESQ.

      MICHAEL BOWEN, ESQ.

10

LAW OFFICE OF IRA DANIEL TOKER

     Attorneys for Dalia Genger, D&K GP LLC

     465 West End Ave

     New York, NY, 10024

BY:   IRA TOKAYER, ESQ.

POLLOCK COHEN LLP

     Attorneys for The Orly Genger 1993 Trust

     60 Broad Street, 24th Floor

     New York, NY 10004

BY:   ADAM POLLOCK, ESQ

FOLEY & LARDNER LLP

     Attorneys for Dalia Genger

     90 Park Avenue

     New York, NY 10016

BY:   PAUL J. LABOV, ESQ.

     DOUGLAS SPELFOGEL, ESQ.

TOGUT, SEGAL & SEGAL LLP

Attorneys for Arie Genger

One Penn Plaza

New York, NY, 10119


BY:   BRIAN MOORE, ESQ.

FRANK OSWALD, ESQ.

P R O C E E D I N G S

THE COURT:  Okay.  Good afternoon.  Again, it's Judge Garrity.  I think we're ready to get going.  I'm sorry for the little bit of a delay.  I'm not going to ask for appearances. I can see who's here on the dashboard.  As Ms. Rodriguez indicated, please identify yourself when you speak.  First identify yourself so that the recording can pick this up, who's speaking.

Before we get started, I do have a question for Mr. Dellaportas.  Mr. Dellaportas, in reviewing some of the pleadings and the documents that were filed, I note that you were at Morgan, Lewis.  What years were you at Morgan, Lewis?

MR. DELLAPORTAS:  Sir, I believe it was -- oh, boy. Memory test.  I believe it was 2013 to 2016.  I know that Your Honor was there for a brief period, and we may have crossed over, but I do not believe we actually worked on any matters together.

THE COURT:  Yes.  No.  No, that's why I asked.  I left in February of 2015, so I guess we overlapped.  More specifically, I don't recall that we ever met, although we probably did at some point.  And I agree with you.  I don't think we ever worked on anything together.

I just wanted to disclose this to the group, because I guess you were representing the Gengers while you were at Morgan, Lewis; is that right?

MR. DELLAPORTAS:  That's correct, Your Honor.

THE COURT:  All right.  Well, again, I don't believe I ever worked on anything with Mr. Dellaportas, and certainly not anything related to the Gengers.  But as I said, I wanted to disclose that just for folks' information.  I'm not asking you to do anything or not do anything with it at this time, but it is out there now, and if you have a problem, I think there are steps that can be taken, working through the clerk's office, to alert the clerk of the court if there are issues, conflict issues, that sort of thing.  But in any event, I wanted to take care of that.

Okay.  That having been said, what I'd like to do today is beginning with the trustee, the trustee to please give me an update as to where things stand, what progress, if any, has been made with respect to trying to come to a global resolution.  And then I'll hear from the trustee, through her counsel, as to the views on how we should proceed.

I'll hear from all of you.  I've reviewed all of the documents and had a chance to read a number of the decisions that had been issued by the many courts that have had the opportunity to deal with some of the Genger litigation.

Well, why don't we start there, and as I have questions I will raise them.  But please, go ahead.

MS. PIAZZA:  Good afternoon, Your Honor. It's Deborah Piazza, the Chapter 7 trustee.  My counsel is on the line,

Rocco Cavaliere, and he will update you with all the details.

THE COURT:  Thank you.

MS. PIAZZA:  Thank you.

MR. CAVALIERE:  Good afternoon, Your Honor.  Rocco Cavaliere, Tarter Krinsky & Drogin, on behalf of Deborah Piazza, the Chapter 7 trustee.

Just by way of background, Your Honor, and I'll answer your questions shortly about the current status, just for the record, by way of background, all the parties appeared in this court on March 4th of this year for the first status conference.  And Your Honor was, if you recall, was participating on the phone that day.  And at that time I provided a broad overview, and all the parties-in-interest participated and discussed their positions in the case.  And during the conference Your Honor directed that all the parties provide a position statement, file it on the court docket, and all those position statements were filed on April 17th.

In addition, Your Honor had asked, because of the nature of this case, the litigations pending in so many different courts, that it would be useful to have a chart which describes the current status of the various actions, and during the course of the week of April 13th I prepared the initial chart, and I circulated multiple drafts over the course of that week to the various parties, ultimately culminating in the chart that was filed with the court on April 17th.

It was a constantly evolving document, changes coming from all parties, and when it was filed late afternoon on April 17th it had many of the comments, but some comments may not have yet had an opportunity to just update, so I did, to update the chart further, but since there was a deadline I advised the parties, to the extent that they had any disputes with respect to the content they could certainly raise it just to clarify this current status by way of either including it in their position statements that we filed later that day, or if it was important, to raise it with the Court today.

And certainly nothing in that chart was intended to be prejudicial to any parties.  It's not of any precedential value.  It's just a -- it's a useful, hopefully a useful resource for the Court to see the various issues and pending claims and where things are.

To answer Your Honor's question at the outset, where we are, as we said in the position statement that we filed on April 17th, we had gotten two proposals.  They were the Broser, Arie Genger, and Herschmann proposal that we had been working on for some time.  And then we did receive an updated proposal by the Sagi group, which I would call the Dalia Genger, Sagi Genger, and the Orly Genger trustee just for shorthand.  I know they have different positions, but I'm just using the Sagi group for purposes of just the ease of reference.

And then we spent the good part of two to three weeks

working with the parties, and getting very, very close with both proposals.  And frankly, I guess we have a different problem than we had on April 17th.  We have two -- instead of having one proposal that we were prepared to go forward with on April 17th, we have the luxury of having two really appealing proposals, each with their own pros and cons and risks.  And we were very close with both parties over the last week, and we advised each side that we appreciated their patience and their work with us.

And we also recognize there needs to be finality to this.  I mean, we've been speaking to the parties for a while. The offers are all -- were both pretty good from the trustee's perspective.  And we've told the parties that it's our intention to conclude the settlement discussions with a hopefully anticipated final settlement agreement with either the Sagi group or the Broser, Arie Genger and Herschmann group by May 15th, with an executed settlement agreement, with the hope that by May 22nd -- that's a Friday -- or maybe Monday the 25th or the 26th, somewhere thereabouts, certainly before the end of the month, we would file a settlement motion with the Court.

If, for some reason, there is a breakdown with each side, or the trustee ultimately decides it would, frankly, be better for the estate to, at least initially, pursue, by way of complaint, the thirty-two-million-dollar fraudulent transfer,

we intend to do so.  If we can't get a settlement done, we intend to do so by the end of this month.

So one of the other things also, Your Honor, that today is about is scheduling matters.  So as I just said, there is a chance we'll have a settlement with one side or the other, with a motion hopefully on file around the 22nd, 25th of this month.  Thus, ideally, during the course of -- as we go through this, and there's other things that need to be discussed, but hopefully we can get a hearing date from Your Honor at some point today for possibly late June or early July.

I'll give people an opportunity to raise objections, and also to the extent there is going to be a need for discovery -- I don't know that there will be, but there might be.  This is a highly litigious case, Your Honor, so I would anticipate whichever proposal that we proceed with, which obviously we would believe if we're proceeding with one proposal over the other that the proposal that we're selecting is the best proposal for the estate and certainly fair and reasonable, but the parties will no doubt object to any proposal that we do.  I have no doubt about that.

So there will be a need potentially for discovery, so I think it does make sense to push it out till the end of June/July in case people do want to serve discovery, and gives the people an opportunity, all parties-in-interest an opportunity to serve discovery, take that position, if need be.

And that sets up as well to the motion to dismiss filed by Sagi Genger on April 26th.

THE COURT:  I'm sorry.  I'm sorry.  Well, excuse me. Excuse me, Mr. Cavaliere.  I'm sorry for interrupting you, but let's just back up a tiny bit.  I want to make sure I understand, and I believe that I'm clear as to what it is that the trustee is negotiating with parties.

First off, one of the things that isn't completely clear to me -- well, let me back up a little bit.

Under the settlement agreements that you have, you've reached, one would want to do -- and one for the other, they're mutually exclusive?

MR. CAVALIERE:  Yes, that's correct.

THE COURT:  Okay.  And what are the claims of the estate that are being settled?  I don't want to know the terms. I would just like to know what you're talking about settling. Unless the folks who are negotiating -- excuse me.  I'm sorry to interrupt you.  Unless the folks who are negotiating this have an objection to that, in light of the fact that you are negotiating.  And again, I don't mean to interfere with any of that.  I just, as we start to talk about how this is -- how this could unfold, I'm just curious.  I want to make sure I -- to the extent that I'm able to be told and we can discuss it, just what it is that would be settled?

Does anyone have an objection to that?

MR. PITTA:  Your Honor, it's Thomas Pitta of Emmet, Marvin & Martin on behalf of Sagi Genger.  We would have no objection to the trustee discussing the nature of their claims that he would be settling in connection with a potential settlement with Sagi and his mother and other parties.

THE COURT:  All right.

MR. LABOV:  And Your Honor, this is Paul Labov of Foley on behalf of Dalia Genger, the mother.  And again, we have no objection as well.

THE COURT:  Okay.

MR. OSWALD:  Likewise, Your Honor.  Frank Oswald for Togut on behalf of Arie Genger.

THE COURT:  All right.

MR. CAVALIERE:  Okay.  All right, Your Honor.  It's Rocco Cavaliere.  Does anyone else -- I'm sorry.  Does Mr. Herschmann or Mr. Gartman want to speak as to their particular roles?

MR. GARTMAN:  Your Honor, Chris Gartman from Hughes Hubbard & Reed on ADBG LLC.  We have no objection either.

THE COURT:  All right.  Great.

All right.  Mr. Cavaliere.

MR. CAVALIERE:  Okay.  So let me start, I guess, with the -- I'll start with the proposal we've been working on for a longer period of time, because it was one that was started -- it was consummated, frankly, by the first trustee, that dealt

with the following forms of -- or assets and claims and so forth.

It addressed a resolution, and it's continued to evolve, and there's some differences, and I can't get into all of the consideration, obviously, but the initial proposal, which has now been improved, deals just globally with a resolution of the thirty-two million-dollar fraudulent conveyance action, provides some resolution with respect to the homestead that the debtor and Mr. Herschmann own jointly in Texas, and also addresses how to handle various claims that may exist that the estate might have against certain parties in the Sagi group.  So that's, kind of, the basket of types of issues that are being dealt with in that proposal.

With respect to the Sagi group proposal, that also has --

THE COURT:  And excuse me.  I'm sorry.  I'm sorry. Before you go there, pardon me.  It's the judge, and again, I apologize.  Just now, the thirty-two-million-dollar fraudulent conveyance, when you're talking about resolving that, that resolves what?  The estate's claims or the claims against the -- what is it that's being resolved on the thirty-two- million-dollar fraudulent conveyance?

MR. CAVALIERE:  Well, Your Honor, it's the estate's rights with respect to the potential recovery of fraudulent conveyances that were allegedly made to the Broser group, as

well as potential recovery that the estate might have in those Trump notes that have yet to be paid.

THE COURT:  All right.  And so the parties to this settlement would then include those parties with The Trump Group and all of the potential claimants?

MR. CAVALIERE:  The transferees of those actions and any parties that receive liens on the Trump notes would be the parties that would be, I guess, resolving with the trustee their potential -- the potential avoidance of those claims by the trustee.  So those are the parties that would be included in the settlement agreement.

There would need to be, just like the last -- the issues will then evolve, frankly, into whether the settlement with this group will allow for -- based on Second Circuit decisions -- to allow these claims that the trustee's releasing to provide a release of any other claims or derivative claims or duplicate claims that may exist as it relates to the fraudulent conveyance action.

THE COURT:  And just -- and again, and forgive me, because I'm just not clear on some of these things.  The 42 (sic) million dollars, there was a settlement that was arrived at with The Trump Group, right, and The Trump Group has two notes that they've -- they have 15 million dollars' worth of -- two 7.5-million-dollar notes have been provided, and there was another 17 million dollars in two pieces, right?  Am I correct

on that?

MR. CAVALIERE:  Yes, that is correct, Your Honor.

THE COURT:  All right.  And so you, as the fiduciary of Orly Genger's estate, you're looking, and you're saying that Orly Genger, that there were fraudulent transfers out of the estate which you seek to recover, or alleged fraudulent transfers?

MR. CAVALIERE:  That is correct.  That would be one of -- that would be a cause of action that we believe exists, may exist, that the debtor's estate owns.

THE COURT:  Okay.  And so it would be the estate's position that those funds, the funds that you would seek to claw back, were Orly Genger assets?  Is that right?

MR. CAVALIERE:  That is correct.  Certainly if we were to bring -- pursue a complaint, then certainly for purposes of our settlement discussions we are taking the position that those are Orly's funds that would have been fraudulently conveyed.  But there's, just to be -- obviously there's certain risks and objections.

Certain parties have different views as to whether those monies belong to Orly individually or belong to the Orly Genger Trust, or separately, the Genger litigation trust, because there's a dispute as to whether the debtor, in 2012, assigned whatever rights she might have in these shares of TRI, the company that was formed by her father, Arie, that to the

extent that she'd have future rights, and then a year later, as it turns out, there was this settlement agreement that was crafted with The Trump Group, and she ultimately received some settlement proceeds.

But prior to that period of the settlement, she did, apparently, assign her rights.  So there's a dispute with respect to whether the trustee will ultimately be successful in pursuing those fraudulent conveyances.  And that's one of the issues that Your Honor will need to address as part of the -- if we were to pursue a settlement, that would be a gating issue that Your Honor will have to address as part of a settlement motion approval.

THE COURT:  All right.  And under this settlement agreement, the transferees of the thirty-two million dollars, or those who give something back, are then going to get releases from the estate?

MR. CAVALIERE:  That is correct, Your Honor.  We would provide whatever releases we can provide as an estate, and consistent with, as most parties -- most defendants, as you know, Your Honor, want the broadest releases possible. Whatever other releases we could provide under Second Circuit law, we would certainly attempt to provide if this is the proposal that we -- if we go down this path and choose this proposal for purposes of settlement.

THE COURT:  All right.  And then the homestead, that's

just a homestead exemption, that's what that's about?

MR. CAVALIERE:  There is -- it's a jointly owned property between the debtor and the husband -- that's Mr. Herschmann -- and so there is some equity that exists above and beyond the exemption, Your Honor.  And we would be working -- we would be settling that equity, so to speak, with Mr. Herschmann, just consistent with what he was providing before, in the sense of he was providing consideration before.  I can't speak to what he's providing now but would be providing cash to essentially buy out that equity, with the debtor waiving any exemptions as well as further value to the estate.

THE COURT:  All right.  And that, the marital property, that's in the apartment in Austin?

MR. CAVALIERE:  Yes, that's correct, Your Honor.

THE COURT:  All right.  And then I think you said you're resolving estate claims, or maybe -- what is the Sagi part of -- that piece to it?  The last piece to it.

MR. CAVALIERE:  So yes.  The last piece of this one was that there are certain claims that the estate may have against certain members of the Sagi group, and this settlement, which is, I guess, somewhat different.  I can't get into how it's -- the differences -- but the last proposal -- which is not a surprise, so that just everyone's aware of -- had anticipated the pursuit of those claims on behalf of the trustee by Kasowitz Benson, where, while I can't get into all,

it's not necessarily -- that's not necessarily what's going to happen if we go down this path with the Herschmann-Broser group, but it is a concept that will allow for these claims to be prosecuted by a third party for the benefit of the estate.

THE COURT:  All right.  Okay.  And then the other proposal that you've been looking at?

MR. CAVALIERE:  Sure.  The other proposal would contemplate an assignment of the estate's rights in the fraudulent conveyance action to the Sagi group and for certain value upfront, with additional value to be provided to the estate to the extent that the Sagi group was successful in pursuit of the fraudulent conveyance action.

The proposal also provides that the Sagi group would then -- if this transaction were to be determined by the trustee to be in the best interest -- would essentially tie any and all recoveries in this estate to that recovery.  So if the Sagi group is successful after the assignment, they would provide, as I said, a lump sum amount to the estate, and whether they're successful or not, the estate would keep it. And if they're successful, they would provide certain consideration back to the estate, and they would keep the balance.  And the balance of those monies that they keep would be applied to their claims.

And if they're not successful, they wouldn't necessarily come back to the bankruptcy estate.  The bankruptcy

estate, essentially, would be left with a smaller number of creditors, and in addition it would essentially resolve all of the various litigations with mutual releases between the trustee, on the one side, and the Sagi group parties on the other.

In addition, it would also provide for a full discharge for the debtor, Orly Genger. The three discharge actions would essentially be dismissed, so that she would be given a discharge. Again, the only recoveries that they could receive would be from that thirty-two-million-dollar avoidance action if they were successful.

THE COURT: All right. And what you were saying is you think that by May the 15th you will have a decision, and you'd be filing the motion within a week or so, maybe a little longer, a week or ten days later, and you'd be looking for a return date in late June or early July?

MR. CAVALIERE: Yes. That is correct, Your Honor.

And in addition, I also did want to add just briefly, we do also have the issue of scheduling on the motion to dismiss filed by Sagi Genger. In my view, it would make sense to have those, the hearing on both at the same time, as opposed to having the motion to dismiss before any hearing on a motion to settle. So that's certainly something we can talk through. I haven't even given Mr. Pitta a chance to speak to it, but I think, in the natural order of things, it would make sense for

the hearing to take place at the same time.

And lastly, because, as I just noted, some or all, depending on what proposal we go down -- I mean, which path we go down -- some or all of these litigations that are pending everywhere, in every court in New York, will be resolved, potentially some or all of them.  And so therefore, to the extent there are any deadlines that are with respect to -- in a couple of cases, objections to remand that the trustee might need to file.  And also there's obviously the pending discharge actions and the constructive trust actions and when do parties file answers on those things.

I would respectfully request that the Court just maintain the status quo for the time being, allow this process to play out, allow us to file a settlement motion, allow us to hear either approval of the settlement motion -- well, either we bring a complaint or we prosecute a settlement motion, and at the same time, have a hearing on the dismissal motion.

And at that point, we'll have a clearer picture of where things stand as to whether we should proceed with litigation on a number of different matters in all these other courts that were described in depth in that chart that we provided to the Court.

THE COURT:  All right.

MR. CAVALIERE:  So with that said, Your Honor, unless Your Honor has any additional questions, I'm happy to cede the

floor to any other party that wishes to be heard.

THE COURT:  Well, before you do that, so your proposal is that you'll file -- you will have resolved your discussions by the 15th.  You'll file your motion by the 22nd or 26th or thereabouts.  As I said before, return date in late June, early July.  And that's on settling with one of the groups.

MR. CAVALIERE:  Correct, Your Honor.

THE COURT:  Now, depending on which group you go with -- it could be either group -- the discharge litigation may or may not be resolved, right?

MR. CAVALIERE:  That is absolutely correct, Your Honor.  The discharge actions would only get resolved as part of one proposal, not the other proposal.

THE COURT:  And you're also saying, then, that what you would suggest is that we would schedule -- move forward on the motion to dismiss?  If the proponents of the motion to dismiss are not part of the group that's settling, you would say file that motion as well?

MR. CAVALIERE:  Well, that motion has already been filed on April 26th, presumably --

THE COURT:  Well, I'm sorry.

MR. CAVALIERE:  Yes.  If the Sagi group --

THE COURT:  I'm sorry.

MR. CAVALIERE:  Yes.  I'm sorry.  Go ahead, Your Honor.  I apologize.

THE COURT:  No, no, no, no.  It's my mistake.  Go ahead, please.

MR. CAVALIERE:  Okay.  So obviously if the Sagi group is the group that -- and I'm sorry I wasn't clear before.  I apologize.  If the trustee were to pursue the proposal with the Sagi group, part and parcel of that settlement would be a withdrawal, or potentially an adjournment until a later period of the dismissal motion.  We wouldn't have to hear the dismissal motion at the same time.  The only time that we might -- that I assume Mr. Pitta will speak on this point -- he would press and want to hear the motion to dismiss -- is if we decided to choose the other proposal.

There is argument to be made we should actually have a hearing on the settlement with the other side before the hearing on the motion to dismiss, but just to be fair and as objective as possible, we do acknowledge that there's been a long period here where the Sagi group has been waiting to have their motion to dismiss heard.  So in just trying to be as objective and fair as possible, if we were to go down that path, I mean, we, certainly, as the trustee, it's, frankly, Your Honor's decision as to how Your Honor wants to control the calendar.  But we would certainly have no objection to having the hearing in that particular circumstance at the same time as the hearing on the settlement to approve with the other group that the Sagi group is adverse to.

THE COURT:  Okay.  And your thinking would be that I could approve this settlement and then dismiss the case?

MR. CAVALIERE:  No.  I would think that if -- my thinking would be -- I mean, if it was up to me, Your Honor, I would prefer not to have it on the same day.  Presumably, if Your Honor were to approve the settlement, Your Honor would deny the motion to dismiss.

I'm not suggesting that I believe the motion to dismiss has merit.  I'm just suggesting that a party has a right to be heard on their motion, and that's all.  I was trying to be objective in that regard.  But we certainly would be -- if we were to pursue a settlement with the Broser, Arie Genger, and Herschmann group, we would obviously, by definition, be filing an objection to the motion to dismiss and have that heard at the same time, with the possibility, then, I guess, if we did it this way, that the settlement would be denied by the Court, and also Your Honor would have to determine whether to keep the case and allow us to eventually pursue these actions and keep the case open for further administration, or if Your Honor's determined on that day that Your Honor's heard enough and wants to dismiss the case, then Your Honor certainly has the ability to do that as well.

THE COURT:  Under the first proposal, where, essentially, what the trust is doing and trustee is doing is settling the debtor's claim to the thirty-two million dollars

and addressing the liquidation of the claims against the Sagi parties and then dealing with the homestead, what about the other claims in the case?  At the end of that, they're all just allowed claims in the Chapter 7 case?  What happens to those?  What happens to the folks who think they have claims against the estate?

They've filed them.  I understand that.  Is the trust -- the trustee is then looking at it and saying that resolves the case?  There's nothing left to do.  Or there's still have to go and look at the liability side.  We've been looking first at the asset side and then the liability side. Is that the way to look at that?

MR. CAVALIERE:  Yes.  We would still need to do a claims reconciliation and potentially object to certain claims. So there would still need to be work to be done to clean up the claims register.

In particular, as an example, Your Honor, just by way of example only, let's just take Sagi Genger as an example.  He has a judgment for 3.2 million dollars.  He's filed a claim for about twelve million dollars, because there was a footnote in the Judge Forrest decision that suggested that the most money that Dalia Genger could ever receive from her children was twenty-four million, and because of an agreement reached in 2004 between Sagi Genger and Dalia Genger to provide her with support and then with the separate agreement between Sagi

Genger and Orly Genger, the debtor, to provide fifty percent of any payment to -- or any obligation -- fifty percent of that obligation would be covered by Orly.  And a court determination with respect to the judgment was, as I said, 3.2, but with the footnote that Mr. Genger has taken it upon himself to file a claim for 12 million dollars, we're not so sure that that's appropriate.

We're also investigating possible counterclaims that may exist that were pending in one of those state court matters that are currently pending.  And so that would be part of the claims resolution process, determining whether that claim is valid.

There have been various allegations as well by the Arie Genger/Herschmann group side of malfeasance and fraud and things of that nature, which could then give rise to if the trustee determined, after we investigated it further, potential equitable subordination of that claim.

And then you have the claims of Dalia Genger, who does not have a contract claim necessarily against the debtor, but she's now raised in a constructive trust claim, so we would need to address that and have that claim -- file a motion to dismiss that claim.

And there's also the Orly Genger trustee that has filed a claim for alleged breach of fiduciary duty by Orly in her capacity as a beneficiary of the Orly Genger Trust, because

she had obtained standings at various points in the circuit court actions to take certain actions on behalf of the trust. And there's now a dispute as to whether her actions gave rise to a breach of fiduciary duty. That's a large claim. We would need to take a position.

So no questions there's still work to be done. We have started the analysis of the claims of the Kasowitz Law Firm of Mr. Herschmann, and also we've started the analysis, as well, of the Arie Genger claim. So we're moving along with respect to certain of the claims, but the other claims are more in the nature of potential litigations that would need to be had before the Court -- after a settlement is approved with this group, with the Broser, Arie, and Herschmann group.

THE COURT: All right. Who is representing -- on the phone -- who is representing Orly Genger?

MR. GERON: Your Honor, it's Yann (skip in audio).

THE COURT: I'm sorry?

MR. GERON: This is Yann Geron. I'm on the line, and I represent Orly Genger. My firm represents (skip in audio). I'm on the line.

THE COURT: Okay.

MR. GERON: My name is Yann Geron, Your Honor, and I represent Orly Genger.

THE COURT: Thank you.

MR. GERON: My firm represents Orly Genger.

It would be logical, I think, if Your Honor would permit, for me to present next.

THE COURT:  Yes.  That's why I asked.  So, please.  Go ahead.

MR. GERON:  So again, Yann Geron.  Thank you, Your Honor.  So again, Yann Geron from the firm of Reitler Kailas & Rosenblatt.  We represent Orly Genger in the case in New York that transferred to New York.

Let me start with a couple of observations.  One, obviously we cannot object, and we do not object to the trustee's request for further time, and applaud, I think, her efforts to settle as many of the underlying disputes as possible  We encourage her, and we have been working with her, I think, indirectly, and to some extent directly, to arrive at an artful and strong settlement, which would resolve as many of the underlying matters as possible.

We had hoped that the trustee would be in a position today to announce the direction she would be taking in terms of a settlement and then be able to proceed with a lined up 9019 motion.  We're not far from that, as I gathered from Mr. Cavaliere's presentation, but it still seems like we have a little bit of distance to cover.  Obviously we thought we were further along the way on this.

In any event, we can't argue with the trustee's need to make certain that she is taking the correct side on the

settlement and that she'd fully consider, in this particularly complex case, the 9019 process and the prospective objections that will be faced either way, either direction that she goes.

We also really can't object to the trustee's efforts to minimize the litigations that are surrounding this case that are both in the court in the four adversary proceedings that are pending and outside of the court in matters that appear to be stayed at this point.  And we support the trustee's request that those adversary proceedings, and those -- obviously the secondary litigations -- all be stayed.

Where we do disagree, Your Honor, and we strongly do disagree, is on the treatment of the motion to dismiss, the proposed treatment of the motion to dismiss.  We would submit to the Court that the motion to dismiss should be held in abeyance like all the other litigation, pending the trustee's prospective 9019 motion.  I have a number of reasons that I would present to the Court for your consideration.

The first is substance based.  The motion to dismiss -- one would expect the debtor to say this -- but we strongly believe that it is baseless and that it's really just a sideshow.  The new motion, as it was remade just a couple a of weeks ago, less than a couple of weeks ago, has no less than 200 pages of exhibits, and most of them, or many of them, anyway, are, having unilaterally redacted by the movant, so that we can't see or evaluate them.  The redactions say that

they would make those documents available to Your Honor in camera, which is fine for the Court but makes it very difficult for us to even evaluate the motion.  So what we're left with is a series of allegations of grievous harm and terrible conduct, but all of that, all those allegations, are largely hidden behind unilateral redactions.  So we can't even evaluate the motion at this point.

        But it leaves us with the impression that this is a kitchen sink full of baseless allegations and that we shouldn't give them air, and we ask the Court to not give them air at this point.  If it becomes germane later, after the 9019, then they should be given air.  But at this point, it doesn't make sense.

        THE COURT:  Well, you've had a chance --

        MR. GERON:  One noted --

        THE COURT:  I mean, excuse me.  I'm sorry.  It is the judge.  I'm sorry to interrupt you.  I mean, you've had a chance to read the -- isn't the motion on file?

        MR. GERON:  Yes, Your Honor.  The motion itself is on file.  I meant the exhibits.  There are a series of exhibits.

        THE COURT:  No.  No.

        MR. GERON:  2 --

        THE COURT:  No, and I appreciate -- I'm sorry to interrupt you, Mr. Geron.  I appreciate that.  I looked at it and had a similar experience as I read through it.  But there

are -- there are some redacted portions.  It's not substantial.

And there's certainly documents that have been indicated that

they're redacted, but they identify the documents, I think.

In any event, my point is that while there's

certainly, and I'm not suggesting this would be the way it gets

litigated.  I'm not suggesting that at all.  All I'm saying is

that while I appreciate the fact that you are at a disadvantage

if you don't have an unredacted document, you're not completely

in the dark either as to what they are saying and what their

theories are.  And I'm not sure that it's really different than

what was already filed.

MR. GERON:  Understood, Your Honor.  I think there's a

concern that I have, and I've voiced it since I got involved in

the case in the first place, which is that the way this is

lining up, if the motion to dismiss proceeds, we are going to

get involved in a host of discovery disputes.

First, there's the redactions and how to deal with

them.  Next, there are already subpoenas that have been issued,

and there are threatened subpoenas that will be issued, all in

connection with the motion to dismiss.

In response, obviously the debtor would take a

position that there have been at least a year's worth of post-

judgment discovery that's been had.  A lot of that discovery is

attached.  At least two of the -- I think two or three of the

transcripts are attached to the motion to dismiss, so there's

already been discovery.  There's been years of discovery before the judgment was entered.  So I think that what we can anticipate is that if the motion to dismiss were to go forward, we would have no end of discovery disputes even before we got to the merits on the motion to dismiss.  So the concern is purely procedural and a waste, I think, I would submit, a waste of effort, particularly because the 9019 --

Well, let me just add one more thing on the discovery side, which is there are -- the claims in the motion to dismiss are really based in two issues -- really, essentially, two issues, which was that there were some assets that should have been disclosed, at least arguably, by Sagi, should have been disclosed on this bankruptcy schedules.  And again, arguably, by Sagi, were not disclosed on the bankruptcy schedules.

And two, again, in connection with the motion to dismiss, that this is a close-knit two-party dispute that doesn't belong in the bankruptcy court.

Well, as we just heard from Mr. Cavaliere, in terms of the claims picture alone, we have a significant number of claims, not the least of which is Sagi's own claim, which is significantly more stated than the judgment itself.  And then there are a host of other claimants who have filed claims, all of which means that this -- and clearly demonstrated this debtor is entitled to at least a shot at her discharge.

And two, that the schedules themselves, as a matter of

fact, do disclose the claims at issue.  They disclose them as being contested by the debtor.  The reason I bring that up is because the motion to dismiss really is nothing more than an attack on discharge and should be considered in the context of discharge, that if the debtor didn't list assets, and if she didn't do them intention -- if she neglected to list those assets intentionally, with the intent, the requisite intent, then this should be a 727 matter as an adversary proceeding. It should not be in the context of dismissal.  And I think the argument that's being made for dismissal is really just an effort to sidestep the 727 adversary proceeding process, which would be organized and which would have its own limited correct discovery, and its own limited correct timing.

Bringing it now, in the context of dismissal, just will bog us down into a discovery quagmire that has nothing to do -- that will be to the side of the fact that we have a 9019 that the trustee is trying to line up.

Now, in terms of the 9019, what occurs to me, anyway, Your Honor, is that the trustee, it doesn't really make sense to have the motion to dismiss proceed in parallel with a 9019, and I, respectively, don't understand exactly what the trustee -- why the trustee would want that to happen.

If the 9019 is granted, as the Court was just discussing with Mr. Cavaliere, then the motion to dismiss would presumably be moot.  If the 9019 is denied, then maybe there's

another settlement that the trustee would like to pursue, or there's the fraudulent conveyance litigation that the trustee would want to pursue.  Either way, the 9019 needs to be explored without the specter of dismissal.

The dismissal won't fit into this process and will be wasteful in this process if we line it up.  If the trustee is anticipating potentially having dismissal coincide with one of the settlements as outlined, the Sagi settlement, as he is outlining -- as Mr. Cavaliere is outlining on behalf of the trustee, if that's the anticipation that somehow once that settlement is approved there would be some form of dismissal, then the trustee should have the burden to make her own motion to dismiss in connection with her own 9019.  It should not be dovetailed with a motion by Sagi, which is really an objection to discharge.

So from the debtor's perspective, respectfully, Your Honor, we would -- we're fine -- I mean, we can't really argue with the trustee's timing.  We understand the trustee's timing. We understand that she is doing the very best she can under the circumstances.  We would have hoped that the settlement was aligned now, but so be it.  We'll work with her, continue to work with her in any way we can.

By the way, just as a quick careted note, the Sagi settlement, one of the terms that was described just now to the Court is that the proposal would be that somehow Orly would get

her discharge.  I have to just confess to the Court that we have -- I, at least -- my firm has not been part of the Sagi settlement discussion.  So I hear it.  I understand it.  But I have not been part of it.

Back to the proposal.  It seems that what really ought to happen at this point -- the most expedient, the most efficient process to move forward -- is let's abide the trustee's requested timing with a motion to be made in, say, the 22nd of May, the 25th of May, something like that.  Let's get a hearing in early July or late June to approve that settlement.  Let's get some discovery going just about the 9019.  And if the Court would so have it, perhaps have a discovery conference at some predetermined date to let the parties come back on just discovery issues that only deal with 9019.

THE COURT:  All right.  Does anyone else wish to be heard from the -- I'll call it the --

I'm sorry.  Go ahead.

MR. CAVALIERE:  Your Honor, Rocco Cavaliere.  Just to briefly respond.  I just want to clarify.  I think I, as I indicated earlier, it would obviously be the trustee's preference that the hearing on the motion to dismiss take place after either of the settlements that would be heard at a settlement hearing.  It would make more sense.  But we are trying to be objective as well, and that's the only reason I

pointed out that we would be -- we wouldn't object, certainly, to the extent the Court thought it was appropriate to have a hearing on both issues at the same time.

So I just want to clarify for Mr. Geron. I don't necessarily disagree with him that it makes sense, but I, at the same time, was not going to necessarily strenuously object to Mr. Pitta's request, or if Mr. Dellaportas is making that request, to have it heard at the same time.

I would certainly object if they would attempt to have a hearing on a motion to dismiss before any approval, any opportunity to have a pending settlement motion approved by the Court.

So I just wanted to clarify so the parties understood what the trustee's position was with respect to this.

THE COURT: All right. Thank you. Could I hear from any -- the way I see this is that we've got two camps here, and I'm not -- in describing it this way, I don't mean to sound like I've made any determinations on one thing or another, but anyone else? I've heard from the debtor. There are those who are party to the proposal with the trustee who are aligned with the debtor. Do any of those folks want to be heard with respect to the trustee's proposal?

MR. OSWALD: Your Honor, this is Frank Oswald of Togut, Segal for Arie Genger. As you know, we did submit, as part of the letter with Mr. Geron and Mr. Gartman's client, Mr.

Herschmann, a joint collective position statement.

THE COURT:  Yes.

MR. OSWALD:  I echo the views of Mr. Geron, and I, too, thought that when we started the hearing today there would have been an announcement regarding a global settlement with our side.

Nonetheless, representing a trustee myself for thirty-four years, I understand the trustee feels obligated to fully consider all the proposals, but certainly at this point, fifteen years of litigation, as I said at the first conference, I think this Court is ideally suited to resolve many of the issues.  Maybe not every issue, but a lot of the issues, including some of the ancillary claim issues that have been raised in that letter.

We do look forward to the trustee making the decision promptly.  We hope that the settlement that we were discussing up and through this weekend comes to fruition and that the 9019 should be brought on quickly.

I share Mr. Geron's concern.  It sounds like the Court had the same concern with regard to the documents. Fortunately, we're not in a place where the party that files the most pieces of paper wins.  This is still a place where the substance will be looked at and determinations made on that.

So that's where we stand on it.

THE COURT:  All right.  Thank you.  Anyone else wish

to be heard that was aligned with Orly and her father?

MR. GARTMAN:  Your Honor, Chris Gartman from Hughes Hubbard & Reed on behalf of litigation funder ADBG LLC.

THE COURT:  Yes.

MR. GARTMAN:  Your Honor, I just wanted to note at the outset that obviously when Mr. Cavaliere was describing certain claims and his position on various matters, these are obviously heavily disputed issues, and so the parties to the settlement on our side would certainly reserve all rights and contest any of those factual findings.  So I just didn't want silence to be any concession of any allegations that are being made.

But it would seem to me, Your Honor, that given the status that we have here, that it would be most efficient to schedule another status conference for -- call it shortly after the May 15th date that Mr. Cavaliere is proposing, since so many of the issues flow from that proposed resolution.  And obviously every single party has filed a position statement that suggests all sorts of different ways forward.  But until we know what the trustee's proposed path forward is, it would seem to me that everything involving any of the parties should be stayed, and we should just get back on another telephonic conference relatively soon.

Obviously you have our position on everything.  We strongly believe that there are gating issues that can and should be resolved relating to the standing of Dalia Genger to

even assert any rights in this case as a result of her dismissal of claims relating to these Trump settlement proceeds, and that that could be done as a hearing prior to the settlement hearing.

So all this is outlined in our papers, and I don't want to get into it necessarily, given the current status of things, but I did just want to make that suggestion that it may make a lot more sense, before we have another twenty people stand up and say something, to just get back together relatively soon.

THE COURT:  All right.  Thank you.  Anyone else wish to be heard on that side?

MR. BOWEN:  Your Honor, this is Mike Bowen.  I'm an attorney with Kasowitz Benson Torres.  We're a creditor.  I just want to say very briefly that we agree with the position that Mr. Gartman just articulated.

THE COURT:  Okay.  Thank you.

Mr. Pitta?

Oh, I'm sorry.  Is there anyone else from that side?

All right.  Mr. Pitta or Mr. Dellaportas?

MR. PITTA:  Good morning.  Or good afternoon.  Sorry, Your Honor.  Thomas Pitta of Emmet, Marvin & Martin.

THE COURT:  Pitta.  I'm sorry.

MR. PITTA:  That's okay.  Your Honor, at the outset I would say we're happy to hear that the trustee is

consentering -- consenting the hearing on our motion to dismiss. I would point out that our motion to dismiss was originally filed in September of last year. It's been approximately, I think that makes it eight months since it was filed. We believe it's appropriate for a hearing to proceed on it.

I've heard the other side of this coin say throughout here that the hearing on the 9019 motion should proceed before the hearing on the motion to dismiss. I would just point out that there is no 9019 settlement, and this case was transferred here in December of last year. We're about six months into this case being in this district, and there is no settlement. So the idea that we're just going to continue to kick the can down the road, because the parties that received fraudulent transfers from the debtor don't want to have a day in court, on the premise that we should just continue holding off until a settlement has been reached that's to their liking, doesn't make a lot of sense to us.

We adopt Mr. Cavaliere's proposal that to the extent that he reaches a settlement with the Arie and Herschmann and Broser camp, that the motions could be heard simultaneously. We actually think that the motion to dismiss is a gating issue to getting to approval of a 9019 settlement to determine whether this case should be before this Court in the first place, but we would consent -- and we think, actually, a lot of

the issues would probably be overlapping.

Mr. Geron talked about the need for discovery related to the motion to dismiss and how we shouldn't duplicate that discovery if there's going to be a settlement.  One, we've had discovery that's been outstanding for quite some times.  We served discovery in Texas; received, really, no responses from the parties that are on the phone today.

We served updated subpoenas out of the Southern District of New York since the case was transferred here, and we would like to see that discovery flow, but we are prepared to proceed on the motion to dismiss in its current form.  We definitely would like the Court to make sure that parties are producing documents ahead of that, but we don't think that -- one, we think it would be quite wasteful to have this process go twice, where there'd be a motion to dismiss hearing and then separately, at some point, either before or after, a hearing on a 9019 settlement, that would have very overlapping issues. That would be a true waste.

And so we think that if there is to be a settlement with the other side of this, that a hearing on that should be simultaneous, and we think that the time has come for a hearing on the motion to dismiss.

So that is what we would seek here.

In response to a few of the things that were said by the folks who've spoken before me, in terms of claims

reconciliation, if the trustee were to settle with Sagi and the other parties to the proposed agreement with Sagi, we think it actually obviates the need almost entirely for claims reconciliation here.  The Sagi and Dalia and the Orly Genger Trust, the claims filed by all of them would be essentially dismissed from this case, and they would receive their recovery only out of litigation proceeds, and all that would be left are the parties that are all aligned with each other and that have basically all taken the position that there's nothing in this bankruptcy to recover.  And so we think that claims reconciliation would either be obviated or greatly minimized by a settlement with us.

In response to Mr. Geron's statements about the redacted motion, a couple of things along that line.  One, most of what is redacted in the motion and the exhibits are actually the debtor's documents.  It's things along the lines of her pre-nuptial agreement, her escrow agreement, her deposition testimony, and her tax returns.  There's very little in there that the debtor should not have access to.

We have not served the unredacted copies on parties, in part because we've been threatened with contempt previously in this case by Mr. Herschmann when the case was in Texas, for allegedly violating a protective order by showing documents to the Texas bankruptcy judge and the Texas Chapter 7 trustee.  So until Your Honor enters the protective order that's been

submitted and has been circulated to the parties, we would say that we don't want to serve the unredacted motion until we're told by parties that it would not be a violation of the protective order that was previously entered.

THE COURT:  Mr. Pitta.

MR. PITTA:  Again --

THE COURT:  I'm sorry.  I'm sorry to interrupt you. Are you saying that you have submitted such an order, a protective order?

MR. PITTA:  Your Honor, it's actually -- I don't believe the order has been submitted to court.  It's circulated among the parties for a signature, and there are certain parties --

THE COURT:  Oh, okay.

MR. PITTA:  -- that have -- no, yeah.  No, sorry, Your Honor.  There are certain parties that have signed it previously, either through their counsel in Texas or here, and we are awaiting signatures from the remaining parties, and have been for a while now.

THE COURT:  All right.  Well, then -- I'm sorry to interrupt you, but presumably, once that gets done, then these issues about the redaction will be moot.

MR. PITTA:  Yes.  And again, I would point out that the redactions are being complained about by a party that should have access to just about all of the underlying

documents that are being talked about here.

THE COURT:  No, I understood that the first time.  I understood that the first time, and I think probably everyone else did.  And I take your point.  But I am -- and again, I'm sorry.  I was just concerned that the logjam is with us, because we don't always -- like for the rest of you, it's not easy to get access to all the papers that are floating around.  But --

MR. PITTA:  I hope so, Your Honor.  I had phrased it that way, and I thought I had cleaned it up, but no, it is not on you.  It's not --

THE COURT:  No, no.

MR. PITTA:  It's not before you.

THE COURT:  Not a problem.  Not a problem.

MR. PITTA:  So Your Honor, where we sit here today is we have -- the trustee has agreed that, at long last, a hearing should be held on our motion to dismiss, and we think it should be, at the latest, held contemporaneously with any settlement that the trustee reaches with the debtor and the parties that we allege are the recipients of the fraudulent transfers.  And those parties are here, again, seeking to just put off their day in court.  And all we've ever asked for here was our day in court.

Finally, one thing I would note in connection with the settlement discussions that are happening is what's really

being traded here, what's being bid upon with the trustee, are the fraudulent conveyance actions.  That's the value we're talking about.  And on one side you have the creditors of this estate, who are looking to bring assets back into the estate, and on the other side you have a group of parties that are alleged creditors but at the same time are also the transferees of those assets, and so their interest is in not having them returned to the estate to be shared equally among all of the debtor's creditors, including Sagi.

And so we would suggest that the balance between the two settlements being proposed is not equal.

But where we are today, Your Honor, is we would like to have a hearing on our motion to dismiss.  We think that it's truly the only thing before the Court at this time, and has been before the Court for some time, and we would ask for a hearing approximately forty-five days from now.  I think the trustee has suggested a hearing in late June or early July.  We think late June is plenty of time for our motion to be heard as well as any motion that may be filed by the trustee by the 25th of this month.  And if a motion to approve a settlement is to be filed after that point, it's not a reason to hold off on hearing our motion to dismiss.

THE COURT:  All right.  Anyone else?

MR. PITTA:  Thank you, Your Honor.

THE COURT:  Thank you.  Anyone else from the Sagi

camp?

MR. LABOV:  Good afternoon, Your Honor.  Paul Labov, Foley & Lardner, on behalf of Dalia Genger, the debtor's mother.

THE COURT:  Yes.

MR. LABOV:  Thank you, Your Honor.  Look.  Obviously we submitted our position paper to Your Honor last week or the week before.  We'd like to see the motion to dismiss scheduled, obviously, and heard.  We think it's a gating issue.

We tried to get to a settlement, as Your Honor has heard and as you've seen in the papers -- obviously you've read them, so you know that this is a sixteen-year interfamily dispute, and that's putting in mildly.

And so while we thought we were far along with the trustee in terms of a settlement, obviously they're not there yet, and that's fine.  But that shouldn't have any bearing or effect on the gating issue of whether this was what we think is a bad faith filing.

I heard Mr. Geron talk about missing something on a schedule.  The odd thing, Your Honor, is that the thing that they missed on the schedule was exactly the thing that we're talking about now.  The irony of that is incredible.  It's a thirty-two-million-dollar claim that everybody is now talking about that was not listed on the schedule.

But even more so, Your Honor, that's just a small part

of -- and you read in the papers, so this is not a day to discuss all this, but it's just a small part of the motion to dismiss.  We think that that is indicative -- one issue is indicative of, really, the bad faith that we think -- we think and allege is easily satisfied here.

Mr. Oswald said substance matters.  He thinks substance matters in this court.  And I actually agree with him.  I second him on that.  And I think that if we got in front of Your Honor in terms of scheduling and a hearing on a motion to dismiss, all of those issues would be in front of Your Honor, and Your Honor would make a decision on those issues.

The other thing that was mentioned was the 9019 in terms of well, if we go with the Sagi group, or we go with the Arie group or the Orly group, those can be resolved, and we're done.  But really, that's not the way it will go.  Obviously it's sixteen years of interfamily squabbles.  I assume that a 9019 that gets filed will also entail significant amounts of discovery and appeals is my guess, given what's already happened in this case.  And so are we going to start down that path, with that kind of litigation strategy, when a motion to dismiss may be much shorter and end this much sooner?

So again, I won't respond to the issues on standing and all those kinds of other things that came up with respect to Dalia on the call today.  But again, we are firmly in the

Sagi camp in terms of just scheduling and hearing on the motion to dismiss.

THE COURT:  All right.  Thank you.  Anyone else wish to be heard?

MR. POLLOCK:  Your Honor, this is Adam Pollock on behalf of The Orly Genger Trust.

MR. LABOV:  Thank you.

MR. POLLOCK:  We are not exactly -- the label "Sagi camp" doesn't fit perfectly for us, but I understand it's just the Court's convenience.  So setting that aside, we have only two brief points to make here.

One is there was talk of maintaining the status quo as to the chart of actions or the actions that are in the chart that Mr. Cavaliere had submitted.  If we are going to be maintaining the status quo, we would respectfully ask that it be brief.  The defendants in our separate district court action, as I said two months ago during the last status conference, the defendants have been using this bankruptcy as an excuse to stall out that case since, I think, October.

And I mentioned that two months ago, and now two months have passed, a difficult two months for us all, of course, but I would respectfully ask that any further stay be brief in nature.  That's (a).

And second point I wanted to briefly make is about our adversary proceeding.  That was filed, I think, last October,

and served in November, and we still don't have an answer.  So depending on how the various settlement proposals get resolved, as Mr. Cavaliere was discussing, we would also want to get onto the calendar a motion in that case, given that there's been no answer.

THE COURT:  All right.

MR. LABOV:  Judge, I'm sorry.  This is Paul Labov again.  I should add that I believe the constructive trust complaint from my client was served on April 20th.  We discussed it with Mr. Cavaliere.  I think his answer is due towards the end of May, but we've agreed with him to push that back for a short period of time to see if we can get the rest of this resolved.

THE COURT:  All right.  I'm just going to put you all on hold for a second.  Just bear with me, please.

(Pause)

THE COURT:  Hi.  It's the judge.  Is everyone still there?

UNIDENTIFIED SPEAKER:  Yes, Your Honor.

THE COURT:  Okay.  Thank you.  And I apologize for having to step out for a moment.

And Counsel, you were saying, and I apologize for interrupting you.

Does anyone else want to be heard with respect to the matters we've been discussing?

All right.  Now, Mr. Cavaliere, you say you're --

MR. GARTMAN:  Your Honor.  Hi.  I'm sorry.  I was just unmuting myself, Your Honor.

THE COURT:  Oh, I'm sorry.  Go ahead.  Go ahead.

MR. GARTMAN:  That's okay.  It's Chris Gartman.  I just wanted to respond briefly, because obviously I was trying to suggest a path forward where we didn't all get into positions, but I did just want to respond very briefly to some of the things that were stated, and others --

THE COURT:  Okay.

MR. GARTMAN:  -- may want the opportunity to do that also.

THE COURT:  All right.

MR. GARTMAN:  And I'll just try to take all these very quickly, Your Honor, but this whole point about the motion to dismiss, about there being some concealing of assets, it's a complete farce, Your Honor.  The schedules list the fraudulent transfer actions that the parties that you just heard from have filed.  They actually attached copies of the first page of the complaints, and they say that there are a lot of claims that are disputed.  So this concept that the debtor is simply trying to conceal these claims is belied by the exact schedules themselves.

Second, Sagi is now apparently claiming that he's transferring assets back into the estate.  I just want to point

out that all of the members of the Sagi group, through various complaints and things that they've filed in the court as well as their pending actions in other courts, are trying to strip the estate of those proceeds and bring those litigations outside of the bankruptcy court to liquidate the claims for their own benefit.

And I will say that without going into details, I can tell you that our proposed settlement would provide substantial recoveries to the estate, with the potential for even more substantial recoveries through the pursuit of claims.  So the notion that they're giving and that we're taking is simply false.

I also just want to state that there was a lot of discussion on their end about scheduling a motion to dismiss. What I heard was that if the trustee decides to settle with them, that the motion to dismiss would be moot.  So I was simply suggesting a path forward, that there be a status conference after we see which path the trustee decides to go with, because all of these discussions may drastically change, and the resolution reached by the trustee may drastically change the way that Your Honor goes about scheduling things going forward.

Regarding the Dalia constructive trust complaint that was filed, there was an attempt to effectuate service.  That service was completely improper.  It violated Rule 4(e), which

provides that -- sorry.  Bankruptcy Rule 7004(e), which provides that the complaint has to be served within seven days after issuance of the summons.  The summons was issued on February 20th.  There was a purported attempt to serve by mail just about a week or so ago.

Rule 4(m) provides that if there is not service within ninety days of the date on which the action is commenced, that they have blown the deadline for service unless Your Honor orders otherwise.

So I just want to throw out there that there was an attempt to effectuate service, and I don't want to go into it more than that, but there is not currently, in our opinion, a deadline to respond.

And I also just want to point out as far as discovery goes, I think that the amended motion to dismiss speaks for itself.  There's 550 pages that were filed in that motion to dismiss.  It attaches --

UNIDENTIFIED SPEAKER:  I knew someone was going to object to service.

MR. GARTMAN:  -- numerous documents, Your Honor, that --

UNIDENTIFIED SPEAKER:  No.  No.  But --

THE COURT:  Could you please go on mute if you're not speaking?  Could you please go on mute if you're not speaking?

MR. GARTMAN:  Your Honor, there are numerous documents that were attached to that amended motion to dismiss that were produced in post-judgment discovery.  My client alone sat for two depositions.  This concept that we need more discovery in connection with a motion to dismiss from anybody on our side of this proposed settlement is just very surprising to me.

There have been numerous subpoenas, numerous documents produced, numerous depositions, and all of it is right there in front of Your Honor's eyes, because it's attached to the amended motion to dismiss.  So while we may need some discovery if that were to proceed, it would be very surprising to me that they need anything more from our side.

MR. CAVALIERE:  Your Honor, if I may be heard?

MR. GARTMAN:  That's all I have.  Thank you.

MR. CAVALIERE:  Your Honor, Rocco Cavaliere, Tarter Krinsky.  Just briefly on the constructive trust action with respect to the service of the complaint.  I was approached by Mr. Labov to accept service by email, and in furtherance of just the objective approach of this case that we're taking with talking to both sides, I had agreed that he can serve the complaint by email, but I certainly did not waive any defenses to the extent that, as Mr. Gartman pointed out, if the summons was not properly issued or if it was served after the day required under Rule 7004(e), then certainly the same defenses would apply to my client.

So I just wanted to point that out.  I didn't address those types of defenses in just trying to be accommodating, because I was told that they would be mailing it, so they would mail it.  And I said okay.  I could accept it by email if you intend on mailing it.

So again, the trustee's defenses in that regard are preserved.  I just wanted to state that for the record.  Thank you.

UNIDENTIFIED SPEAKER:  Your Honor.

MR. GARTMAN:  Again, Your Honor, just one more thing.  I'm sorry.  So regarding the constructive trust complaint, I would like to hear from Dalia's counsel whether they intend to pursue that claim, because the last time we were before Your Honor they said that it was filed as a means of preserving some statute of limitations and that they didn't intend to proceed with it.  So I would like to understand what the attempt to effectuate service was about, and if they intend to proceed.

I will tell you, I have no idea on earth how they believe that they have complied with any statute of limitations, since the complaint seeks a constructive trust over proceeds that they allege belong to Dalia Genger as a result of a 2004 divorce settlement, when there is a six-year statute of limitations for a constructive trust claim.  So even if they --

MR. LABOV:  So --

MR. GARTMAN:  -- are basing their claim on a Trump settlement, they blew the deadline by about seven months, Your Honor.  But it seems to me that they've blown the deadline by fourteen years, and this is just another bad faith litigation tactic that, frankly, we shouldn't even have to spend the money to respond to.

MR. LABOV:  So Your Honor, this is Paul Labov.  I'm happy to jump in here.  I'll just make a few quick points, because this is just a status conference.  This is not an adversary proceeding where we're arguing our claims.  And please don't take the lack of aggressive attitude or tone as agreeing or schluffing off what Mr. Gartman said.

First, I'll start with the fact that I think pretty much if you serve these things you understand that his recitation of Rule 7004(e) and that you must serve the complaint within seven days of the summons being issued is simply incorrect.  You've got to go to -- you actually have to go to Federal Rule and then 4(m), I believe.  But again, that's an issue that we can discuss.

I will also ask, now that Mr. Cavaliere and Mr. Gartman have spoken up, given the current environment, whether you will accept service of the complaint.  Given what's going on, I think that's probably a reasonable thing to do, of course, but I'm asking now whether you will do that.

And then finally, with respect to the actual substance

of the complaint and what we intend to do, well, that's the subject of litigation, and so I'm not going to go into that now, other than to say of course we disagree with your characterization of the statute of limitations.

(No audio for forty-eight seconds)

UNIDENTIFIED SPEAKER:  Has everyone hang up?  I didn't really.  It's what?  It's -- well, I can't hear them.

THE OPERATOR:  Hello.  Can everyone hear me?

ALL:  Yes.

UNIDENTIFIED SPEAKER:  Yes, I can hear you now.

UNIDENTIFIED SPEAKER:  Something happened before.

THE OPERATOR:  Okay.  Something is going on with the system, so I'm going to ask everyone to hang up and go back in.

UNIDENTIFIED SPEAKER:  Bye.

ALL:  Okay.

(Pause)

THE COURT:  All right.  Do we have everyone back on?

UNIDENTIFIED SPEAKER:  Yes, Your Honor.

UNIDENTIFIED SPEAKER:  Yes, Your Honor.

THE COURT:  All right.  Thank you.  All right.  We'll give everybody just a couple of more minutes.

All right.  Look.  I don't want to get into service and issues like that.  You want to get on the phone with one another and work that out, that's fine.

This is what I'm going to do.  I'm going to adjourn

this status conference to May the 21st at 2 o'clock.  By then Mr. Cavaliere will have determined which way he's going to go, if any way --

THE OPERATOR:  Your Honor?

THE COURT:  -- as far as --

THE OPERATOR:  Your Honor?

THE COURT:  Yes.

THE OPERATOR:  I'm sorry.  We have to activate the hearing bot (ph.) before we proceed.

THE COURT:  Okay.  Then do it, please.

THE OPERATOR:  Yeah.  Just give me a minute.  Hold on.

(Pause)

THE COURT:  Okay.  So we're going to adjourn this to the 21st.

Mr. Cavaliere, when you've decided -- when the trustee has decided as to what route she plans to pursue, if any, are you prepared to share the agreement before you file it with all of the parties on this call, or do you want to file it first?

Mr. Cavaliere?

Can you folks hear me?

UNIDENTIFIED SPEAKER:  We can, Your Honor.

UNIDENTIFIED SPEAKER:  Yes, Your Honor.

THE COURT:  All right.  Mr. Cavaliere there?

MR. CAVALIERE:  Oh, Your Honor.  Your Honor.  I apologize --

THE COURT:  Yes.

MR. CAVALIERE:  -- Your Honor.  I was on mute for some reason.  Okay.

So to answer your question, Your Honor, if the parties believe it would -- I think it would be productive.  The purpose of the May 21st conference --

THE COURT:  No.  You know what?  I'm sorry to interrupt you.  Here's what we're going to do.  You're going to make your decision by the 15th.  You're going to file your motion.  Whatever route you're going to go, you're going to file it by 20th, and we're going to have a conference on the 22nd, so people will have an opportunity to see it.  They'll see your motion.  And on the 22nd we'll have a conference.  We'll know which way you're going.  If we have to then talk about teeing up the motion to dismiss, we can do that then.  Seeing what's in the motion and then address these things.

All right?  You can live with that?

MR. CAVALIERE:  Yes, Your Honor.  If I could have till the 21st?  I mean, this is obviously, as I think one of the parties mentioned -- Mr. Labov mentioned -- either settlement will be hotly disputed, and so therefore we will certainly do as fabulous a job as we can with respect to this motion.  This motion will not be fifteen pages.  This motion will be thirty pages.

So assume for the moment that I have a deal on the 15th.  If I could just have till the 21st to just file the motion as early in the day as I can, that'll give everybody an opportunity to review the settlement agreement that'll be attached thereto.  So that'd be the only --

THE COURT:  Okay.

MR. CAVALIERE:  -- wrinkle.

THE COURT:  And then --

MR. CAVALIERE:  I would ask for that extra day, if possible.

THE COURT: All right.  That's fine.  That's what we'll do.  You'll file your motion.  We'll have a conference call at 2 o'clock that afternoon.  That's on the Friday.  And we'll see where things are.  Okay?

MR. CAVALIERE:  No problem, Your Honor.

THE COURT:  So that's what we're going to do.

MR. CAVALIERE:  Thank you very much, Your Honor.

MR. HERSCHMANN:  Your Honor?

THE COURT:  And what I would ask --

And just let me finish, please.  It's the judge.

What I would ask is that we continue to hold everything else in abeyance until that time.  I know there are other things that need to be discussed.  But I would ask also that those of you who are on the phone and raising the issues as far as the constructive trust litigation, et cetera, please

try to address that offline, and see if you can work that stuff out.

Now, someone wanted to be heard, and I interrupted him, and I apologize for that.  But please go ahead.

MR. HERSCHMANN:  I'm sorry, Your Honor.  It's Eric Herschmann.  And I just want to --

THE COURT:  Yes.

MR. HERSCHMANN:  -- focus on the one issue that just relates to me personally.  And I have --

THE COURT:  Yes.

MR. HERSCHMANN:  -- submitted a letter to the Court yesterday, and I know Mr. Dellaportas responded, but I ask that the Court consider the relief that I requested that is very targeted.

THE COURT:  I'm --

MR. HERSCHMANN:  It is --

THE COURT:  I'm sorry.  Excuse me.  I didn't see the letter.

MR. HERSCHMANN:  Okay, Your Honor.  So there were a -- after I received -- as Your Honor recalls, in the March 4th conference we discussed whether or not the investigator had illegally obtained any information about me.  And at that conference, Mr. Dellaportas, even with his client sitting in the courtroom, said that there was no such a report.  It had not happened.

I then wrote an email to Mr. Dellaportas laying out certain facts and information about what had transpired, and he wrote back a very long letter, but within the letter did acknowledge that, in fact, they do have an investigator report, contrary to what they represented to Your Honor and what they had been representing to us, that he's been in possession of it for an extended period of time. And then I asked for specific relief. And it's on docket 240, Your Honor, from yesterday.

Mr. Dellaportas then stated in a response letter to Your Honor that he, in his words, he was unexpectedly asked about the issue of the investigator having a report on me, and I also challenged whether or not there was actually a criminal investigation in Israel, because he had previously claimed that obtaining my travel and banking records would be commonly available.

Late yesterday evening when I received -- or it was late yesterday afternoon when I received Mr. Dellaportas response to Your Honor, I actually had received just before that a response from the State of Israel Ministry of Public Security, which is the agency that oversees all law enforcement in Israel. And in that letter they make clear that there is an ongoing criminal investigation that's being conducted by the Israel National Police regarding the invasion of my privacy by the Fraud Crimes Unit of the Central Unit in Jerusalem District Police. The Jerusalem District Attorney's office and the

Investigation Division are all working on it.

They also confirmed that it is proceeding with senior officials involved, and it's on their timely schedule to continue it.  And the relief that I sought --

THE COURT:  And so the -- excuse me.  I'm sorry.  Mr. Herschmann, excuse me.  If you'd just run that by me again?  That there is -- there is an --

MR. HERSCHMANN:  Sure.

THE COURT:  There is an investigation being conducted in Israel?

MR. HERSCHMANN:  Yes.

THE COURT:  Being conducted of you?

MR. HERSCHMANN:  No, no, Your Honor.  No, it's being conducted of Sagi Genger and his investigator --

THE COURT:  Okay.

MR. HERSCHMANN:  -- and others.  And that was premised on --

THE COURT:  So okay.

MR. HERSCHMANN:  Previously they had denied that there was any investigative report done concerning me and denied that it existed.  Mr. Dellaportas made a representation to Your Honor at the March 4th hearing.  He said that there was nothing other than the one report that we provided.

THE COURT:  Right.

MR. HERSCHMANN:  So now that we've taken the time to

go back and look at it, Mr. Dellaportas acknowledges that there is a report on me, that they've had it for an extended period of time, and the reason that he misrepresented to the Court that one existed is because he was surprised that it had been raised and he was not expecting it.

Of course in his letter he also says that this issue, and he told the Court, has been addressed for the last six months, including in court filings before Your Honor and various other communications with Mr. Dellaportas.

So the relief that I am seeking is that they produce to me and only me any and all reports or other documents, including in native format, that contain or refer to my personal information that were not obtained by subpoena or court order; they identify all persons to whom they shared that information.

They produced the contents of the communications. They continue to hold it in strict confidence pending any further order of the Court, and they also identify any persons who have -- they provided a copy of my confidential pre-marital agreement.

And the last thing that Mr. Dellaportas claimed yesterday -- after previously telling the Court that his client directly hired the investigator, and the investigative report, at least orally, has been sent only to Sagi Genger and not copying any counsel -- is that it's supposedly attorney work

product.  And he doesn't identify which attorney, and the only person who has ever made these claims previously about being able to invade my privacy and has tried continuously has been Mr. Dellaportas in various filings.

And the last point, Your Honor, Judge Freeman had specifically ordered Mr. Dellaportas not to even issue a subpoena to any third party and specifically discussing my information without advanced prior notice.  After that instruction he issued a subpoena to American Express with my name in it and my account number without giving notice.  The judge admonished him for that.  She ordered that he produce the subpoena to us in an order by Judge Freeman on May 6th of 2019, and after that it is now clear that they have at least one investigative report, if not more, on me on my personal information.

And I'd ask the Court, and it's contained in the filings from yesterday by both Mr. Dellaportas and myself, that the relief I requested be granted, I be provided the information that belongs to me, and contrary to the representations they have made, and confirmed by the State of Israel and the Ministry of Security assigned by the chief of staff to the minister himself, this is a very serious criminal investigation going on in Israel regarding the invasion of my property and my privacy and stealing my confidential information.

THE COURT:  All right.  Mr. Dellaportas?  Mr. Dellaportas on the line?

Mr. Herschmann, can you hear me?

MR. HERSCHMANN:  I can, Your Honor.

THE COURT:  You can.  I see --

MR. PITTA:  Your Honor, it's Thomas Pitta.

THE COURT:  -- Mr. Dellaportas is --

MR. PITTA:  Your Honor, it's Thomas Pitta --

THE COURT:  Yes, Mr. Pitta.

MR. PITTA:  -- Mr. Dellaportas' partner.  I'm trying to --

THE COURT:  Yes.

MR. PITTA:  -- determine if he muted himself or what's happened.  I'm not sure where Mr. Dellaportas is.  I see him on the system as signed in, but I'm not sure why he's not hearing anything.

MR. DELLAPORTAS:  Hello.

MR. PITTA:  John?  Go ahead.

MR. DELLAPORTAS:  Yes.  Can you hear me, Your Honor?

THE COURT:  Yes.

MR. PITTA:  Yeah.

MR. DELLAPORTAS:  Oh.  Oh, great.  Thank you, Your Honor.  Very little of what Mr. Herschmann said beyond identifying himself was factually correct.

Very briefly, Your Honor, the facts are as follows.

Mr. Herschmann, in frustration of our discovery, as found by the Western District Court, was found to have filed multiple false affidavits, one in which he said that he lived in Texas, although he later admitted he was living in Israel at the time. Another in which he denied having a joint Amex account with his wife, and we later found out, through Amex, that they did, indeed, have a joint account, spending hundreds of thousands of dollars, including by her.

So Mr. Genger, in pursuit of post-judgment discovery, retained an Israeli attorney, who retained a licensed private investigator, who conducted some research, produced a couple of reports.  We've never been advised by any law enforcement agency anywhere that anything's being investigated -- not my client, not the attorney who retained him.  It's great that Mr. Herschmann filed a complaint there and got a case number and got a form letter.  Good for him.  And if there's something there, if the investigator did something wrong, by all means the Israeli authorities are perfectly capable of handling that, investigating that.

The issue that we have is that through post-judgment discovery we've now been trying for a year-and-a-half to get discovery from Mr. Herschmann.  He hasn't produced a single document.  He's never agreed to a single day to sit for a deposition.  He not merely has joint finances with the debtor, but he also claims to be a two-million-dollar creditor of the

debtor, based on his own legal fees, when he previously told the court and stated in his pre-nup that these were pro bono. So we obviously have an interest in seeking discovery.

He also filed affidavits in which he falsely stated he was living one place with the debtor in order to get her out of various legal predicaments that she's in.

So we've had a long saga with him.  It's a lot of antics.  We're not sure what any of this had to do with the matter before Your Honor.  We do know that last time we were before Your Honor, Your Honor asked us to hold discussions.  We provided Mr. Herschmann a sixty-seven page letter responding to all his inquiries.  He made no response for eleven days.  We then, on our own, invited him to have a meet and confer.  He ignored that, and instead filed a letter and motion with Your Honor.  So if there's any indication of the bad faith in which these false allegations are being made, that's it.

And honestly, Your Honor, I have no idea whether it's a crime in Israel for what the private investigator did.  I do know that it's a crime in the United States to file false affidavits, and Mr. Herschmann has filed multiple of them. We've pointed out how they're false.  He's never denied it.  He can't deny it.  And so that's a matter that was subject to multiple sanctions motions that we had filed in the district court, which Mr. Herschmann got stayed by causing his wife to file for bankruptcy.

We've never been admonished by Magistrate Judge Freeman.  He has.  Magistrate Judge Freeman found that his colleague, Mr. Bowen, had made a misrepresentation to the ownership of one of the houses.  We're happy to, on our dismissal motion, to go back before Magistrate Judge Freeman and have all these things decided, but we object to giving him anything when he hasn't given us any discovery for a year-and-a-half, and he's never served any discovery on us.

MR. HERSCHMANN:  Your Honor, it's Eric Herschmann.  Can I just briefly respond?

THE COURT:  Sure.

MR. HERSCHMANN:  Mr. Dellaportas has filed multiple letters with the Court seeking all types of sanctions, making these arguments.  Judge Freeman, who had all these letters from him, never once granted the relief.  On May 16th she ordered that the Court defers ruling on the issues raised herein, all of the claims Mr. Dellaportas just made, except that counsel for Sagi Genger is directed to inform Eric Herschmann of the service of any subpoenas calling for the production of his financial or personal information.  That's what the judge ordered.

Mr. Dellaportas, in everything he just said to you, does not deny that he misrepresented to this Court that he did not have an investigative report on me.  He just says he was "unexpectedly asked about it" at the March 4th conference, and

even though he tells this Court in the same filing that he discussed the issue for the past six months.  And while all of that is a red herring in making all his allegations and factual arguments, he went ahead, and he has admitted they hired an investigator to investigate Orly Genger, to go through and identify bank accounts, and they found a bank account from sixteen-plus years ago, and he then, based on that bank account, accused me of committing bankruptcy fraud of hiding the account from the trustee.

If he didn't make that false accusation, we would have never known about this.  But after he didn't find any joint accounts when he already used his investigator to rummage through Orly's accounts, it's disingenuous to claim that he needed to go ahead and go through my accounts to confirm that no such account existed.

And I ask Your Honor, I note the ruling doesn't have to be made today, but if Your Honor looks at the letters that were filed yesterday, I think you'll see very clearly that the argument that Mr. Dellaportas makes that the chief of staff to the minister of public security, which oversees all of law enforcement in Israel, is some form letter, is belied by logic and any common sense.  So I ask Your Honor to look at that.

And my relief is very targeted.  It is information that they have about me that they did not obtain via court order or subpoena, especially after Judge Freeman told them not

even to try to do it with a subpoena.

THE COURT:  All right.  All right.  What I'm going to do --

MR. DELLAPORTAS:  Your Honor.

THE COURT:  -- is I will --

I'm sorry.  Yes.  Go ahead, Mr. Dellaportas.

MR. DELLAPORTAS:  Your Honor, very briefly.  We believe we have the right, particularly with regard to the debtor's husband and claim secured creditor, to the extent he refuses discovery for a year-and-a-half, to retain private investigators to investigate it.

Now, if this particular investigator did something wrong, which we've seen no evidence of, and we're not aware of, and we didn't ask him to do it, and no Israel authority has told us he has, but to the extent that Mr. Herschmann isn't completely making this up, then the Israeli authorities will deal with that.

But in the meantime, we would object to any attempt to invade our work product by someone who quite clearly has encumbered the estate with a two-million-dollar fraudulent debt and has acted through multiple -- the backdated documents and fraudulent affidavits and other things that we think are outrageous -- in order to shield his wife from their true creditors.

THE COURT:  Okay.  I'm going to read, probably

tonight, read the letters, and I'll get back to you, through Ms. Rodriguez, as to when the three of us can get on the phone together.

Is there anything else that I need to have?  I mean, I've got the three letters.  I see they've got attachments to them, et cetera.  That's the universe of the documents that I'll be looking at.  Right?

MR. HERSCHMANN:  Yes, Your Honor.  It's Eric Herschmann.

THE COURT:  Right?  Right.  And Mr. Dellaportas?

MR. DELLAPORTAS:  Yes, Your Honor.  Yes, Your Honor. This is John Dellaportas.

THE COURT:  All right.  Fine.  All right.  Thank you.

All right.  That's what we're going to do.  And so we'll get back in touch with you, but otherwise what we will do is in connection with our status conference of today, we're going to adjourn that and all the matters on the calendar to the 22nd at 2 o'clock.  You'll all have the benefit of the trustee's agreement, if she's able to reach one, and a motion seeking approval of it.

And what I would ask you to do is to file it, and at this point, even though Ms. Rodriguez may kill me, file it without a return date.  And when we get together on the 22nd, and people have had a chance to see what's there, we'll be able to talk about what's necessary as far as discovery and those

types of matters, and then we'll get a return date for it and talk about the motion to dismiss if it's necessary to do so. All right?

UNIDENTIFIED SPEAKER:  Thank you very much, Your Honor.

THE COURT:  Does anyone have any questions?

UNIDENTIFIED SPEAKER:  Thank you, Your Honor.  No.

THE COURT:  And thank you all very much.  I apologize for the technical glitches that we had, but thanks for your patience, and we'll see how all this turns out.

Take care.  Thank you.

(Whereupon these proceedings were concluded at 2:33 PM)

79

C E R T I F I C A T I O N

I, Hana Copperman, certify that the foregoing transcript is a true and accurate record of the proceedings.

*Hana Copperman*

_____

Hana Copperman (CET-487)

AAERT Certified Electronic Transcriber

eScribers

352 Seventh Ave., Suite #604

New York, NY 10001

Date:  May 18, 2020

ORLY GENGER
Lead Case No. 19-13895-jlg

May 5, 2020

---

**#**

**#1 (1)**
5:15
**#219 (1)**
4:2
**#222 (1)**
4:4
**#224 (1)**
4:7
**#225 (1)**
4:10
**#232 (1)**
4:13
**#233 (1)**
4:16
**#234 (1)**
4:19
**#235 (1)**
4:22
**#236 (1)**
5:2
**#237 (1)**
5:5
**#604 (1)**
6:22

---

**A**

**abeyance (2)**
35:15;65:22
**abide (1)**
41:7
**ability (1)**
30:22
**able (5)**
18:23;34:19;70:3;
77:19,24
**ABOULAFIA (1)**
8:8
**above (1)**
24:4
**absolutely (1)**
28:11
**accept (3)**
59:18;60:4;61:22
**access (3)**
48:19;49:25;50:7
**accommodating (1)**
60:2
**account (7)**
70:10;72:5,7;75:6,
8,9,15
**accounts (4)**
75:6,12,13,14
**accusation (1)**
75:10
**accused (1)**
75:8
**acknowledge (2)**
29:16;67:4
**acknowledges (1)**

**69:1**
**acted (1)**
76:21
**action (9)**
20:8;21:18;22:9;
25:9,12;26:11;
54:17;58:7;59:16
**Actions (16)**
4:19;14:21;21:6;
26:8;27:10,10;
28:12;30:19;33:2,2,
3;51:2;54:13,13;
56:18;57:3
**activate (1)**
63:8
**actual (1)**
61:25
**actually (12)**
12:16;29:13;
46:22,25;48:3,15;
49:10;53:7;56:19;
61:17;67:12,18
**Adam (3)**
5:2;10:15;54:5
**ADBG (4)**
5:7;9:3;19:19;44:3
**add (3)**
26:18;38:8;55:8
**addition (4)**
14:18;26:2,6,18
**additional (2)**
25:10;27:25
**address (6)**
23:9,11;32:21;
60:1;64:17;66:1
**addressed (2)**
20:3;69:7
**addresses (1)**
20:10
**addressing (1)**
31:1
**adjourn (3)**
62:25;63:13;77:17
**adjournment (1)**
29:7
**administration (1)**
30:20
**admitted (2)**
72:4;75:4
**admonished (2)**
70:11;74:1
**adopt (1)**
46:19
**advanced (1)**
70:8
**Adversary (11)**
5:9,13,17,21;6:2;
35:6,9;39:8,11;
54:25;61:10
**adverse (1)**
29:25
**advised (3)**
15:5;16:8;72:12

**affidavits (4)**
72:3;73:4,20;
76:22
**afternoon (8)**
12:2;13:24;14:4;
15:2;45:21;52:2;
65:13;67:17
**Again (22)**
12:2;13:2;18:20;
19:8;20:17;21:19;
26:9;34:5,6;38:13,
15;49:6,23;50:4,21;
53:23,25;55:8;60:6,
10;61:18;68:6
**against (6)**
20:11,20;24:20;
31:1,5;32:19
**agency (2)**
67:20;72:13
**aggressive (1)**
61:11
**ago (6)**
35:22,22;54:17,
20;58:5;75:7
**agree (3)**
12:21;45:15;53:7
**agreed (4)**
50:16;55:11;
59:20;72:23
**agreeing (1)**
61:12
**agreement (14)**
16:15,17;21:11;
23:2,14;31:23,25;
48:2,17,17;63:17;
65:4;69:20;77:19
**agreements (1)**
18:10
**a-half (1)**
74:8
**ahead (13)**
13:23;28:24;29:2;
34:4;41:18;47:13;
56:4,4;66:4;71:18;
75:4,14;76:6
**air (3)**
36:10,10,12
**al (8)**
5:9,10,13,14,18,
18,22;6:2
**alert (1)**
13:9
**aligned (4)**
40:21;42:20;44:1;
48:3
**allegations (7)**
32:13;36:4,5,9;
44:11;73:16;75:3
**allege (3)**
50:20;53:5;60:21
**alleged (3)**
22:6;32:24;51:6
**allegedly (2)**

**20:25;48:23**
**allow (7)**
21:14,15;25:3;
27:13,14,14;30:18
**allowed (1)**
31:4
**almost (1)**
48:3
**alone (2)**
38:19;59:3
**along (5)**
33:9;34:23;48:14,
16;52:14
**although (2)**
12:20;72:4
**always (1)**
50:6
**amended (3)**
58:15;59:2,10
**American (1)**
70:9
**Amex (2)**
72:5,6
**among (2)**
49:12;51:8
**amount (1)**
25:18
**amounts (1)**
53:18
**analysis (2)**
33:7,8
**ancillary (1)**
43:13
**ANDREW (1)**
9:23
**announce (1)**
34:18
**announcement (1)**
43:5
**anticipate (2)**
17:15;38:3
**anticipated (2)**
16:15;24:24
**anticipating (1)**
40:7
**anticipation (1)**
40:10
**antics (1)**
73:8
**anything's (1)**
72:13
**apartment (1)**
24:13
**apologize (8)**
20:18;28:25;29:5;
55:20,22;63:25;
66:4;78:8
**apparently (2)**
23:6;56:24
**appealing (1)**
16:5
**appeals (1)**
53:19

**appear (1)**
35:7
**appearances (1)**
12:4
**appeared (1)**
14:9
**applaud (1)**
34:11
**applied (1)**
25:23
**apply (1)**
59:25
**appreciate (3)**
36:23,24;37:7
**appreciated (1)**
16:8
**approach (1)**
59:19
**approached (1)**
59:17
**appropriate (3)**
32:7;42:2;46:5
**approval (5)**
23:12;27:15;
42:10;46:23;77:20
**approve (5)**
29:24;30:2,6;
41:10;51:20
**approved (3)**
33:12;40:11;42:11
**approximately (2)**
46:4;51:16
**April (10)**
14:17,22,25;15:2,
18;16:3,5;18:2;
28:20;55:9
**arguably (2)**
38:12,13
**argue (2)**
34:24;40:17
**arguing (1)**
61:10
**argument (3)**
29:13;39:10;75:19
**arguments (2)**
74:14;75:4
**Arie (13)**
5:7;11:3;15:19;
16:16;19:12;22:25;
30:12;32:14;33:9,
13;42:24;46:20;
53:15
**around (2)**
17:6;50:7
**arrive (1)**
34:14
**arrived (1)**
21:21
**artful (1)**
34:15
**articulated (1)**
45:16
**aside (1)**

19-01447-jlg    Doc 10    Filed 05/18/20    Entered 05/20/20 10:50:11    Main Document
Pg 81 of 93
ORLY GENGER
Lead Case No. 19-13895-jlg

May 5, 2020

54:10
assert (1)
  45:1
asset (1)
  31:11
assets (9)
  20:1;22:13;38:11;
  39:5,7;51:4,7;56:16,
  25
assign (1)
  23:6
assigned (2)
  22:24;70:21
assignment (2)
  25:8,17
Associates (2)
  4:23;8:12
assume (3)
  29:10;53:17;65:1
attached (6)
  37:24,25;56:19;
  59:2,9;65:5
attaches (1)
  58:17
attachments (1)
  77:5
attack (1)
  39:4
attempt (7)
  23:22;42:9;57:24;
  58:4,11;60:16;76:18
attitude (1)
  61:11
attorney (5)
  45:14;69:25;70:1;
  72:10,14
Attorneys (9)
  8:3,12;9:3,11,19;
  10:3,11,19;11:3
Attorney's (1)
  67:25
audio (3)
  33:16,19;62:5
Austin (1)
  24:13
authorities (2)
  72:18;76:16
authority (1)
  76:14
available (2)
  36:1;67:15
Ave (1)
  10:4
Avenue (2)
  6:22;10:20
avoidance (2)
  21:9;26:10
awaiting (1)
  49:18
aware (2)
  24:23;76:13

B

back (20)
  18:5,9;22:13;
  23:15;25:21,25;41:5,
  14;44:21;45:9;51:4;
  55:12;56:25;62:13,
  17;67:3;69:1;74:5;
  77:1,15
backdated (1)
  76:21
background (2)
  14:7,9
bad (4)
  52:18;53:4;61:4;
  73:15
balance (3)
  25:22,22;51:10
bank (3)
  75:6,6,7
banking (1)
  67:14
Bankruptcy (14)
  3:2,13;25:25,25;
  38:13,14,17;48:10,
  24;54:18;57:5;58:1;
  73:25;75:8
based (5)
  21:14;35:18;
  38:10;73:1;75:7
baseless (2)
  35:20;36:9
basically (1)
  48:9
basing (1)
  61:1
basket (1)
  20:12
Battery (1)
  9:4
bear (1)
  55:15
bearing (1)
  52:16
becomes (1)
  36:11
beginning (1)
  13:13
behalf (18)
  4:4,7,10,13,16,20,
  22;5:2;14:5;19:2,8,
  12;24:24;33:2;40:9;
  44:3;52:3;54:6
behind (1)
  36:6
belied (2)
  56:22;75:21
belong (4)
  22:21,21;38:17;
  60:21
belongs (1)
  70:19

beneficiary (1)
  32:25
benefit (3)
  25:4;57:6;77:18
Benson (7)
  5:6,17;9:10,18,19;
  24:25;45:14
best (3)
  17:18;25:15;40:19
better (1)
  16:24
beyond (2)
  24:5;71:23
bid (1)
  51:1
bit (4)
  12:4;18:5,9;34:22
blew (1)
  61:2
blown (2)
  58:8;61:3
bog (1)
  39:15
bono (1)
  73:2
bot (1)
  63:9
both (8)
  16:2,7,12;26:21;
  35:6;42:3;59:20;
  70:17
Boulevard (1)
  8:5
BOWEN (4)
  9:24;45:13,13;
  74:3
Bowling (1)
  3:3
boy (1)
  12:13
breach (2)
  32:24;33:4
breakdown (1)
  16:22
BRIAN (1)
  11:7
brief (4)
  12:15;54:11,16,23
briefly (10)
  26:18;41:20;
  45:15;54:24;56:6,8;
  59:16;71:25;74:10;
  76:7
bring (5)
  22:15;27:16;39:2;
  51:4;57:4
Bringing (1)
  39:14
Broad (2)
  10:12;14:13
broadest (1)
  23:20
Broadway (3)

8:14;9:12,20
Broser (6)
  15:18;16:16;
  20:25;30:12;33:13;
  46:21
brought (1)
  43:18
burden (1)
  40:12
buy (1)
  24:10
Bye (1)
  62:14

C

calendar (3)
  29:22;55:4;77:17
call (6)
  15:21;41:17;
  44:14;53:25;63:18;
  65:13
calling (1)
  74:19
came (1)
  53:24
camera (1)
  36:2
camp (4)
  46:21;52:1;54:1,9
camps (1)
  42:16
can (32)
  12:5,7;13:8;17:9;
  18:23;23:18;26:23;
  38:2;40:19,22;
  44:24;46:13;53:15;
  55:12;57:7;59:20;
  61:19;62:8,10;63:20,
  21;64:16,18,23;65:3;
  66:1;71:3,4,5,19;
  74:10;77:2
capable (1)
  72:18
capacity (1)
  32:25
care (2)
  13:11;78:11
careted (1)
  40:23
Case (32)
  4:2;5:11,19,23;
  14:14,19;17:14,23;
  30:2,18,19,21;31:3,
  4,9;34:7;35:2,5;
  37:14;45:1;46:10,12,
  24;47:9;48:6,22,22;
  53:20;54:19;55:4;
  59:19;72:15
cases (1)
  27:8
cash (1)
  24:9

cause (1)
  22:9
causing (1)
  73:24
Cavaliere (58)
  4:7,16,20;14:1,4,5;
  18:4,13;19:14,15,21,
  22;20:23;21:6;22:2,
  8,14;23:17;24:2,14,
  18;25:7;26:17;
  27:24;28:7,11,19,22,
  24;29:3;30:3;31:13;
  38:18;39:24;40:9;
  41:19,19;44:6,15;
  54:14;55:3,10;56:1;
  59:13,15,15;61:20;
  63:2,15,19,23,24;
  64:3,19;65:7,9,15,17
Cavaliere's (2)
  34:21;46:19
cede (1)
  27:25
Central (1)
  67:24
certain (15)
  20:11;22:18,20;
  24:19,20;25:9,20;
  31:14;33:2,10;
  34:25;44:6;49:12,
  16;67:2
certainly (22)
  13:3;15:7,11;
  16:19;17:18;22:14,
  15;23:22;26:23;
  29:20,22;30:11,22;
  37:2,5;42:1,9;43:9;
  44:9;59:21,24;64:22
cetera (2)
  65:25;77:6
challenged (1)
  67:12
chance (6)
  13:19;17:5;26:24;
  36:14,18;77:24
change (2)
  57:19,21
changes (1)
  15:1
Chapter (4)
  13:25;14:6;31:4;
  48:24
characterization (1)
  62:4
chart (8)
  14:20,23,25;15:5,
  11;27:21;54:13,13
chief (2)
  70:21;75:19
children (1)
  31:22
choose (2)
  23:23;29:12
Chris (3)

19:18;44:2;56:5
**CHRISTOPHER (1)**
9:7
**Circuit (3)**
21:14;23:21;33:1
**circulated (3)**
14:23;49:1,11
**circumstance (1)**
29:23
**circumstances (1)**
40:20
**City (1)**
8:6
**claim (20)**
30:25;31:19;32:6,
11,17,19,20,21,22,
24;33:4,9;38:20;
43:13;52:23;60:13,
23;61:1;75:13;76:9
**claimants (2)**
21:5;38:22
**claimed (2)**
67:13;69:21
**claiming (1)**
56:24
**claims (48)**
15:15;18:14;19:3;
20:1,10,20,20;21:9,
15,16,16,17;24:16,
19,24;25:3,23;31:1,
3,4,5,14,14,16;32:11,
18;33:7,10,10;38:9,
19,20,22;39:1;44:7;
45:2;47:25;48:3,5,
10;56:20,22;57:5,10;
61:10;70:2;72:25;
74:17
**clarify (4)**
15:7;41:20;42:4,
13
**claw (1)**
22:13
**clean (1)**
31:15
**cleaned (1)**
50:10
**clear (6)**
18:6,9;21:20;29:4;
67:21;70:13
**clearer (1)**
27:18
**clearly (3)**
38:23;75:18;76:19
**clerk (1)**
13:9
**clerk's (1)**
13:8
**client (7)**
42:25;55:9;59:3,
25;66:23;69:22;
72:14
**close (2)**
16:1,7

**close-knit (1)**
38:16
**COHEN (1)**
10:10
**coin (1)**
46:7
**coincide (1)**
40:7
**colleague (1)**
74:3
**collective (1)**
43:1
**coming (1)**
15:1
**commenced (1)**
58:7
**comments (2)**
15:3,3
**committing (1)**
75:8
**common (1)**
75:22
**commonly (1)**
67:14
**communications (2)**
69:9,16
**company (1)**
22:25
**complained (1)**
49:24
**Complaint (15)**
5:15;16:25;22:15;
27:16;55:9;57:23;
58:2;59:17,21;60:11,
20;61:16,22;62:1;
72:15
**complaints (2)**
56:20;57:2
**complete (1)**
56:17
**completely (4)**
18:8;37:8;57:25;
76:16
**complex (1)**
35:2
**complied (1)**
60:19
**conceal (1)**
56:22
**concealing (1)**
56:16
**concept (3)**
25:3;56:21;59:4
**concern (4)**
37:13;38:5;43:19,
20
**concerned (1)**
50:5
**concerning (1)**
68:20
**concession (1)**
44:11
**conclude (1)**

16:14
**concluded (1)**
78:12
**conduct (1)**
36:4
**conducted (5)**
67:22;68:9,12,14;
72:11
**confer (1)**
73:13
**Conference (23)**
4:2;5:11,19,23;
6:3;14:11,15;41:13;
43:10;44:14,22;
54:18;57:18;61:9;
63:1;64:7,12,14;
65:12;66:21,23;
74:25;77:16
**confess (1)**
41:1
**confidence (1)**
69:17
**confidential (2)**
69:19;70:24
**confirm (1)**
75:14
**confirmed (2)**
68:2;70:20
**conflict (1)**
13:9
**connection (7)**
19:4;37:20;38:15;
40:13;50:24;59:5;
77:16
**cons (1)**
16:6
**consent (1)**
46:25
**consentering (1)**
46:1
**consenting (1)**
46:1
**consider (3)**
35:1;43:9;66:13
**consideration (4)**
20:5;24:8;25:21;
35:17
**considered (1)**
39:4
**consistent (2)**
23:19;24:7
**constantly (1)**
15:1
**constructive (9)**
27:10;32:20;55:8;
57:23;59:16;60:11,
20,23;65:25
**consummated (1)**
19:25
**contain (1)**
69:12
**contained (1)**
70:16

**contemplate (1)**
25:8
**contemporaneously (1)**
50:18
**contempt (1)**
48:21
**content (1)**
15:7
**contents (1)**
69:16
**contest (1)**
44:9
**contested (1)**
39:2
**context (3)**
39:4,9,14
**continue (6)**
40:21;46:13,16;
65:21;68:4;69:17
**continued (1)**
20:3
**continuously (1)**
70:3
**contract (1)**
32:19
**contrary (2)**
67:5;70:19
**control (1)**
29:21
**convenience (1)**
54:10
**conveyance (8)**
20:8,19,22;21:18;
25:9,12;40:2;51:2
**conveyances (2)**
20:25;23:8
**conveyed (1)**
22:18
**copies (2)**
48:20;56:19
**Copperman (1)**
6:20
**copy (1)**
69:19
**copying (1)**
69:25
**counsel (7)**
13:17,25;49:17;
55:22;60:12;69:25;
74:17
**counterclaims (1)**
32:8
**couple (7)**
27:8;34:9;35:21,
22;48:14;62:21;
72:11
**course (7)**
14:22,23;17:7;
54:22;61:24;62:3;
69:6
**Court (164)**
3:2;12:2,18;13:2,
9;14:2,10,16,25;

15:10,14;16:21;18:3,
14;19:6,10,13,20;
20:16;21:3,19;22:3,
11;23:13,25;24:12,
15;25:5;26:12;27:5,
12,22,23;28:2,8,14,
21,23;29:1;30:1,17,
23;32:3,9;33:2,12,
14,17,21,24;34:3;
35:6,7,14,17;36:2,
10,14,16,21,23;
38:17;39:23;40:25;
41:1,12,16;42:2,12,
15;43:2,11,19,25;
44:4;45:11,17,23;
46:15,24;47:12;49:5,
7,11,14,20;50:2,12,
14,22,23;51:14,15,
23,25;52:5;53:7;
54:3,16;55:6,14,17,
20;56:4,10,13;57:2,
5;58:23;62:17,20;
63:5,7,10,13,23;
64:2,8;65:6,8,11,16,
19;66:7,10,11,13,15,
17;68:5,9,12,15,18,
24;69:3,7,8,14,18,
22;70:16;71:1,5,7,9,
12,20;72:2;73:2,24;
74:11,13,16,23;75:1,
24;76:2,5,25;77:10,
13;78:6,8
**courtroom (1)**
66:24
**courts (4)**
13:20;14:20;
27:21;57:3
**Court's (1)**
54:10
**cover (1)**
34:22
**covered (1)**
32:3
**crafted (1)**
23:3
**creditor (3)**
45:14;72:25;76:9
**creditors (6)**
5:6;26:2;51:3,6,9;
76:24
**crime (2)**
73:18,19
**Crimes (1)**
67:24
**criminal (3)**
67:12,22;70:22
**crossed (1)**
12:15
**CULLEN (1)**
8:2
**culminating (1)**
14:24
**curious (1)**

18:22
**current (6)**
14:8,21;15:8;45:6;
47:11;61:21
**currently (2)**
32:10;58:12

## D

**D&K (1)**
10:3
**Dalia (14)**
4:14;10:3,19;
15:21;19:8;31:22,
24;32:18;44:25;
48:4;52:3;53:25;
57:23;60:21
**Dalia's (1)**
60:12
**DANIEL (1)**
10:2
**dark (1)**
37:9
**dashboard (1)**
12:5
**date (8)**
17:9;26:16;28:5;
41:13;44:15;58:7;
77:23;78:1
**day (12)**
14:12;15:9;30:5,
20;46:15;50:22,22;
53:1;59:23;65:3,9;
72:23
**days (6)**
26:15;51:16;58:2,
7;61:16;73:12
**deadline (5)**
15:5;58:8,13;61:2,
3
**deadlines (1)**
27:7
**deal (5)**
13:21;37:17;
41:14;65:1;76:17
**dealing (1)**
31:2
**deals (1)**
20:6
**dealt (2)**
19:25;20:13
**Deborah (5)**
4:8,17,20;13:24;
14:5
**debt (1)**
76:20
**debtor (22)**
5:5;20:9;22:23;
24:3,10;26:7;32:1,
19;35:19;37:21;
38:24;39:2,5;42:19,
21;46:15;48:19;
50:19;56:21;72:24;

73:1,5
**debtor's (7)**
22:10;30:25;
40:16;48:16;51:9;
52:3;76:9
**December (1)**
46:11
**decided (4)**
29:12;63:15,16;
74:6
**decides (3)**
16:23;57:15,18
**decision (6)**
26:13;29:21;
31:21;43:15;53:11;
64:10
**decisions (2)**
13:19;21:15
**defendants (3)**
23:19;54:16,18
**defenses (4)**
59:21,24;60:2,6
**defers (1)**
74:16
**definitely (1)**
47:12
**definition (1)**
30:14
**delay (1)**
12:4
**DELLAPORTAS (36)**
8:18;12:10,10,13;
13:1,3;42:7;45:20;
66:23;67:1,9,17;
68:21;69:1,9,21;
70:4,6,17;71:1,2,7,
14,17,19,22;74:12,
17,22;75:19;76:4,6,
7;77:10,11,12
**Dellaportas' (1)**
71:10
**demonstrated (1)**
38:23
**denied (6)**
30:17;39:25;
68:19,20;72:5;73:21
**deny (3)**
30:7;73:22;74:23
**depending (3)**
27:3;28:8;55:2
**deposition (2)**
48:17;72:24
**depositions (2)**
59:4,8
**depth (1)**
27:21
**derivative (1)**
21:16
**described (2)**
27:21;40:24
**describes (1)**
14:21
**describing (2)**

42:17;44:6
**details (2)**
14:1;57:7
**determination (1)**
32:3
**determinations (2)**
42:18;43:23
**determine (3)**
30:18;46:23;71:13
**determined (4)**
25:14;30:20;
32:16;63:2
**determining (1)**
32:11
**differences (2)**
20:4;24:22
**different (8)**
14:20;15:23;16:2;
22:20;24:21;27:20;
37:10;44:18
**difficult (2)**
36:2;54:21
**directed (2)**
14:15;74:18
**direction (2)**
34:18;35:3
**directly (2)**
34:14;69:23
**disadvantage (1)**
37:7
**disagree (4)**
35:11,12;42:5;
62:3
**discharge (11)**
26:7,7,9;27:9;
28:9,12;38:24;39:4,
5;40:15;41:1
**disclose (4)**
12:23;13:5;39:1,1
**disclosed (3)**
38:12,13,14
**discovery (35)**
17:13,21,23,25;
37:16,23,23;38:1,1,
4,8;39:13,15;41:11,
13,14;47:2,4,5,6,10;
53:19;58:14;59:3,4,
10;72:1,9,21,22;
73:3;74:7,8;76:10;
77:25
**discuss (3)**
18:23;53:2;61:19
**discussed (6)**
14:14;17:8;55:10;
65:23;66:21;75:2
**discussing (6)**
19:3;39:24;43:16;
55:3,25;70:7
**discussion (2)**
41:3;57:14
**discussions (6)**
16:14;22:16;28:3;
50:25;57:19;73:10

**disingenuous (1)**
75:13
**dismiss (57)**
18:1;26:20,22;
28:16,17;29:11,15,
18;30:2,7,9,14,21;
32:22;35:12,13,14,
19;37:15,20,25;38:3,
5,9,16;39:3,20,24;
40:13;41:22;42:10;
46:2,2,9,22;47:3,11,
15,22;50:17;51:13,
22;52:8;53:3,10,22;
54:2;56:16;57:14,
16;58:15,17;59:2,5,
10;64:16;78:2
**dismissal (12)**
27:17;29:8,9;39:9,
10,14;40:4,5,7,11;
45:2;74:5
**dismissed (2)**
26:8;48:6
**dispute (5)**
22:23;23:6;33:3;
38:16;52:13
**disputed (3)**
44:8;56:21;64:22
**disputes (4)**
15:6;34:12;37:16;
38:4
**distance (1)**
34:22
**district (7)**
46:12;47:9;54:16;
67:24,25;72:2;73:23
**Division (1)**
68:1
**divorce (1)**
60:22
**Doc (11)**
4:2,4,7,10,13,16,
19,22;5:2,5,15
**docket (2)**
14:16;67:8
**document (3)**
15:1;37:8;72:23
**documents (16)**
12:11;13:19;36:1;
37:2,3;43:20;47:13;
48:16,23;50:1;
58:20;59:1,7;69:11;
76:21;77:6
**dollars (8)**
21:21,25;23:14;
30:25;31:19,20;
32:6;72:8
**dollars' (1)**
21:23
**done (7)**
17:1;31:15;33:6;
45:3;49:21;53:16;
68:20
**doubt (2)**

17:19,20
**DOUGLAS (1)**
10:24
**dovetailed (1)**
40:14
**down (8)**
23:23;25:2;27:3,4;
29:19;39:15;46:14;
53:20
**drafts (1)**
14:23
**drastically (2)**
57:19,20
**Drogin (1)**
14:5
**due (1)**
55:10
**duplicate (2)**
21:17;47:3
**during (4)**
14:15,21;17:7;
54:17
**duty (2)**
32:24;33:4
**DYKMAN (1)**
8:2

## E

**earlier (1)**
41:21
**early (6)**
17:10;26:16;28:5;
41:10;51:17;65:3
**earth (1)**
60:18
**ease (1)**
15:24
**easily (1)**
53:5
**easy (1)**
50:7
**echo (1)**
43:3
**effect (1)**
52:17
**effectuate (3)**
57:24;58:11;60:17
**efficient (2)**
41:7;44:13
**effort (2)**
38:7;39:11
**efforts (2)**
34:12;35:4
**eight (1)**
46:4
**either (15)**
15:8;16:15;19:19;
27:15,15;28:9;35:3,
3;37:9;40:3;41:23;
47:16;48:11;49:17;
64:21
**eleven (1)**

73:12
**ELIZABETH (1)**
  8:8
**else (13)**
  19:15;41:16;
  42:19;43:25;45:11,
  19;50:4;51:23,25;
  54:3;55:24;65:22;
  77:4
**email (4)**
  59:18,21;60:4;
  67:1
**EMMET (3)**
  8:11;19:1;45:22
**encourage (1)**
  34:13
**encumbered (1)**
  76:20
**End (9)**
  10:4;16:20;17:2,
  22;31:3;38:4;53:22;
  55:11;57:14
**enforcement (3)**
  67:20;72:12;75:21
**enough (1)**
  30:21
**entail (1)**
  53:18
**entered (2)**
  38:2;49:4
**enters (1)**
  48:25
**entirely (1)**
  48:3
**entitled (1)**
  38:24
**environment (1)**
  61:21
**equal (1)**
  51:11
**equally (1)**
  51:8
**equitable (1)**
  32:17
**equity (3)**
  24:4,6,10
**Eric (7)**
  5:6;9:11,15;66:5;
  74:9,18;77:8
**eScribers (1)**
  6:21
**escrow (1)**
  48:17
**especially (1)**
  75:25
**ESQ (14)**
  8:8,17,18;9:7,11,
  15,23,24;10:7,15,23,
  24;11:7,8
**essentially (8)**
  24:10;25:15;26:1,
  2,8;30:24;38:10;
  48:5

**estate (29)**
  16:24;17:18;
  18:15;20:11;21:1;
  22:4,6,10;23:16,18;
  24:11,16,19;25:4,11,
  16,18,19,21,25;26:1;
  31:6;51:4,4,8;56:25;
  57:4,9;76:20
**estate's (4)**
  20:20,23;22:11;
  25:8
**et (10)**
  5:9,9,13,13,18,18,
  22;6:2;65:25;77:6
**evaluate (3)**
  35:25;36:3,6
**even (14)**
  26:24;36:3,6;38:4;
  45:1;52:25;57:9;
  60:23;61:5;66:23;
  70:6;75:1;76:1;
  77:22
**evening (1)**
  67:16
**event (3)**
  13:10;34:24;37:4
**eventually (1)**
  30:18
**everybody (3)**
  52:23;62:21;65:3
**everyone (6)**
  50:3;55:17;62:6,8,
  13,17
**everyone's (1)**
  24:23
**everywhere (1)**
  27:5
**evidence (1)**
  76:13
**evolve (2)**
  20:4;21:13
**evolving (1)**
  15:1
**exact (1)**
  56:22
**exactly (3)**
  39:21;52:21;54:8
**example (3)**
  31:17,18,18
**except (1)**
  74:17
**exclusive (1)**
  18:12
**excuse (9)**
  18:3,4,17;20:16;
  36:16;54:19;66:17;
  68:5,6
**executed (1)**
  16:17
**exemption (2)**
  24:1,5
**exemptions (1)**
  24:11

**exhibits (4)**
  35:23;36:20,20;
  48:15
**exist (4)**
  20:11;21:17;
  22:10;32:9
**existed (3)**
  68:21;69:4;75:15
**exists (2)**
  22:9;24:4
**expect (1)**
  35:19
**expecting (1)**
  69:5
**expedient (1)**
  41:6
**experience (1)**
  36:25
**explored (1)**
  40:4
**Express (1)**
  70:9
**extended (2)**
  67:7;69:2
**extent (12)**
  15:6;17:12;18:23;
  23:1;25:11;27:7;
  34:14;42:2;46:19;
  59:22;76:9,15
**extra (1)**
  65:9
**eyes (1)**
  59:9

## F

**fabulous (1)**
  64:23
**faced (1)**
  35:3
**fact (6)**
  18:19;37:7;39:1,
  16;61:13;67:4
**facts (2)**
  67:2;71:25
**factual (2)**
  44:10;75:3
**factually (1)**
  71:24
**fair (3)**
  17:18;29:15,19
**faith (4)**
  52:18;53:4;61:4;
  73:15
**false (6)**
  57:12;72:3;73:16,
  19,21;75:10
**falsely (1)**
  73:4
**far (6)**
  34:20;52:14;
  58:14;63:5;65:25;
  77:25

**farce (1)**
  56:17
**father (2)**
  22:25;44:1
**February (2)**
  12:19;58:4
**Federal (1)**
  61:18
**feels (1)**
  43:8
**fees (1)**
  73:1
**few (2)**
  47:24;61:8
**fiduciary (3)**
  22:3;32:24;33:4
**fifteen (2)**
  43:10;64:24
**fifty (2)**
  32:1,2
**file (23)**
  14:16;16:20;17:6;
  27:9,11,14;28:3,4,
  18;32:5,21;36:18,20;
  63:17,18;64:10,12;
  65:2,12;73:19,25;
  77:21,22
**Filed (43)**
  4:4,7,10,13,16,19,
  22;5:2;12:11;14:17,
  25;15:2,9,17;18:2;
  26:20;28:20;31:7,
  19;32:24;37:11;
  38:22;44:17;46:3,5;
  48:5;51:19,21;
  53:18;54:25;56:19;
  57:2,24;58:16;
  60:14;72:2,15;73:4,
  14,20,23;74:12;
  75:18
**files (1)**
  43:21
**filing (4)**
  26:14;30:14;
  52:18;75:1
**filings (3)**
  69:8;70:4,17
**final (1)**
  16:15
**finality (1)**
  16:10
**Finally (2)**
  50:24;61:25
**finances (1)**
  72:24
**financial (1)**
  74:20
**find (1)**
  75:11
**findings (1)**
  44:10
**fine (6)**
  36:2;40:17;52:16;

62:24;65:11;77:13
**finish (1)**
  65:20
**Firm (5)**
  33:8,19,25;34:6;
  41:2
**firmly (1)**
  53:25
**First (16)**
  12:6;14:10;18:8;
  19:25;30:23;31:11;
  35:18;37:14,17;
  43:10;46:24;50:2,3;
  56:19;61:13;63:18
**fit (2)**
  40:5;54:9
**floating (1)**
  50:7
**Floor (2)**
  10:12;28:1
**flow (2)**
  44:16;47:10
**focus (1)**
  66:8
**FOLEY (3)**
  10:18;19:8;52:3
**folks (6)**
  18:17,18;31:5;
  42:21;47:25;63:20
**folks' (1)**
  13:5
**following (1)**
  20:1
**follows (1)**
  71:25
**footnote (2)**
  31:20;32:5
**forgive (1)**
  21:19
**form (4)**
  40:11;47:11;
  72:16;75:21
**format (1)**
  69:12
**formed (1)**
  22:25
**forms (1)**
  20:1
**Forrest (1)**
  31:21
**forth (1)**
  20:2
**Fortunately (1)**
  43:21
**forty-eight (1)**
  62:5
**forty-five (1)**
  51:16
**forward (10)**
  16:4;28:15;38:3;
  41:7;43:15;44:18,
  19;56:7;57:17,22
**found (5)**

72:1,2,6;74:2;75:6
**four (2)**
35:6;43:8
**fourteen (1)**
61:4
**FRANK (3)**
11:8;19:11;42:23
**frankly (6)**
16:2,23;19:25;
21:13;29:20;61:5
**fraud (3)**
32:14;67:24;75:8
**fraudulent (18)**
16:25;20:7,18,22,
24;21:18;22:5,6;
23:8;25:9,12;40:2;
46:14;50:20;51:2;
56:17;76:20,22
**fraudulently (1)**
22:17
**Freeman (7)**
70:5,12;74:2,2,5,
14;75:25
**Friday (2)**
16:18;65:13
**front (3)**
53:9,10;59:9
**fruition (1)**
43:17
**frustration (1)**
72:1
**full (2)**
26:6;36:9
**fully (2)**
35:1;43:8
**funder (1)**
44:3
**funds (3)**
22:12,12,17
**further (8)**
15:5;24:11;30:19;
32:16;34:11,23;
54:22;69:18
**furtherance (1)**
59:18
**future (1)**
23:1

## G

**Garden (1)**
8:6
**GARRITY (2)**
3:12;12:3
**GARTMAN (21)**
9:7;19:16,18,18;
44:2,2,5;45:16;56:2,
5,5,11,14;58:20;
59:1,14,22;60:10;
61:1,12,21
**Gartman's (1)**
42:25
**gathered (1)**

34:20
**gating (5)**
23:10;44:24;
46:22;52:9,17
**gave (1)**
33:3
**Genger (67)**
4:5,11,14,23;5:3,5,
6,7,9,9,13,13,18,22,
22;6:2,2;8:3,12;10:3,
11,19;11:3;13:21;
15:19,21,22,22;
16:16;18:2;19:2,8,
12;22:5,13,22,22;
26:7,20;30:13;31:18,
22,24,24;32:1,1,5,18,
23,25;33:9,15,19,23,
25;34:7;42:24;
44:25;48:4;52:3;
54:6;60:21;68:14;
69:24;72:9;74:18;
75:5
**Genger/Herschmann (1)**
32:14
**Gengers (2)**
12:24;13:4
**Genger's (1)**
22:4
**germane (1)**
36:11
**GERON (19)**
33:16,18,18,22,22,
25;34:5,5,6;36:15,
19,22,24;37:12;42:4,
25;43:3;47:2;52:19
**Geron's (2)**
43:19;48:13
**gets (3)**
37:5;49:21;53:18
**given (10)**
26:9,24;36:12;
44:12;45:6;53:19;
55:4;61:21,22;74:7
**gives (1)**
17:23
**giving (3)**
57:11;70:10;74:6
**glitches (1)**
78:9
**global (2)**
13:15;43:5
**globally (1)**
20:6
**goes (3)**
35:3;57:21;58:15
**Good (9)**
12:2;13:24;14:4;
15:25;16:12;45:21,
21;52:2;72:16
**GP (1)**
10:3
**granted (3)**
39:23;70:18;74:15

**Great (3)**
19:20;71:22;72:14
**greatly (1)**
48:11
**Green (1)**
3:3
**grievous (1)**
36:4
**group (39)**
12:23;15:21,24;
16:16,16;20:12,14,
25;21:5,14,22,22;
23:3;24:20;25:3,9,
11,13,17;26:4;28:8,
9,17,22;29:3,4,6,17,
24,25;30:13;32:14;
33:13,13;51:5;53:14,
15,15;57:1
**groups (1)**
28:6
**guess (8)**
12:19,24;16:2;
19:22;21:8;24:21;
30:16;53:19

## H

**Hana (1)**
6:20
**handle (1)**
20:10
**handling (1)**
72:18
**hang (2)**
62:6,13
**happen (3)**
25:2;39:22;41:6
**happened (4)**
53:20;62:11;
66:25;71:14
**happening (1)**
50:25
**happens (2)**
31:4,5
**happy (4)**
27:25;45:25;61:8;
74:4
**harm (1)**
36:4
**hear (15)**
13:16,18;27:15;
29:8,11;41:3;42:15;
45:25;60:12;62:7,8,
10;63:20;71:3,19
**heard (25)**
28:1;29:18;30:10,
15,21;38:18;41:17,
23;42:8,19,21;44:1;
45:12;46:7,21;
51:18;52:9,11,19;
54:4;55:24;56:18;
57:15;59:13;66:3
**hearing (35)**

17:9;26:21,22;
27:1,17;29:14,15,23,
24;41:10,22,24;42:3,
10;43:4;45:3,4;46:1,
5,8,9;47:15,16,20,
21;50:16;51:13,16,
17,22;53:9;54:1;
63:9;68:22;71:15
**heavily (1)**
44:8
**held (3)**
35:14;50:17,18
**Hello (2)**
62:8;71:17
**herein (1)**
74:16
**Here's (1)**
64:9
**herring (1)**
75:3
**Herschmann (45)**
5:6;9:11,15;15:19;
16:16;19:16;20:9;
24:4,7;30:13;33:8,
13;43:1;46:20;
48:22;65:18;66:5,6,
8,11,16,19;68:6,8,11,
13,16,19,25;71:3,4,
23;72:1,15,22;73:11,
20,24;74:9,9,12,18;
76:15;77:8,9
**Herschmann-Broser (1)**
25:2
**Hi (2)**
55:17;56:2
**hidden (1)**
36:5
**hiding (1)**
75:8
**highly (1)**
17:14
**himself (4)**
32:5;70:22;71:13,
24
**hired (2)**
69:23;75:4
**hold (6)**
51:21;55:15;
63:11;65:21;69:17;
73:10
**holding (1)**
46:16
**homestead (4)**
20:9;23:25;24:1;
31:2
**HON (1)**
3:12
**honestly (1)**
73:17
**Honor (135)**
12:15;13:1,24;
14:4,7,11,15,18;
17:3,9,14;19:1,7,11,

14,18;20:23;22:2;
23:9,11,17,20;24:5,
14;26:17;27:24,25;
28:7,12,25;29:21;
30:4,6,6,17,22;
31:17;33:16,22;34:1,
6;35:11;36:1,19;
37:12;39:19;40:17;
41:19;42:23;44:2,5,
12;45:13,22,24;
48:25;49:10,16;50:9,
15;51:12,24;52:2,6,
7,10,20,25;53:9,11,
11;54:5;55:19;56:2,
3,15,17;57:21;58:8,
20;59:1,13,15;60:9,
10,14;61:3,7;62:18,
19;63:4,6,21,22,24,
24;64:3,5,19;65:15,
17,18;66:5,19,20;
67:5,8,10,18;68:13,
22;69:8;70:5;71:4,6,
8,19,23,25;73:9,10,
10,15,17;74:9;75:16,
17,22;76:4,7;77:8,
11,11;78:5,7
**Honor's (5)**
15:16;29:21;
30:20,21;59:9
**hope (3)**
16:18;43:16;50:9
**hoped (2)**
34:17;40:20
**hopefully (4)**
15:13;16:15;17:6,
9
**host (2)**
37:16;38:22
**hotly (1)**
64:22
**houses (1)**
74:4
**HUBBARD (3)**
9:2;19:19;44:3
**HUGHES (3)**
9:2;19:18;44:2
**hundreds (1)**
72:7
**husband (2)**
24:3;76:9

## I

**idea (3)**
46:13;60:18;73:17
**ideally (2)**
17:7;43:11
**identify (7)**
12:6,7;37:3;69:14,
18;70:1;75:6
**identifying (1)**
71:24
**ignored (1)**

19-01447-jlg    Doc 10    Filed 05/18/20    Entered 05/20/20 10:50:11    Main Document
Pg 86 of 93
ORLY GENGER
Lead Case No. 19-13895-jlg

May 5, 2020

73:14
**illegally (1)**
66:22
**important (1)**
15:10
**impression (1)**
36:8
**improper (1)**
57:25
**improved (1)**
20:6
**Inc (2)**
4:23;8:13
**include (1)**
21:4
**included (1)**
21:10
**including (6)**
15:8;43:13;51:9;
69:8,12;72:8
**incorrect (1)**
61:17
**incredible (1)**
52:22
**indeed (1)**
72:7
**indicated (3)**
12:6;37:2;41:21
**indication (1)**
73:15
**indicative (2)**
53:3,4
**indirectly (1)**
34:14
**individually (1)**
22:21
**inform (1)**
74:18
**information (11)**
13:5;66:22;67:2;
69:13,15;70:8,15,19,
25;74:20;75:23
**initial (2)**
14:22;20:5
**initially (1)**
16:24
**inquiries (1)**
73:12
**instead (2)**
16:3;73:14
**instruction (1)**
70:9
**intend (7)**
17:1,2;60:5,12,15,
17;62:1
**intended (1)**
15:11
**intent (2)**
39:7,7
**intention (2)**
16:14;39:6
**intentionally (1)**
39:7

**interest (3)**
25:15;51:7;73:3
**interfamily (2)**
52:12;53:17
**interfere (1)**
18:20
**interrupt (6)**
18:18;36:17,24;
49:7,21;64:9
**interrupted (1)**
66:3
**interrupting (2)**
18:4;55:23
**into (15)**
20:4;21:13;24:21,
25;39:15;40:5;45:6;
46:11;51:4;56:7,25;
57:7;58:11;62:2,22
**invade (2)**
70:3;76:19
**invasion (2)**
67:23;70:23
**investigate (2)**
75:5;76:11
**investigated (2)**
32:16;72:13
**investigating (2)**
32:8;72:19
**investigation (5)**
67:13,22;68:1,9;
70:23
**investigative (4)**
68:20;69:23;
70:14;74:24
**investigator (11)**
66:21;67:4,11;
68:14;69:23;72:11,
17;73:18;75:5,12;
76:12
**investigators (1)**
76:11
**Investment (2)**
4:23;8:12
**invited (1)**
73:13
**involved (3)**
37:13,16;68:3
**involving (1)**
44:20
**IRA (2)**
10:2,7
**irony (1)**
52:22
**Israel (11)**
67:13,19,21,23;
68:10;70:21,23;
72:4;73:18;75:21;
76:14
**Israeli (3)**
72:10,18;76:16
**issuance (1)**
58:3
**issue (15)**

23:10;26:19;39:1;
43:12;46:22;52:9,
17;53:3;61:19;66:8;
67:11;69:6;70:6;
72:20;75:2
**issued (7)**
13:20;37:18,19;
58:3;59:23;61:16;
70:9
**issues (25)**
13:9,10;15:14;
20:12;21:13;23:9;
38:10,11;41:14;
42:3;43:12,12,13;
44:8,16,24;47:1,17;
49:22;53:10,12,23;
62:23;65:24;74:16

**J**

**JAMES (1)**
3:12
**Jerusalem (2)**
67:24,25
**jlg (1)**
5:21
**job (1)**
64:23
**JOHN (3)**
8:18;71:18;77:12
**Joint (6)**
5:5;43:1;72:5,7,
24;75:11
**jointly (2)**
20:9;24:2
**JR (1)**
3:12
**JUDGE (18)**
3:13;12:2;20:17;
31:21;36:17;48:24;
55:7,17;65:20;70:5,
11,12;74:1,2,5,14,
20;75:25
**judgment (5)**
31:19;32:4;37:23;
38:2,21
**July (5)**
17:10;26:16;28:6;
41:10;51:17
**jump (1)**
61:8
**June (6)**
17:10;26:16;28:5;
41:10;51:17,18
**June/July (1)**
17:23

**K**

**Kailas (1)**
34:6
**Kasowitz (8)**
5:6,17;9:10,18,19;

24:25;33:7;45:14
**keep (5)**
25:19,21,22;30:18,
19
**kick (1)**
46:13
**kill (1)**
77:22
**kind (2)**
20:12;53:21
**kinds (1)**
53:24
**kitchen (1)**
36:9
**knew (1)**
58:18
**known (1)**
75:11
**Krinsky (2)**
14:5;59:16
**KURLAND (1)**
9:23

**L**

**label (1)**
54:8
**Labov (15)**
4:13;10:23;19:7,7;
52:2,2,6;54:7;55:7,7;
59:18;60:25;61:7,7;
64:21
**lack (1)**
61:11
**LARDNER (2)**
10:18;52:3
**large (1)**
33:4
**largely (1)**
36:5
**last (16)**
16:7;21:12;24:17,
18,22;46:3,11;50:16;
52:7;54:17,25;
60:13;69:7,21;70:5;
73:9
**lastly (1)**
27:2
**late (9)**
15:2;17:10;26:16;
28:5;41:10;51:17,
18;67:16,17
**later (7)**
15:9;23:1;26:15;
29:7;36:11;72:4,6
**latest (1)**
50:18
**LAW (6)**
10:2;23:22;33:7;
67:20;72:12;75:20
**laying (1)**
67:1
**least (9)**

16:24;37:22,24;
38:12,20,24;41:2;
69:24;70:13
**leaves (1)**
36:8
**left (5)**
12:18;26:1;31:9;
36:3;48:7
**legal (2)**
73:1,6
**less (2)**
35:22,22
**Letter (19)**
4:4,7,10,16,22;5:5;
42:25;43:14;66:11,
18;67:3,3,9,21;69:6;
72:16;73:11,14;
75:21
**letters (5)**
74:13,14;75:17;
77:1,5
**Lewis (3)**
12:12,12,25
**liability (2)**
31:10,11
**licensed (1)**
72:10
**liens (1)**
21:7
**light (1)**
18:19
**Likewise (1)**
19:11
**liking (1)**
46:17
**limitations (4)**
60:15,20,23;62:4
**limited (2)**
39:12,13
**line (7)**
13:25;33:18,20;
39:17;40:6;48:14;
71:2
**lined (1)**
34:19
**lines (1)**
48:16
**lining (1)**
37:15
**liquidate (1)**
57:5
**liquidation (1)**
31:1
**list (3)**
39:5,6;56:17
**listed (1)**
52:24
**litigated (1)**
37:6
**Litigation (14)**
5:7;13:21;22:22;
27:20;28:9;35:15;
40:2;43:10;44:3;

48:7;53:21;61:4;
62:2;65:25
**litigations (7)**
14:19;26:3;27:4;
33:11;35:5,10;57:4
**litigious (1)**
17:14
**little (6)**
12:4;18:9;26:14;
34:22;48:18;71:23
**live (1)**
64:18
**lived (1)**
72:3
**living (2)**
72:4;73:5
**LLC (6)**
5:7;6:21;9:3;10:3;
19:19;44:3
**LLP (10)**
5:17;8:2,11;9:2,
10,18,19;10:10,18;
11:2
**logic (1)**
75:21
**logical (1)**
34:1
**logjam (1)**
50:5
**long (4)**
29:17;50:16;67:3;
73:7
**longer (2)**
19:24;26:15
**look (7)**
31:10,12;43:15;
52:6;62:22;69:1;
75:22
**looked (2)**
36:24;43:23
**looking (7)**
22:4;25:6;26:15;
31:8,11;51:4;77:7
**looks (1)**
75:17
**lot (8)**
37:23;43:12;45:8;
46:18,25;56:20;
57:13;73:7
**lump (1)**
25:18
**luxury (1)**
16:5

**M**

**Magistrate (3)**
74:1,2,5
**mail (2)**
58:4;60:4
**mailing (2)**
60:3,5
**maintain (1)**

27:13
**maintaining (2)**
54:12,15
**makes (4)**
36:2;42:5;46:4;
75:19
**making (5)**
42:7;43:15;74:13;
75:3;76:16
**malfeasance (1)**
32:14
**many (8)**
13:20;14:19;15:3;
34:12,15;35:23;
43:11;44:16
**March (4)**
14:10;66:20;
68:22;74:25
**marital (1)**
24:12
**MARTIN (3)**
8:11;19:2;45:22
**MARVIN (3)**
8:11;19:2;45:22
**matter (4)**
38:25;39:8;73:9,
22
**matters (12)**
12:16;17:4;27:20;
32:9;34:16;35:7;
44:7;53:6,7;55:25;
77:17;78:1
**May (30)**
3:6;12:15;15:3;
16:17,18;20:10;
21:17;22:10;24:19;
26:13;28:10,10;
32:9;41:9,9;44:15;
45:7;51:19;53:22;
55:11;56:11;57:19,
20;59:10,13;63:1;
64:7;70:12;74:15;
77:22
**maybe (5)**
16:18;24:16;
26:14;39:25;43:12
**mean (11)**
16:11;18:20;27:3;
29:20;30:4;36:16,
17;40:17;42:17;
64:20;77:4
**means (3)**
38:23;60:14;72:17
**meant (1)**
36:20
**meantime (1)**
76:18
**meet (1)**
73:13
**members (2)**
24:20;57:1
**Memory (1)**
12:14

**mentioned (4)**
53:13;54:20;
64:21,21
**merely (1)**
72:24
**merit (1)**
30:9
**merits (1)**
38:5
**met (1)**
12:20
**Michael (3)**
5:21;8:3;9:24
**might (6)**
17:13;20:11;21:1;
22:24;27:8;29:10
**Mike (1)**
45:13
**mildly (1)**
52:13
**million (9)**
21:21,23,25;
23:14;30:25;31:19,
20,23;32:6
**million-dollar (2)**
20:7,22
**minimize (1)**
35:5
**minimized (1)**
48:11
**minister (2)**
70:22;75:20
**Ministry (2)**
67:19;70:21
**minute (1)**
63:11
**minutes (1)**
62:21
**misrepresentation (1)**
74:3
**misrepresented (2)**
69:3;74:23
**missed (1)**
52:21
**missing (1)**
52:19
**mistake (1)**
29:1
**moment (2)**
55:21;65:1
**Monday (1)**
16:18
**money (2)**
31:21;61:5
**monies (2)**
22:21;25:22
**month (4)**
16:20;17:2,7;
51:20
**months (9)**
46:4,11;54:17,20,
21,21;61:2;69:8;
75:2

**MOORE (1)**
11:7
**moot (3)**
39:25;49:22;57:16
**More (15)**
12:19;33:10;38:8,
21;39:3;41:24;45:8;
52:25;57:9;58:12;
59:4,12;60:10;
62:21;70:14
**Morgan (3)**
12:12,12,25
**morning (1)**
45:21
**most (9)**
23:19,19;31:21;
35:23;41:6,6;43:22;
44:13;48:14
**mother (3)**
19:5,8;52:4
**motion (99)**
16:20;17:6;18:1;
23:12;26:14,19,22,
22;27:14,15,16,17;
28:4,16,16,18,19;
29:8,9,11,15,18;
30:7,8,10,14;32:21;
34:20;35:12,13,14,
16,18,21;36:3,7,18,
19;37:15,20,25;38:3,
5,9,15;39:3,20,24;
40:12,14;41:8,22;
42:10,11;46:1,2,8,9,
22;47:3,11,15,22;
48:14,15;49:2;
50:17;51:13,18,19,
20,22;52:8;53:2,10,
21;54:1;55:4;56:15;
57:14,16;58:15,16;
59:2,5,10;64:11,14,
16,17,23,24,24;65:3,
12;73:14;74:5;
77:19;78:2
**motions (2)**
46:21;73:23
**movant (1)**
35:24
**move (2)**
28:15;41:7
**moving (1)**
33:9
**much (6)**
53:22,22;61:14;
65:17;78:4,8
**multiple (6)**
14:23;72:2;73:20,
23;74:12;76:21
**must (1)**
61:15
**mute (3)**
58:23,24;64:3
**muted (1)**
71:13

**mutual (1)**
26:3
**mutually (1)**
18:12
**myself (3)**
43:7;56:3;70:17

**N**

**name (2)**
33:22;70:10
**National (1)**
67:23
**native (1)**
69:12
**natural (1)**
26:25
**nature (5)**
14:19;19:3;32:15;
33:11;54:23
**necessarily (7)**
25:1,1,25;32:19;
42:5,6;45:6
**necessary (2)**
77:25;78:2
**need (20)**
17:8,12,21,25;
21:12;23:9;27:9;
31:13,15;32:21;33:5,
11;34:24;47:2;48:3;
59:4,10,12;65:23;
77:4
**needed (1)**
75:14
**needs (2)**
16:10;40:3
**neglected (1)**
39:6
**negotiating (4)**
18:7,17,18,20
**New (16)**
3:4,4;6:23;8:15;
9:5,13,21;10:5,13,
21;11:5;27:5;34:7,8;
35:21;47:9
**next (2)**
34:2;37:18
**ninety (1)**
58:7
**Nonetheless (1)**
43:7
**note (5)**
12:11;40:23;44:5;
50:24;75:16
**noted (2)**
27:2;36:15
**notes (4)**
21:2,7,23,24
**notice (2)**
70:8,10
**notion (1)**
57:11
**November (1)**

19-01447-jlg   Doc 10   Filed 05/18/20   Entered 05/20/20 10:50:11   Main Document
Pg 88 of 93
ORLY GENGER
Lead Case No. 19-13895-jlg

May 5, 2020

55:1
**number (7)**
13:19;26:1;27:20;
35:16;38:19;70:10;
72:15
**numerous (5)**
58:20;59:1,7,7,8
**NY (10)**
6:23;8:6,15;9:5,
13,21;10:5,13,21;
11:5

**O**

**object (11)**
17:19;31:14;
34:10,10;35:4;42:1,
6,9;58:19;74:6;
76:18
**objection (8)**
18:19,25;19:3,9,
19;29:22;30:14;
40:14
**objections (4)**
17:11;22:19;27:8;
35:2
**objective (5)**
29:16,19;30:11;
41:25;59:19
**obligated (1)**
43:8
**obligation (2)**
32:2,3
**observations (1)**
34:9
**obtain (1)**
75:24
**obtained (3)**
33:1;66:22;69:13
**obtaining (1)**
67:14
**obviated (1)**
48:11
**obviates (1)**
48:3
**obviously (23)**
17:16;20:5;22:18;
27:9;29:3;30:13;
34:10,22;35:9;
37:21;41:21;44:6,7,
17,23;52:6,9,11,15;
53:16;56:6;64:20;
73:3
**occurs (1)**
39:18
**o'clock (3)**
63:1;65:13;77:18
**October (2)**
54:19,25
**odd (1)**
52:20
**off (5)**
18:8;46:16;50:21;

51:21;61:12
**offers (1)**
16:12
**OFFICE (3)**
10:2;13:8;67:25
**officials (1)**
68:3
**offline (1)**
66:1
**Oldner (2)**
5:21;8:3
**once (3)**
40:10;49:21;74:15
**One (43)**
3:3;9:4;11:4;16:4;
17:3,5,16;18:8,11,
11;19:24;22:8;23:8;
24:18;26:4;28:6,13;
32:9;34:9;35:19;
36:15;38:8;40:7,24;
42:18;47:4,14;
48:14;50:24;51:3;
53:3;54:12;60:10;
62:23;64:20;66:8;
68:23;69:4;70:13;
72:3;73:5;74:4;
77:19
**ongoing (1)**
67:22
**only (13)**
26:9;28:12;29:9;
31:18;41:14,25;
48:7;51:14;54:10;
65:5;69:11,24;70:1
**onto (1)**
55:3
**open (1)**
30:19
**operations@escribersnet (1)**
6:25
**OPERATOR (6)**
62:8,12;63:4,6,8,
11
**opinion (1)**
58:12
**opportunity (9)**
13:21;15:4;17:11,
24,25;42:11;56:11;
64:13;65:4
**opposed (1)**
26:21
**orally (1)**
69:24
**order (13)**
26:25;48:23,25;
49:4,8,9,11;69:14,
18;70:12;73:5;
75:25;76:23
**ordered (4)**
70:6,11;74:15,21
**orders (1)**
58:9
**organized (1)**

39:12
**originally (1)**
46:3
**Orly (28)**
5:3,5,22;8:3;
10:11;15:22;22:4,5,
13,21,21;26:7;32:1,
3,23,24,25;33:15,19,
23,25;34:7;40:25;
44:1;48:4;53:15;
54:6;75:5
**Orly's (2)**
22:17;75:13
**OSWALD (7)**
11:8;19:11,11;
42:23,23;43:3;53:6
**others (2)**
56:9;68:16
**otherwise (2)**
58:9;77:15
**ought (1)**
41:5
**out (26)**
13:7;17:22;22:5;
23:2;24:10;27:14;
42:1;46:2,9;47:8;
48:7;49:23;54:19;
55:21;57:1;58:10,
14;59:22;60:1;
62:24;66:2;67:1;
72:6;73:5,21;78:10
**outlined (2)**
40:8;45:5
**outlining (2)**
40:9,9
**outrageous (1)**
76:23
**outset (3)**
15:16;44:6;45:24
**outside (2)**
35:7;57:5
**outstanding (1)**
47:5
**over (5)**
12:16;14:23;16:7;
17:17;60:21
**overlapped (1)**
12:19
**overlapping (2)**
47:1,17
**oversees (2)**
67:20;75:20
**overview (1)**
14:13
**own (10)**
16:6;20:9;38:20;
39:12,13;40:12,13;
57:6;73:1,13
**owned (1)**
24:2
**ownership (1)**
74:4
**owns (1)**

22:10

**P**

**page (2)**
56:19;73:11
**pages (4)**
35:23;58:16;
64:24,25
**paid (1)**
21:2
**paper (2)**
43:22;52:7
**papers (4)**
45:5;50:7;52:11;
53:1
**parallel (1)**
39:20
**parcel (1)**
29:6
**pardon (1)**
20:17
**Park (2)**
9:4;10:20
**part (14)**
15:25;23:9,11;
24:17;28:12,17;
29:6;32:10;41:2,4;
42:25;48:21;52:25;
53:2
**participated (1)**
14:14
**participating (1)**
14:12
**particular (4)**
19:16;29:23;
31:17;76:12
**particularly (3)**
35:1;38:7;76:8
**parties (47)**
14:9,15,24;15:2,6,
12;16:1,7,11,13;
17:19;18:7;19:5;
20:11;21:3,4,7,8,10;
22:20;23:19;26:4;
27:10;31:2;41:14;
42:13;44:8,20;
46:14;47:7,12;48:2,
8,20;49:1,3,12,13,16,
18;50:19,21;51:5;
56:18;63:18;64:5,21
**parties-in-interest (2)**
14:13;17:24
**partner (1)**
71:10
**party (8)**
25:4;28:1;30:9;
42:20;43:21;44:17;
49:24;70:7
**passed (1)**
54:21
**past (1)**
75:2

**path (9)**
23:23;25:2;27:3;
29:20;44:19;53:21;
56:7;57:17,18
**patience (2)**
16:8;78:10
**Paul (6)**
4:13;10:23;19:7;
52:2;55:7;61:7
**Pause (3)**
55:16;62:16;63:12
**payment (1)**
32:2
**Pending (12)**
4:19;14:19;15:14;
27:4,9;32:9,10;35:7,
15;42:11;57:3;69:17
**Penn (1)**
11:4
**people (6)**
17:11,23,24;45:8;
64:13;77:24
**percent (2)**
32:1,2
**perfectly (2)**
54:9;72:18
**perhaps (1)**
41:12
**period (8)**
12:15;19:24;23:5;
29:7,17;55:12;67:7;
69:2
**permit (1)**
34:2
**person (1)**
70:2
**personal (3)**
69:13;70:14;74:20
**personally (1)**
66:9
**persons (2)**
69:14,18
**perspective (2)**
16:13;40:16
**ph (1)**
63:9
**phone (6)**
14:12;33:15;47:7;
62:23;65:24;77:2
**phrased (1)**
50:9
**Piazza (7)**
4:8,17,20;13:24,
25;14:3,6
**pick (1)**
12:7
**picture (2)**
27:18;38:19
**piece (3)**
24:17,17,18
**pieces (2)**
21:25;43:22
**Pitta (32)**

4:4,10,22;8:17;
19:1,1;26:24;29:10;
45:18,20,21,22,23,
24;49:5,6,10,15,23;
50:9,13,15;51:24;
71:6,6,8,8,9,10,13,
18,21
**Pitta's (1)**
42:7
**place (7)**
27:1;37:14;41:22;
43:21,22;46:25;73:5
**plans (1)**
63:16
**play (1)**
27:14
**Plaza (2)**
9:4;11:4
**pleadings (1)**
12:11
**please (13)**
12:6;13:13,23;
29:2;34:3;55:15;
58:23,24;61:11;
63:10;65:20,25;66:4
**plenty (1)**
51:18
**PM (2)**
3:7;78:12
**point (24)**
12:21;17:10;
27:18;29:10;35:8;
36:7,11,12;37:4;
41:6;43:9;46:2,9;
47:16;49:23;50:4;
51:21;54:24;56:15,
25;58:14;60:1;70:5;
77:22
**pointed (3)**
42:1;59:22;73:21
**points (3)**
33:1;54:11;61:8
**Police (2)**
67:23,25
**Pollock (6)**
5:2;10:10,15;54:5,
5,8
**portions (1)**
37:1
**Position (19)**
5:5;14:16,17;15:9,
17;17:25;22:12,16;
33:5;34:17;37:22;
42:14;43:1;44:7,17,
23;45:15;48:9;52:7
**positions (3)**
14:14;15:23;56:8
**possession (1)**
67:6
**possibility (1)**
30:15
**possible (7)**
23:20;29:16,19;

32:8;34:13,16;65:10
**possibly (1)**
17:10
**post- (1)**
37:22
**post-judgment (3)**
59:3;72:9,20
**potential (9)**
19:4;20:24;21:1,5,
9,9;32:16;33:11;
57:9
**potentially (5)**
17:21;27:6;29:7;
31:14;40:7
**precedential (1)**
15:12
**predetermined (1)**
41:13
**predicaments (1)**
73:6
**prefer (1)**
30:5
**preference (1)**
41:22
**prejudicial (1)**
15:12
**pre-marital (1)**
69:19
**premise (1)**
46:16
**premised (1)**
68:16
**pre-nup (1)**
73:2
**pre-nuptial (1)**
48:17
**prepared (4)**
14:22;16:4;47:10;
63:17
**present (2)**
34:2;35:17
**presentation (1)**
34:21
**preserved (1)**
60:7
**preserving (1)**
60:14
**press (1)**
29:11
**presumably (4)**
28:20;30:5;39:25;
49:21
**Pre-Trial (1)**
6:3
**pretty (2)**
16:12;61:13
**previously (8)**
48:21;49:4,17;
67:13;68:19;69:22;
70:2;73:1
**prior (3)**
23:5;45:3;70:8
**privacy (3)**

67:23;70:3,24
**private (3)**
72:10;73:18;76:10
**pro (1)**
73:2
**probably (5)**
12:21;47:1;50:3;
61:23;76:25
**problem (5)**
13:7;16:3;50:14,
14;65:15
**procedural (1)**
38:6
**proceed (12)**
13:17;17:15;
27:19;34:19;39:20;
46:5,8;47:11;59:11;
60:15,17;63:9
**proceeding (11)**
5:9,13,17,21;6:2;
17:16;39:8,11;
54:25;61:10;68:2
**proceedings (3)**
35:6,9;78:12
**proceeds (6)**
23:4;37:15;45:3;
48:7;57:4;60:21
**process (8)**
27:13;32:11;35:2;
39:11;40:5,6;41:7;
47:14
**produce (2)**
69:10;70:11
**produced (5)**
59:3,8;69:16;
72:11,22
**producing (1)**
47:13
**product (2)**
70:1;76:19
**production (1)**
74:19
**productive (1)**
64:6
**progress (1)**
13:14
**promptly (1)**
43:16
**properly (1)**
59:23
**property (3)**
24:3,13;70:24
**proponents (1)**
28:16
**proposal (30)**
15:19,20;16:4;
17:15,17,17,18,20;
19:23;20:5,13,14;
23:23,24;24:22;25:6,
7,13;27:3;28:2,13,
13;29:5,12;30:23;
40:25;41:5;42:20,
22;46:19

**proposals (5)**
15:18;16:2,6;43:9;
55:2
**proposed (7)**
35:13;44:16,19;
48:2;51:11;57:8;
59:6
**proposing (1)**
44:15
**pros (1)**
16:6
**prosecute (1)**
27:16
**prosecuted (1)**
25:4
**prospective (2)**
35:2,16
**protective (4)**
48:23,25;49:4,9
**provide (12)**
14:16;21:16;
23:18,18,21,22;
25:18,20;26:6;
31:24;32:1;57:8
**provided (8)**
14:13;21:24;
25:10;27:22;68:23;
69:19;70:18;73:11
**provides (5)**
20:8;25:13;58:1,2,
6
**providing (4)**
24:7,8,9,9
**Public (2)**
67:19;75:20
**purely (1)**
38:6
**purported (1)**
58:4
**purpose (1)**
64:7
**purposes (3)**
15:24;22:15;23:24
**pursue (10)**
16:24;22:15;
23:10;29:5;30:12,
19;40:1,3;60:13;
63:16
**pursuing (1)**
23:8
**pursuit (4)**
24:24;25:12;
57:10;72:9
**push (2)**
17:22;55:11
**put (2)**
50:21;55:14
**putting (1)**
52:13

**Q**

**quagmire (1)**

39:15
**Quentin (1)**
8:5
**quick (2)**
40:23;61:8
**quickly (2)**
43:18;56:15
**quite (3)**
47:5,14;76:19
**quo (3)**
27:13;54:12,15

**R**

**raise (4)**
13:23;15:7,10;
17:11
**raised (4)**
32:20;43:14;69:5;
74:16
**raising (1)**
65:24
**reach (1)**
77:19
**reached (4)**
18:11;31:23;
46:17;57:20
**reaches (2)**
46:20;50:19
**read (7)**
13:19;36:18,25;
52:11;53:1;76:25;
77:1
**ready (1)**
12:3
**really (17)**
16:5;35:4,20;
37:10;38:10,10;39:3,
10,19;40:14,17;41:5;
47:6;50:25;53:4,16;
62:7
**reason (6)**
16:22;39:2;41:25;
51:21;64:4;69:3
**reasonable (2)**
17:19;61:23
**reasons (1)**
35:16
**recall (2)**
12:20;14:11
**recalls (1)**
66:20
**receive (5)**
15:20;21:7;26:10;
31:22;48:6
**received (7)**
23:3;46:14;47:6;
66:20;67:16,17,18
**recipients (1)**
50:20
**recitation (1)**
61:15
**recognize (1)**

Min-U-Script®                    eScribers, LLC | (973) 406-2250
                           operations@escribers.net | www.escribers.net
(10) Pitta's - recognize

16:10
**reconciliation (4)**
  31:14;48:1,4,11
**record (2)**
  14:9;60:7
**recording (1)**
  12:7
**records (1)**
  67:14
**recover (2)**
  22:6;48:10
**recoveries (4)**
  25:16;26:9;57:9,
  10
**recovery (4)**
  20:24;21:1;25:16;
  48:6
**red (1)**
  75:3
**redacted (5)**
  35:24;37:1,3;
  48:14,15
**redaction (1)**
  49:22
**redactions (4)**
  35:25;36:6;37:17;
  49:24
**REED (3)**
  9:2;19:19;44:3
**refer (1)**
  69:12
**reference (1)**
  15:24
**refuses (1)**
  76:10
**regard (4)**
  30:11;43:20;60:6;
  76:8
**regarding (5)**
  43:5;57:23;60:11;
  67:23;70:23
**register (1)**
  31:16
**Reitler (1)**
  34:6
**related (2)**
  13:4;47:2
**relates (2)**
  21:17;66:9
**relating (2)**
  44:25;45:2
**relatively (2)**
  44:22;45:10
**release (1)**
  21:16
**releases (5)**
  23:16,18,20,21;
  26:3
**releasing (1)**
  21:15
**relief (7)**
  66:13;67:8;68:4;
  69:10;70:18;74:15;

75:23
**remade (1)**
  35:21
**remaining (1)**
  49:18
**remand (1)**
  27:8
**Report (12)**
  4:13,19;5:2;66:24;
  67:4,11;68:20,23;
  69:2,23;70:14;74:24
**reports (2)**
  69:11;72:12
**represent (3)**
  33:19,23;34:7
**representation (1)**
  68:21
**representations (1)**
  70:20
**represented (1)**
  67:5
**representing (5)**
  12:24;33:14,15;
  43:7;67:6
**represents (2)**
  33:19,25
**request (5)**
  27:12;34:11;35:8;
  42:7,8
**requested (3)**
  41:8;66:13;70:18
**required (1)**
  59:24
**requisite (1)**
  39:7
**research (1)**
  72:11
**reserve (1)**
  44:9
**resolution (7)**
  13:16;20:3,7,8;
  32:11;44:16;57:20
**resolve (3)**
  26:2;34:15;43:11
**resolved (9)**
  20:21;27:5;28:3,
  10,12;44:25;53:15;
  55:2,13
**resolves (2)**
  20:20;31:9
**resolving (3)**
  20:19;21:8;24:16
**resource (1)**
  15:14
**respect (16)**
  13:15;15:6;20:8,
  14,24;23:7;27:7;
  32:4;33:10;42:14,
  22;53:24;55:24;
  59:17;61:25;64:23
**respectfully (4)**
  27:12;40:16;
  54:15,22

**respectively (1)**
  39:21
**respond (7)**
  41:20;53:23;56:6,
  8;58:13;61:6;74:10
**responding (1)**
  73:11
**response (7)**
  37:21;47:24;
  48:13;67:9,18,19;
  73:12
**responses (1)**
  47:6
**rest (2)**
  50:6;55:12
**result (2)**
  45:1;60:22
**retain (1)**
  76:10
**retained (3)**
  72:10,10,14
**return (4)**
  26:16;28:5;77:23;
  78:1
**returned (1)**
  51:8
**returns (1)**
  48:18
**review (1)**
  65:4
**reviewed (1)**
  13:18
**reviewing (1)**
  12:10
**right (54)**
  12:25;13:2;19:6,
  13,14,20,21;21:3,22,
  25;22:3,13;23:13,25;
  24:12,15;25:5;
  26:12;27:23;28:10;
  30:10;33:14;41:16;
  42:15;43:25;45:11,
  20;49:20;51:23;
  54:3;55:6,14;56:1,
  13;59:8;62:17,20,20,
  22;63:23;64:18;
  65:11;68:24;71:1;
  76:2,2,8;77:7,10,10,
  13,13,14;78:3
**rights (7)**
  20:24;22:24;23:1,
  6;25:8;44:9;45:1
**rise (2)**
  32:15;33:3
**risks (2)**
  16:6;22:19
**road (1)**
  46:14
**Rocco (8)**
  4:7,16,19;14:1,4;
  19:15;41:19;59:15
**Rodriguez (3)**
  12:5;77:2,22

**roles (1)**
  19:17
**Rosenblatt (1)**
  34:7
**route (2)**
  63:16;64:11
**Rule (6)**
  57:25;58:1,6;
  59:24;61:15,18
**ruling (2)**
  74:16;75:16
**rummage (1)**
  75:12
**run (1)**
  68:6

**S**

**saga (1)**
  73:7
**Sagi (49)**
  4:4,10,22;8:12;
  15:21,21,23;16:16;
  18:2;19:2,5;20:12,
  14;24:16,20;25:9,11,
  13,17;26:4,20;28:22;
  29:3,6,17,25;31:1,
  18,24,25;38:12,14;
  40:8,14,23;41:2;
  48:1,2,4;51:9,25;
  53:14;54:1,8;56:24;
  57:1;68:14;69:24;
  74:18
**Sagi's (1)**
  38:20
**same (14)**
  26:21;27:1,17;
  29:9,23;30:5,15;
  42:3,6,8;43:20;51:6;
  59:24;75:1
**sanctions (2)**
  73:23;74:13
**sat (1)**
  59:3
**satisfied (1)**
  53:5
**saying (8)**
  22:4;26:12;28:14;
  31:8;37:6,9;49:8;
  55:22
**schedule (6)**
  28:15;44:14;
  52:20,21,24;68:3
**scheduled (1)**
  52:8
**schedules (5)**
  38:13,14,25;56:17,
  22
**scheduling (6)**
  17:4;26:19;53:9;
  54:1;57:14,21
**schluffing (1)**
  61:12

**Second (6)**
  21:14;23:21;53:8;
  54:24;55:15;56:24
**secondary (1)**
  35:10
**seconds (1)**
  62:5
**secured (1)**
  76:9
**Security (3)**
  67:20;70:21;75:20
**Seeing (1)**
  64:17
**seek (3)**
  22:6,12;47:23
**seeking (5)**
  50:21;69:10;73:3;
  74:13;77:20
**seeks (1)**
  60:20
**seem (2)**
  44:12,20
**seems (3)**
  34:21;41:5;61:3
**SEGAL (3)**
  11:2,2;42:24
**selecting (1)**
  17:17
**senior (1)**
  68:2
**sense (11)**
  17:22;24:8;26:20,
  25;36:13;39:19;
  41:24;42:5;45:8;
  46:18;75:22
**sent (1)**
  69:24
**separate (2)**
  31:25;54:16
**separately (2)**
  22:22;47:16
**September (1)**
  46:3
**series (2)**
  36:4,20
**serious (1)**
  70:22
**serve (7)**
  17:23,25;49:2;
  58:4;59:20;61:14,15
**served (8)**
  47:6,8;48:20;55:1,
  9;58:2;59:23;74:8
**service (12)**
  57:24,25;58:6,8,
  11,19;59:17,18;
  60:17;61:22;62:22;
  74:19
**sets (1)**
  18:1
**setting (1)**
  54:10
**settle (4)**

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

ORLY GENGER
Lead Case No. 19-13895-jlg

May 5, 2020

26:23;34:12;48:1;
57:15
**settled (2)**
18:15,24
**settlement (70)**
16:14,15,17,20;
17:1,5;18:10;19:5;
21:4,11,13,21;22:16;
23:2,4,5,10,11,13,24;
24:20;27:14,15,16;
29:6,14,24;30:2,6,
12,16;33:12;34:15,
19;35:1;40:1,8,11,
20,24;41:3,11,24;
42:11;43:5,16;44:8;
45:2,4;46:10,12,17,
20,23;47:4,17,19;
48:12;50:18,25;
51:20;52:10,15;
55:2;57:8;59:6;
60:22;61:2;64:21;
65:4
**settlements (3)**
40:8;41:23;51:11
**settling (6)**
18:16;19:4;24:6;
28:6,17;30:25
**seven (3)**
58:2;61:2,16
**Seventh (1)**
6:22
**share (2)**
43:19;63:17
**shared (2)**
51:8;69:14
**shares (1)**
22:24
**shield (1)**
76:23
**short (1)**
55:12
**shorter (1)**
53:22
**shorthand (1)**
15:22
**shortly (2)**
14:8;44:14
**shot (1)**
38:24
**showing (1)**
48:23
**sic (1)**
21:21
**side (22)**
16:8,23;17:5;26:4;
29:14;31:10,11,11;
32:14;34:25;38:9;
39:16;43:6;44:9;
45:12,19;46:7;
47:20;51:3,5;59:5,12
**sides (1)**
59:20
**sideshow (1)**

35:21
**sidestep (1)**
39:11
**signature (1)**
49:12
**signatures (1)**
49:18
**signed (2)**
49:16;71:15
**significant (2)**
38:19;53:18
**significantly (1)**
38:21
**silence (1)**
44:10
**similar (1)**
36:25
**simply (4)**
56:21;57:11,17;
61:17
**simultaneous (1)**
47:21
**simultaneously (1)**
46:21
**single (3)**
44:17;72:22,23
**sink (1)**
36:9
**sit (2)**
50:15;72:23
**sitting (1)**
66:23
**six (3)**
46:11;69:7;75:2
**sixteen (1)**
53:17
**sixteen-plus (1)**
75:7
**sixteen-year (1)**
52:12
**sixty-seven (1)**
73:11
**six-year (1)**
60:22
**skip (2)**
33:16,19
**small (2)**
52:25;53:2
**smaller (1)**
26:1
**somehow (2)**
40:10,25
**someone (3)**
58:18;66:3;76:19
**somewhat (1)**
24:21
**somewhere (1)**
16:19
**soon (2)**
44:22;45:10
**sooner (1)**
53:22
**sorry (36)**

12:3;18:3,3,4,17;
19:15;20:16,16;
28:21,23,24;29:4;
33:17;36:16,17,23;
41:18;45:19,21,23;
49:7,7,15,20;50:5;
55:7;56:2,4;58:1;
60:11;63:8;64:8;
66:5,17;68:5;76:6
**sort (1)**
13:10
**sorts (1)**
44:18
**sought (1)**
68:4
**sound (1)**
42:17
**sounds (1)**
43:19
**Southern (1)**
47:8
**speak (6)**
12:6;19:16;24:6,9;
26:24;29:10
**SPEAKER (14)**
55:19;58:18,22;
60:9;62:6,10,11,14,
18,19;63:21,22;78:4,
7
**speaking (4)**
12:8;16:11;58:24,
24
**speaks (1)**
58:15
**specific (1)**
67:7
**specifically (3)**
12:20;70:6,7
**specter (1)**
40:4
**SPELFOGEL (1)**
10:24
**spend (1)**
61:5
**spending (1)**
72:7
**spent (1)**
15:25
**spoken (2)**
47:25;61:21
**squabbles (1)**
53:17
**staff (2)**
70:22;75:19
**stall (1)**
54:19
**stand (4)**
13:14;27:19;
43:24;45:9
**standing (2)**
44:25;53:23
**standings (1)**
33:1

**start (7)**
13:22;18:21;
19:22,23;34:9;
53:20;61:13
**started (5)**
12:9;19:24;33:7,8;
43:4
**state (5)**
32:9;57:13;60:7;
67:19;70:20
**stated (5)**
38:21;56:9;67:9;
73:2,4
**statement (4)**
14:16;15:17;43:1;
44:17
**statements (3)**
14:17;15:9;48:13
**States (2)**
3:2;73:19
**Status (18)**
4:13,19;5:2;14:8,
10,21;15:8;27:13;
44:13,14;45:6;54:12,
15,17;57:17;61:9;
63:1;77:16
**statute (4)**
60:15,19,23;62:4
**stay (1)**
54:22
**stayed (4)**
35:8,10;44:21;
73:24
**stealing (1)**
70:24
**step (1)**
55:21
**steps (1)**
13:8
**still (8)**
31:10,13,15;33:6;
34:21;43:22;55:1,17
**strategy (1)**
53:21
**Street (1)**
10:12
**strenuously (1)**
42:6
**strict (1)**
69:17
**strip (1)**
57:3
**strong (1)**
34:15
**strongly (3)**
35:11,20;44:24
**stuff (1)**
66:1
**subject (2)**
62:2;73:22
**submit (3)**
35:13;38:6;42:24
**submitted (6)**

49:1,8,11;52:7;
54:14;66:11
**subordination (1)**
32:17
**subpoena (6)**
69:13;70:7,9,12;
75:25;76:1
**subpoenas (5)**
37:18,19;47:8;
59:7;74:19
**substance (5)**
35:18;43:23;53:6,
7;61:25
**substantial (3)**
37:1;57:8,10
**successful (7)**
23:7;25:11,17,19,
20,24;26:11
**suggest (3)**
28:15;51:10;56:7
**suggested (2)**
31:21;51:17
**suggesting (5)**
30:8,9;37:5,6;
57:17
**suggestion (1)**
45:7
**suggests (1)**
44:18
**Suite (1)**
6:22
**suited (1)**
43:11
**sum (1)**
25:18
**summons (4)**
58:3,3;59:22;
61:16
**support (2)**
31:25;35:8
**supposedly (1)**
69:25
**sure (11)**
18:5,22;25:7;32:6;
37:10;47:12;68:8;
71:14,15;73:8;74:11
**surprise (1)**
24:23
**surprised (1)**
69:4
**surprising (2)**
59:6,11
**surrounding (1)**
35:5
**system (2)**
62:13;71:15

---

**T**

**tactic (1)**
61:5
**talk (7)**
18:21;26:23;

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

52:19;54:12;64:15;
77:25;78:2
**talked (2)**
47:2;50:1
**talking (6)**
18:16;20:19;51:3;
52:22,23;59:20
**targeted (2)**
66:14;75:23
**Tarter (2)**
14:5;59:15
**tax (1)**
48:18
**technical (1)**
78:9
**teeing (1)**
64:16
**telephonic (1)**
44:21
**telling (1)**
69:22
**tells (1)**
75:1
**ten (1)**
26:15
**terms (10)**
18:15;34:18;
38:18;39:18;40:24;
47:25;52:15;53:9,
14;54:1
**terrible (1)**
36:4
**test (1)**
12:14
**testimony (1)**
48:18
**Texas (7)**
20:10;47:6;48:22,
24,24;49:17;72:3
**thanks (1)**
78:9
**that'd (1)**
65:5
**that'll (2)**
65:3,4
**theories (1)**
37:10
**thereabouts (2)**
16:19;28:5
**there'd (1)**
47:15
**therefore (2)**
27:6;64:22
**thereto (1)**
65:5
**thinking (2)**
30:1,4
**third (2)**
25:4;70:7
**thirty (1)**
64:24
**thirty- (1)**
43:7

**thirty-two (3)**
20:7;23:14;30:25
**thirty-two- (1)**
20:21
**thirty-two-million-dollar (4)**
16:25;20:18;
26:10;52:23
**Thomas (8)**
4:4,10,22;8:17;
19:1;45:22;71:6,8
**though (2)**
75:1;77:22
**thought (5)**
34:22;42:2;43:4;
50:10;52:14
**thousands (1)**
72:7
**threatened (2)**
37:19;48:21
**three (5)**
15:25;26:7;37:24;
77:2,5
**throughout (1)**
46:7
**throw (1)**
58:10
**Thus (1)**
17:7
**tie (1)**
25:15
**till (3)**
17:22;64:19;65:2
**timely (1)**
68:3
**times (1)**
47:5
**timing (4)**
39:13;40:18,18;
41:8
**tiny (1)**
18:5
**today (12)**
13:13;15:10;17:4,
10;34:18;43:4;47:7;
50:15;51:12;53:25;
75:17;77:16
**together (5)**
12:17,22;45:9;
77:3,23
**TOGUT (3)**
11:2;19:12;42:24
**TOKAYER (1)**
10:7
**TOKER (1)**
10:2
**told (8)**
16:13;18:23;49:3;
60:3;69:7;73:1;
75:25;76:15
**tone (1)**
61:11
**tonight (1)**
77:1

**Torres (6)**
5:6,17;9:10,18,19;
45:14
**touch (1)**
77:15
**towards (1)**
55:11
**TPR (2)**
4:23;8:12
**traded (1)**
51:1
**transaction (1)**
25:14
**Transcribed (1)**
6:20
**transcripts (1)**
37:25
**transfer (2)**
16:25;56:18
**transferees (3)**
21:6;23:14;51:6
**transferred (3)**
34:8;46:10;47:9
**transferring (1)**
56:25
**transfers (4)**
22:5,7;46:15;
50:20
**transpired (1)**
67:2
**travel (1)**
67:14
**treatment (2)**
35:12,13
**TRI (1)**
22:24
**tried (2)**
52:10;70:3
**true (2)**
47:18;76:23
**truly (1)**
51:14
**Trump (8)**
21:2,4,7,22,22;
23:3;45:2;61:1
**Trust (21)**
5:3,7;8:4;10:11;
22:22,22;27:10;
30:24;31:8;32:20,
25;33:2;48:5;54:6;
55:8;57:23;59:16;
60:11,20,23;65:25
**Trustee (53)**
5:21;8:3;13:13,13,
16,25;14:6;15:22;
16:23;18:7;19:3,25;
21:8,10;23:7;24:25;
25:15;26:4;27:8;
29:5,20;30:24;31:8;
32:16,23;34:17;
39:17,19,22,22;40:1,
2,6,10,12;42:20;
43:7,8,15;45:25;

48:1,24;50:16,19;
51:1,17,19;52:15;
57:15,18,20;63:15;
75:9
**trustee's (16)**
16:12;21:15;
34:11,24;35:4,8,15;
40:18,18;41:8,21;
42:14,22;44:19;
60:6;77:19
**try (3)**
56:14;66:1;76:1
**trying (11)**
13:15;29:18;
30:11;39:17;41:25;
56:6,21;57:3;60:2;
71:10;72:21
**turns (2)**
23:2;78:10
**twelve (1)**
31:20
**twenty (1)**
45:8
**twenty-four (1)**
31:23
**twice (1)**
47:15
**two (21)**
15:18,25;16:3,5;
21:22,24,25;37:24,
24;38:10,10,15,25;
42:16;51:11;54:11,
17,20,20,21;59:4
**two-million-dollar (2)**
72:25;76:20
**two-party (1)**
38:16
**types (4)**
20:12;60:2;74:13;
78:1

**U**

**ultimately (4)**
14:24;16:23;23:3,
7
**Under (6)**
18:10;23:13,21;
30:23;40:19;59:24
**underlying (3)**
34:12,16;49:25
**Understood (4)**
37:12;42:13;50:2,
3
**unexpectedly (2)**
67:10;74:25
**unfold (1)**
18:22
**UNIDENTIFIED (14)**
55:19;58:18,22;
60:9;62:6,10,11,14,
18,19;63:21,22;78:4,
7

**unilateral (1)**
36:6
**unilaterally (1)**
35:24
**Unit (2)**
67:24,24
**United (2)**
3:2;73:19
**universe (1)**
77:6
**Unless (4)**
18:17,18;27:24;
58:8
**unmuting (1)**
56:3
**unredacted (3)**
37:8;48:20;49:2
**up (20)**
12:7;18:1,5,9;
30:4;31:15;34:19;
37:15;39:2,17;40:6;
43:17;45:9;50:10;
53:24;61:21;62:6,
13;64:16;76:16
**update (4)**
13:14;14:1;15:4,4
**updated (2)**
15:20;47:8
**upfront (1)**
25:10
**upon (2)**
32:5;51:1
**used (1)**
75:12
**useful (3)**
14:20;15:13,13
**using (2)**
15:23;54:18

**V**

**valid (1)**
32:12
**value (5)**
15:13;24:11;
25:10,10;51:2
**various (13)**
14:21,24;15:14;
20:10;26:3;32:13;
33:1;44:7;55:2;57:1;
69:9;70:4;73:6
**via (1)**
75:24
**view (1)**
26:20
**views (3)**
13:17;22:20;43:3
**violated (1)**
57:25
**violating (1)**
48:23
**violation (1)**
49:3

**voiced (1)**
37:13

**W**

**waiting (1)**
29:17
**waive (1)**
59:21
**waiving (1)**
24:10
**wants (2)**
29:21;30:21
**waste (3)**
38:6,6;47:18
**wasteful (2)**
40:6;47:14
**way (22)**
14:7,9;15:8;16:24;
30:16;31:12,17;
34:23;35:3;37:5,14;
40:3,22,23;42:16,17;
50:10;53:16;57:21;
63:2,3;64:15
**ways (1)**
44:18
**week (8)**
14:22,24;16:7;
26:14,15;52:7,8;58:5
**weekend (1)**
43:17
**weeks (3)**
15:25;35:22,22
**West (1)**
10:4
**Western (1)**
72:2
**what's (9)**
25:1;50:25;51:1;
53:19;61:22;64:17;
71:13;77:24,25
**Whereupon (1)**
78:12
**whichever (1)**
17:15
**whole (1)**
56:15
**who's (2)**
12:5,7
**who've (1)**
47:25
**wife (3)**
72:6;73:24;76:23
**wins (1)**
43:22
**wish (4)**
41:16;43:25;
45:11;54:3
**wishes (1)**
28:1
**withdrawal (1)**
29:7
**within (5)**

26:14;58:2,6;
61:16;67:3
**without (5)**
40:4;57:7;70:8,10;
77:23
**words (1)**
67:10
**work (9)**
16:9;31:15;33:6;
40:21,22;62:24;
66:1;69:25;76:19
**worked (3)**
12:16,22;13:3
**working (7)**
13:8;15:19;16:1;
19:23;24:5;34:13;
68:1
**worth (2)**
21:23;37:22
**wrinkle (1)**
65:7
**wrong (2)**
72:17;76:13
**wrote (2)**
67:1,3

**Y**

**Yann (5)**
33:16,18,22;34:5,6
**year (4)**
14:10;23:1;46:3,
11
**year-and- (1)**
74:7
**year-and-a-half (2)**
72:21;76:10
**years (7)**
12:12;38:1;43:8,
10;53:17;61:4;75:7
**year's (1)**
37:22
**yesterday (7)**
66:12;67:8,16,17;
69:22;70:17;75:18
**York (15)**
3:4,4;6:23;8:15;
9:5,13,21;10:5,13,
21;11:5;27:5;34:7,8;
47:9

**1**

**1 (5)**
5:11,15,19,23;6:3
**100 (1)**
8:5
**10001 (1)**
6:23
**10004 (2)**
9:5;10:13
**10016 (1)**
10:21

**10019 (2)**
9:13,21
**10024 (1)**
10:5
**10119 (1)**
11:5
**10271 (1)**
8:15
**11530 (1)**
8:6
**12 (1)**
32:6
**12:40 (1)**
3:7
**120 (1)**
8:14
**13th (1)**
14:22
**15 (1)**
21:23
**15th (6)**
16:17;26:13;28:4;
44:15;64:10;65:2
**1633 (2)**
9:12,20
**16th (1)**
74:15
**17 (1)**
21:25
**17th (6)**
14:17,25;15:3,18;
16:3,5
**19-01444-jlg (1)**
5:9
**19-01445-jlg (1)**
5:13
**19-01446-jlg (1)**
5:17
**19-01447 (1)**
5:21
**1993 (4)**
5:3,22;8:4;10:11

**2**

**2 (4)**
36:22;63:1;65:13;
77:18
**2:33 (1)**
78:12
**200 (1)**
35:23
**20-01010-jlg (1)**
6:2
**2004 (2)**
31:24;60:22
**2012 (1)**
22:23
**2013 (1)**
12:14
**2015 (1)**
12:19
**2016 (1)**

12:14
**2019 (1)**
70:12
**2020 (1)**
3:6
**20th (3)**
55:9;58:4;64:12
**21st (5)**
63:1,14;64:7,20;
65:2
**22nd (8)**
16:18;17:6;28:4;
41:9;64:13,14;77:18,
23
**240 (1)**
67:8
**24th (1)**
10:12
**25th (4)**
16:19;17:6;41:9;
51:19
**26th (4)**
16:19;18:2;28:4,
20

**3**

**3.2 (2)**
31:19;32:4
**352 (1)**
6:22

**4**

**42 (1)**
21:20
**465 (1)**
10:4
**4e (1)**
57:25
**4m (2)**
58:6;61:18
**4th (4)**
14:10;66:20;
68:22;74:25

**5**

**5 (1)**
3:6
**550 (1)**
58:16

**6**

**60 (1)**
10:12
**6th (1)**
70:12

**7**

**7 (4)**

13:25;14:6;31:4;
48:24
**7.5-million-dollar (1)**
21:24
**7004e (3)**
58:1;59:24;61:15
**727 (2)**
39:8,11

**9**

**90 (1)**
10:20
**9019 (21)**
34:19;35:2,16;
36:11;38:7;39:16,18,
20,23,25;40:3,13;
41:12,15;43:17;46:8,
10,23;47:17;53:13,
18
**973406-2250 (1)**
6:24