1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - -x


In the Matter of:

ORLY GENGER,                          Lead Case No.

        Debtor.                       19-13895-jlg


- - - - - - - - - - - - - - - - - - - - -x

SAGI GENGER, et al.,

        Plaintiffs,                   Adv. Proc. No.

v.                                    19-01444-jlg

ORLY GENGER, et al.,

        Defendants.

- - - - - - - - - - - - - - - - - - - - -x

DALIA GENGER, et al.,

        Plaintiffs,                   Adv. Proc. No.

v.                                    19-01445-jlg

ORLY GENGER, et al.,

        Defendants.

- - - - - - - - - - - - - - - - - - - - -x

**2**

```
- - - - - - - - - - - - - - - - - - - - -x

KASOWITZ BENSON TORRES LLP, et al.,

        Plaintiffs,                    Adv. Proc. No.

v.                                     19-01446-jlg

SAGI GENGER, et al.,

        Defendants.

- - - - - - - - - - - - - - - - - - - - -x

MICHAEL OLDNER, AS TRUSTEE OF THE ORLY

GENGER 1993 TRUST

        Plaintiff,                     Adv. Proc. No.

v.                                     19-10447-jlg

ORLY GENGER, et al.,

        Defendants.

- - - - - - - - - - - - - - - - - - - - -x

DALIA GENGER,

        Plaintiff,                     Adv. Proc. No.

v.                                     20-01010-jlg

ORLY GENGER, et al.,

        Defendants.

- - - - - - - - - - - - - - - - - - - - -x
```

United States Bankruptcy Court

One Bowling Green

New York, New York


May 22, 2020

2:04 PM


B E F O R E:

HON. JAMES L. GARRITY, JR.

U.S. BANKRUPTCY JUDGE

**4**

(Doc #219) Case Conference

(Doc #222) Letter Filed by Thomas A. Pitta on behalf of Sagi Genger

(Doc #224) Letter Filed by Rocco A. Cavaliere on behalf of Deborah Piazza

(Doc #225) Letter Filed by Thomas A. Pitta on behalf of Sagi Genger

(Doc #232) Status Report filed by Paul J. Labov on behalf of Dalia Genger

(Doc #233) Letter filed by Rocco A. Cavaliere on behalf of Deborah Piazza

(Doc #234) Status Report of Pending Actions Filed by Rocco A. Cavaliere on behalf of Deborah Piazza

(Doc #235) Letter Filed by Thomas A. Pitta on behalf of Sagi Genger, TRP Investment Associates, Inc.

(Doc #236) Status Report Filed by Adam Pollock on behalf of The Orly Genger 1993 Trust

(Doc #237) Joint Position Letter by debtor Orly Genger and creditors Kasowitz Benson Torres, Eric Herschmann, the Genger Litigation Trust, ADBG LLC, and Arie Genger

Adversary proceeding:  19-01444-jlg Genger, et al. v. Genger, et al.
Case Conference

Adversary proceeding:  19-01445-jlg Genger, et al. v. Genger, et al.
(Doc #1) Complaint

Adversary proceeding:  19-01446-jlg Kasowitz Benson Torres LLP, et al. v. Genger, et al.
Case Conference

Adversary proceeding:  19-01447-jlg Michael Oldner, as Trustee of The Orly Genger 1993 v. Genger, et al.
Case Conference

Adversary proceeding:  20-01010-jlg Genger v. Genger, et al.

Pre-trial Conference

Transcribed by:  Ellen S. Kolman

eScribers, LLC

352 Seventh Avenue, Suite #604

New York, NY 10001

(973)406-2250

operations@escribers.net

A P P E A R A N C E S (ALL TELEPHONIC):

REITLER KAILAS & ROSENBLATT LLC

    Attorneys for Debtor

    885 Third Avenue, 20th Floor

    New York, NY 10022


BY:   YANN GERON, ESQ.




TARTER KRINSKY & DROGIN LLP

    Attorneys for Deborah J. Piazza, Chapter 7 Trustee

    1350 Broadway

    New York, NY 10018


BY:   ROCCO A. CAVALIERE, ESQ.

    DEBORAH J. PIAZZA, ESQ.




HUGHES HUBBARD & REED LLP

    Attorneys for ADBG LLC

    One Battery Park Plaza

    New York, NY 10004


BY:   CHRISTOPHER GARTMAN, ESQ.

8

CULLEN AND DYKMAN LLP

    Attorneys for Michael Oldner, Trustee of The Orly Genger

    1993 Trust

    100 Quentin Roosevelt Boulevard

    Garden City, NY 11530


BY:   ELIZABETH M. ABOULAFIA, ESQ.



EMMET, MARVIN & MARTIN LLP

    Attorneys for Sagi Genger and TPR Investment Associates,

    Inc.

    120 Broadway

    New York, NY 10271



BY:   THOMAS A. PITTA, ESQ.

    JOHN DELLAPORTAS, ESQ.

FOLEY & LARDNER LLP

     Attorneys for Dalia Genger

     90 Park Avenue

     New York, NY 10016


BY:   PAUL J. LABOV, ESQ.

      DOUGLAS E. SPELFOGEL, ESQ.



KASOWTIZ BENSON TORRES LLP

     Attorneys for Eric Herschmann

     1633 Broadway

     New York, NY 10019


BY:   ERIC D. HERSCHMANN, ESQ.



KASOWTIZ BENSON TORRES LLP

     Attorneys for Kasowitz Benson Torres LLP

     1633 Broadway

     New York, NY 10019


BY:   ANDREW R. KURLAND, ESQ.

      MICHAEL P. BOWEN, ESQ.

10

LAW OFFICE OF IRA DANIEL TOKAYER

       Attorneys for Dalia Genger, D&K GP LLC

       420 Lexington Avenue, Room 2400

       New York, NY 10170


BY:   IRA D. TOKAYER, ESQ.



POLLOCK COHEN LLP

       Attorneys for The Orly Genger 1993 Trust

       60 Broad Street, 24th Floor

       New York, NY 10004


BY:   ADAM POLLOCK, ESQ.



TOGUT, SEGAL & SEGAL LLP

       Attorneys for Arie Genger

       One Penn Plaza

       New York, NY 10119


BY:   FRANK A. OSWALD, ESQ.

P R O C E E D I N G S

THE COURT:  All right.  Good afternoon.  It's Judge Garrity, and the matter before us this afternoon is In Re: Orly Genger, case number 19-13895.

This is our continuation of the conference that we had earlier in the month.  What I'd like to do is to get an update from the counsel for the trustee, and then I'll be happy to hear from the parties with respect to thoughts on how we should proceed.

What I'm going to try to do today is, in using our new technology here in Court Solutions, if you'd like to speak, raise your hand and I'll be able to see that and try to work through calling on people.  So why don't we get started.

So counsel for the trustee, if you'd note your appearance and get started, that would be great.

MR. CAVALIERE:  Good afternoon, Your Honor.  Rocco Cavaliere, Tarter Krinsky & Drogin, on behalf of Deborah Piazza, the Chapter 7 trustee.  Deborah Piazza's also on the line, Your Honor.

MS. PIAZZA:  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

MR. CAVALIERE:  Your Honor, just by way of background, as you noted, we were here before the Court on May 5th, earlier this month, and we had indicated to the Court that we had made some progress with two different groups of creditors in this

case colloquially referred to, in one instance, the Sagi group, which is comprised of Sagi Genger, which is the brother of the debtor; Dalia Genger, who is the mother of the debtor, and the Orly Genger Trust.

And on the other side it was the parties that had reached a settlement with the first trustee, who are comprised of Arie Genger, the father; Eric Herschmann, the husband; and also the Brosers and their entity, ADBG, which was the litigation funders for a number of litigations, is my understanding, that Arie Genger, and even Orly Genger, in some instances, were involved in.

And we had made -- when we described it to the Court, they were, in each instance, very big proposals with significant consideration but also with significant risk as far as approval, and we were concerned in each instance that if we were to press forward at this relatively early stage from our perspective -- although the case has been pending a while before this Court, it's only been six months and Your Honor hasn't had that many hearings on actual motions -- we were concerned, especially after the conference when Your Honor had asked us to highlight, kind of, the structure of each of the proposals which I think was helpful -- each side then had an opportunity to then speak with us and highlight all of the major issues that they would raise and objections and appeals and the like.

And so the trustee and I regrouped, and we worked on a settlement that Your Honor saw, the settlement motion.  It's much smaller in scale, clearly, than what was contemplated, but it's still fairly large for a Chapter 7 case, and the details are in that motion that we filed yesterday.

Essentially, one part of the case will be addressed in the sense that there were these potential claims against Dalia, the mother, and the Orly Genger Trust trustee to say that we were evaluating and that we had determined would just be very costly for the estate to pursue, and there's some risk there, and so forth.  And we engaged in some discussions with Mr. Herschmann on behalf of an entity that is going to purchase those claims, and that entity, I think, is owned by a trust in which his daughter is the beneficiary.

We also engaged in discussions with ADBG with respect to a loan, and this is all part and parcel of our settlement or sale motion, loan motion, whatever you want to call it, to just advance the administration of the case to allow us to continue our good-faith discussions with them, which may lead to a bigger deal, or it may not.  We haven't made any determination on that, and we made that very clear, that there's always a possibility that we can turn back to the Sagi group on some type of transaction.

So we wanted to put something before the Court that we think is beneficial for the estate for all of the creditors.

Some may disagree, we understand that, but in any case, in this case, there's going to always be some disagreement.  But we think that it's the best path forward, at least for now.  And we retain -- the other beauty of this deal is we do retain, for further disposition, the potential avoidance action, which is the most controversial aspect of the case, the 32.3-million-dollar amounts emanating from the Trump settlement; that is really the most controversial part of this case.  We're holding onto that.

There is also a homestead issue that we continue to negotiate with Mr. Herschmann on.

And we also kept behind potential counterclaims that we have against Sagi Genger, the brother, in part because Sagi did have a claim in the case, there's no disputing that.  He has a judgment against the debtor for 3.2 million.  And rather than assign those claims, and we wanted to try to have an opportunity to negotiate or pursue them -- pursue the counterclaims -- we would like to try to negotiate with Mr. Genger in good faith to see if we can come to a determination on the allowed amount of his claim.

There's also what --  it was reported to me that there might be a potential cause of action against prior counsel to the debtor -- this is before Kasowitz got involved -- that may be some other additional value.

So we really retain significant value in the case and

if the settlement's approved we'll have some funding to move forward and put this case in the right path towards a very successful resolution.

So with that said, part of what we're trying to accomplish today, Your Honor, is to determine scheduling. And obviously, we'd love for the Court to schedule the hearing on that motion within thirty to forty days subject to the Court's availability and get that heard before the Court and determined.

And in the meantime, what we've been doing, I think it makes perfect sense from the perspective of the administration of the case to, essentially, continue to delay, if we can, motion practice on a number of other things that are pending such as the two surrogate court matters that had been removed from surrogate court to district court. They are not yet on this bankruptcy court docket, but I think they soon will be.

And there was motions to remand filed, and the trustee has to object to those. We would prefer to have that done after this motion, hopefully, is heard and approved, the motion that I filed yesterday.

And there's a number of other things: the constructive trust action that Dalia filed, if we can push those deadlines out as well, and a number of other things, such as the -- there's certain appeals of claims in the state court matter that we started discussions, as well, with Dalia

Genger's counsel that we want to push those dates out as well to perfect the appeal and the like.

And one last thing, Your Honor.  There is an action pending by the Orly Genger Trustee against Zeichner Ellman and Wachtel Missry.  These were prior counsel to the debtor.  That action's pending in district court.  It's highlighted in the status report that I filed, and that is filed as a malpractice claim and a breach of fiduciary -- aiding and abetting breach of fiduciary duty claim against those law firms.

And the premise in those cases is that the potential avoidance action that we've been talking about here which we think, potentially, is property of the estate, the trustee of the Orly Genger Trust have taken the position that that potential avoidance action is property of the trust.  And they believe that, as a result of that, their self-determination in that regard, that they have the right to then pursue the lawyers for malpractice in their capacity as representing the beneficiary, Orly Genger, who has had standing at one point on behalf of the trust to pursue certain things.  They have taken upon themselves to sue that firm for aiding and abetting of breach of fiduciary duty and for malpractice based, as I said, on the premise that the potential avoidance action really belongs to the trust.

I've said to Mr. Pollock, who represents the Orly Genger trustee, that I didn't think it was appropriate for the

action to go forward.  I think it did have implications for our bankruptcy estate, not the least of which is any determination by that district court against Zeichner Ellman on the theory that they aided and abetted a breach of fiduciary duty in and of itself would mean that there would have to be a finding that Orly Genger breached her fiduciary duty to the trust.  And there is a claim in this case by the Orly Genger trustee of forty-one million dollars on the theory that Orly Genger breached her fiduciary duty.

So I do think, for that reason and among other reasons, that that should continue to be -- that should be stayed.  That's been proceeding.  But after the last hearing where Your Honor had indicated he wants everything stayed, Mr. Pollock expressed, and we weren't really sure as we didn't really talk about that particular action in-depth of whether Your Honor meant that that should be stayed too.

So I wanted to bring it to the forefront for something for Your Honor to consider and for Mr. Pollock to weigh in on as to whether there should be some type of motion filed by Mr. Pollock for a determination, frankly, that the stay doesn't apply before he proceeds with that action, because I do think it does potentially have an impact.

So with that said, Your Honor, in sum, we look forward to hearing from all the parties, but we'd like to get the motion that we filed yesterday scheduled as soon as possible,

and we'd like most of the other matters that are pending to be held in abeyance until that motion for settlement is approved.

THE COURT:  Let me just ask you.  I had a chance to review it, the document, and not with the amount of time I would have liked to have spent with it, but just refresh my recollection.  The lender -- who is the lender; who is going to be -- or what's the entity that's going to be lending the 300,000 dollars to the trustee in her capacity as trustee?

MR. CAVALIERE:  Yes.  So the lender is ADBG LLC. This is an entity that is owned by the Brosers.  This is the litigation funder that we've been talking about in the case.

THE COURT:  Now, does ADBG have a claim in this case?

MR. CAVALIERE:  I believe they have a contingent claim in this case.  They have a claim that -- they had been -- they were paid around sixteen to seventeen million dollars on account of funding that they provided.  So when the -- the thirty-two-million-dollar potential avoidance action is comprised of seventeen million in cash that's already been paid, most of that to the ADBG entity, and then fifteen million dollars in notes which are subject to offsets due from The Trump Group, no relation to the President.

They also have a lien, a contingent lien, on those 4.5 -- up to 4.5 million dollars of those notes.  That is part of the issue about the potential avoidance action is whether those liens are appropriate or not.  But in the meantime, we've

worked with them to get this potential loan in place and they would be doing so in the capacity as a lender, I guess, to the estate. And one of the features that we have here as part of this deal is that if there is a future resolution with this group, with ADBG, that, essentially, the loan would be waived or it be part of the consideration that would be provided as part of a settlement.

And if, on the other hand, we were to pursue them for recoveries, then this would -- this 300,000-dollar amount, which would be relatively small compared to the potential recoveries, would be an offset. So that's another way that we intend to deal with the claim -- the ultimate payment of it -- at a later date in the case.

THE COURT: Now, under this agreement, the estate is transferring a number of claims to a trust -- who is acquiring -- what is the entity that's acquiring the claims?

MR. CAVALIERE: The entity is an entity that is owned by a trust, and the trust is -- I think the trustee of the trust is -- I think William McDermott is the name, and the beneficiary of that trust is Mr. Herschmann's and the debtor's daughter.

So all negotiations just to -- and I think --

THE COURT: This is --

MR. CAVALIERE: -- it's clear from the motion -- yeah.

THE COURT: No, no. Go ahead.

MR. CAVALIERE:  Yeah, I was just going to add, I mean, it's not as surprise, and I think we stated in the motion -- obviously, we're always transparent with the Court -- the negotiations here between the trustee and this entity were primarily with Mr. Herschmann, who is the representative of the entity.

THE COURT:  And Mr. Herschmann's daughter -- if I remember this correctly, the debtor and Mr. Herschmann's daughter is very young, right?  She's an infant, or he or she is --

MR. CAVALIERE:  Yes.

THE COURT:  -- an infant; is that right?

MR. CAVALIERE:  That's correct.  Three years old.

THE COURT:  Okay.

MR. CAVALIERE:  So hopefully, there won't be any depositions of the infant during this case.

THE COURT:  Right.  And the trust has the authority to settle the claims under your agreement?

MR. CAVALIERE:  That's correct.  Under this agreement, we would assign whatever rights the trustee has against Dalia and the Orly Genger trustee to this entity, and we would receive 50,000 dollars upfront, nonrefundable.  And then there would be outside consideration in connection with future recoveries, and they would periodically consult with us, certainly, but the intention is for them to run the case with

their own counsel, which was really the biggest feature, their own counsel, whoever they want to hire in that regard at their own cost.

And so there would be no incurrence of additional administrative expenses on our end, and so they would have control over how the strategy and the like, and we would hopefully recover -- essentially, become a -- we've essentially created a receivable for the estate in which we can recover up to, in the best-case scenario, up to about eleven million dollars in recoveries if this was really a significant claim that bears fruit.

THE COURT: Right. And what are you settling in this settlement?

MR. CAVALIERE: That's a good question. I think part of what we're settling is -- well, it's -- I don't know if I'd call it a settlement, but part of the loan, with respect to the loan as you might see in a debtor-in-possession type scenario where a loan is provided and then there's these milestones that a debtor agrees to, the trustee has agreed, really, to handle a few of the -- some case administration issues, we -- which we actually agree with, actually, as to how to handle with respect to dismissal of the constructive trust action filed by Dalia, the continued stay of a related proceeding against the Brosers that's also commenced by the Orly Genger trustee, and also, we would agree to support dismissal -- the objection to a

dismissal of the motion to dismiss.

And in addition, there's an agreement that we would try to continue to work with them in good faith, try to settle the potential avoidance action for the next few months.

So that's kind of the agreement, but it's really part of the loan consideration that we negotiated with them.

THE COURT:  All right.  And have you vetted this with the United States Trustee?

MR. CAVALIERE:  No, we did not, Your Honor.

THE COURT:  Did you provide the U.S. Trustee with a copy of the papers?

MR. CAVALIERE:  No, Your Honor, we've not.  I thought we would -- after today's hearing, if we were to get a notice -- if we were to get a hearing date from the Court, that we would serve the notice along with the motion.  We filed the motion yesterday at 3 in the afternoon, but we did not -- we did not run this by the U.S. Trustee's office.

THE COURT:  All right.  Just one -- and an event of default under this agreement is if the case is dismissed; am I correct?

MR. CAVALIERE:  I'm sorry; if you could repeat that, Your Honor, I didn't understand the question.

THE COURT:  I'm sorry.  If I -- if there is a motion made, or if the Court sua sponte dismisses the Chapter 7 bankruptcy case, that is an event of default under your loan

agreement; is that correct?

MR. CAVALIERE:  I think that that is correct; yes, Your Honor.

THE COURT:  All right.

Mr. Geron, you have your hand up.

MR. GERON:  I do, Your Honor.  Thank you.

THE COURT:  Sure.

MR. GERON:  So for the record, my name is Yann Geron and I represent Orly Genger in this matter.

I raise my hand because last time I spoke right after Mr. Cavaliere, and I was going to speak to scheduling issues if the Court will allow me.  More specifically, I was not going to speak to the settlement because we are not a party to the settlement, but rather to the other pressing matter that I'm sure the Court will be asked to decide in terms of scheduling, and that is the motion to dismiss.

I would like to press three related points very briefly about the motion to dismiss.  It comes as no surprise, I think, from the debtor's standpoint that the debtor believes the motion to dismiss to be baseless, to be purely a litigation tactic and posed to raise cost and disruption and as I said at the last hearing that the motion to dismiss is really just the discharge complaint in the guise of a motion to dismiss.

Very briefly, Your Honor, the only issue -- the only issue at all substantively raised by the motion to dismiss is

whether Orly Genger failed to disclose two notes, two promissory notes, on her schedules that are purportedly valued at fifteen million dollars.

I think it's indisputable that the schedules do disclose these notes.  They disclose the fact that the debtor does not believe that she has a right to collect on the notes, but she also discloses the actual litigation and the fact that there is no value to the debtor.  But in terms of disclosing the fact, the fact is there.

My point about litigation tactic is that my concern -- and I voiced this again last time and I won't belabor the point longer than in just a couple of sentences -- is that if the motion to dismiss is allowed to proceed now, say, for example, in parallel with -- in any other -- with that motion, the 9019, the parties will get bogged down in significant discovery issues.

These litigations, as the Court knows, go back years and the enforcement actions by Sagi Genger go back a couple of years and involve multiple depositions already.

So at a very minimum, one can foresee that the dispute will be around what has been produced, what is relevant, what should be produced, and what is duplicative of prior production.  And I fear that, at least, my client will get caught in an endless cycle of motions for protective orders and require court conferences on dispute resolution with respect to

discovery.  And so we think this is -- that was certainly the signal about the motion to dismiss that's already been given to us, and I am concerned about that.

And then the last point is the fact that this is really a discharge complaint and disguise of a motion to dismiss.  This is not a two-party dispute.  The fact that Orly and her brother are disputing things does not change the fact that there are multiple creditors in this case, that there are multiple issues to be resolved in this case, and the dismissal is really a request that the Court finds, again, that by Sagi's view -- that two notes were not disclosed when, in fact, they were, if Sagi wishes to press the point.

This is a 727 issue.  It should be framed as a 727 issue and should be litigated in the context of an adversary proceeding where discovery will have issues of relevance, and we will not be looking at a scattered approach to revisiting issues that have been litigated between the parties for the past fifteen years.

So my point in saying all of this, Your Honor, is that we now have a substantive movement forward by the trustee, a 9019 motion that is ready to be lined up and scheduled, and we ask that the Court consider, among the things that are going to be stayed pending resolution of the 9019 that the Court also consider staying the motion to dismiss until we have the full hearing and the determination of the 9019.

THE COURT:  All right.  Thank you.

Mr. Peeta -- or is it Pitta?  I'm sorry.

MR. PITTA:  Yes.  Thank you, Your Honor.

Good afternoon, Thomas Pitta of Emmet, Marvin & Marvin on behalf of the Sagi Genger.

Your Honor, one thing at the outset here is that I think what we know at this point is this is not a 9019 motion that's been filed.  There's nothing being settled.  I think Your Honor asked the right question.  It is a sale motion and a financing motion, but we'll address that in the context of addressing this motion.

But what we keep hearing here is notwithstanding the fact that we have had a motion to dismiss on file since September of last year, everybody's response is the motion is invalid if there's plenty of problems with it, so don't hear it.  That's not how you deal with a motion that you think isn't worthy of being granted.  You respond to the motion and you deal with it on the merits.  And we think it's far past time for our motion to dismiss to be heard on its merits.

Mr. Cavaliere was here not three weeks ago and told Your Honor that, "In my view, it would make sense to have the hearing on both at the same time as opposed to having the motion to dismiss before any motion to settle.  It would make" -- he went on to say allow us to file a settlement motion and hearing approval of a settlement motion at the same time

and we'll have a hearing on the dismissal motion.  He said, "But we would certainly have no objection to having a hearing in that particular circumstance at the same time as the hearing on the settlement to approve what the other group that the Sagi group is adverse to."

Your Honor, we, at every stage here, are told now is not the time to hear the motion to dismiss that's been on file for months and months and months.  Well, it is time for us to hear the motion to dismiss that's been on file for months and months and months.

We were also told two-and-a-half weeks ago that we were going to be back here with a grand settlement that was going to deal with the fraudulent conveyance actions and the homestead and the claims against my client and his mother, or was going to settle with -- on a grand scale with my client and his mother.  But instead, we're back here, and what's been filed is a motion to do a whole lot less for the estate, and somehow to give up, I think, an enormous amount to other parties.

We have a settlement that brings 50,000 dollars into the estate on account of claims that we think are worthless, but we'll deal with that.  We'll address the claims that -- and frankly, Dalia's counsel will deal with the claims that supposedly are being sold.  But the other part of the motion is to approve financing.  And that is not a settlement; it's a

financing motion.  And what seems to have happened here is that the trustee has agreed to receive 300,000 dollars in financing which -- this isn't an operating debtor.  There were comparisons made to a DIP motion in a Chapter 11 case.  This isn't an operating debtor that needs funds in order to run its business.  This is a Chapter 7 case where the only administrative claims that we can foresee are the fees of Tarter Krinsky.

So what the trustee has done is in exchange for 300,000 dollars to be used to pay Tarter Krinsky's fees being provided by what should be the big defendant in this case, the parties have received seventeen million dollars that we've been trying for years to bring back into this debtor's estate.  That party is now putting in a 300,000-dollar loan to the trustee to pay Tarter Krinsky's fees, and in exchange, the trustee has agreed not to sue that party for at least another seven months.

I don't understand what (break in audio) on the basis of the creditors of this estate.  The creditors of this estate get nothing out of this.

So we do believe it is time for a motion to dismiss that we've had on file for nine months or so to be heard.  And we are willing to have that hearing simultaneously with the hearing on this motion that was filed yesterday, but we do believe it needs to (break in audio).

Your Honor, Mr. -- I'll just respond briefly to Mr.

Geron's comments.  Mr. Geron would like to portray our motion to dismiss as simply a complaint about the fact that the two notes were not disclosed in the debtor's schedules.

You've seen our motion.  I think you're well aware that it is not solely based on the failure to disclose two notes in the debtor's schedules.  There is a lot more in there, and just to have it cheapened to that in order to say we don't even need to hear it because it's so silly is kind of a ridiculous comment to make.

It's time for a hearing on a motion to dismiss, and I think Your Honor scheduled that together with the hearing on this motion that was filed yesterday in the relatively near future.

We think there's a lot of very capable attorneys working for all the parties in this case.  We can work through -- and the to the extent we need Your Honor's help we'll get it, but we can work through whatever discovery issues there may be, but it's time to go ahead and actually have a case here.

THE COURT:  All right.  Thank you.

Mr. Pollock?

MR. POLLOCK:  Thank you, Your Honor.  And for the record, it's Adam Pollock for the Orly Genger 1993 Trust through its trustee, Mr. Michael Oldner.

We have two brief points about the issues that Mr.

Cavaliere touched on, one about the district court action, and one is the remand motions.

First, he mentioned a potential stay, and it's in the proposed settlement, of our two district court actions. These are district court actions by nondebtors against nondebtors about nondebtor monies. There's no basis for a stay. And what we would propose to do is very quickly put in a brief to that effect seeking a comfort letter from Your Honor allowing us to proceed in the district court. We'd like to tee those up very quickly.

The proposed settlement is very questionable to me. In the proposed settlement, the trustee and the Brosers, through their entity, the ABDG (sic) entity, they want to stay our district court action until December 31st, which seems like a very arbitrary date. Indeed, as Mr. Pitta mentioned, the Brosers are paying 300,000 dollars to Mr. Cavaliere's firm on, and this is in the motion, "very favorable terms", which is a fancy way of saying that it is not at arms' length.

And what do the Brosers get for paying 300,000 dollars? They get the trustee's agreement to stall out our litigation against them in district court until at least December 31st.

And I am struck by, just three weeks ago, Mr. Cavaliere said that he was evaluating the fraudulent transfer action, and three weeks ago, he said he was either going to

come back today with a settlement, or he was going to litigate it, but now he needs till December to think about it.  He's already had six months to think about it.  We'd like to proceed in those actions, and we can't understand what's happening between now and December.

And my other point, which Mr. Pitta touched on, which is he's saying in page 15 of the motion that he might litigate the fraudulent conveyance case against the Brosers in December, but there's a real question about whether that's going to happen when the key defendants to such an action are literally paying 300,000 dollars to his law firm.  It's a completely insider transaction where the lender just happens to be the largest litigation target.

So I come back to there's nothing to stay in the district court actions:  nondebtor parties, nondebtor funds.  We suggest respectfully that we very quickly brief this.  Same analysis for the case against the Zeichner Ellman firm which Mr. Cavaliere mentioned, and when he mentioned just a few months ago -- sorry -- a few minutes ago that Orly brought those claims -- Orly Genger brought those claims through the Zeichner firm on behalf of the estate.  They were derivative claims.

Accordingly, to the extent that there's malpractice in that action, those were the Orly Genger Trust claims to bring, not Orly's claims to bring.  I'll put that in the motion that

I'm proposing and to let this move forward.  So that's point one.

THE COURT:  Mr. Pol --

MR. POLLOCK:  Go ahead.

THE COURT:  Excuse me, Mr. Pollock, excuse me; it's the judge.

What is it that you envision with the briefs?  Exactly what are you thinking about?  This would be a motion by you on behalf of your client for a determination that the automatic stay doesn't preclude you from moving forward?  I mean, is that -- would that be the posture, it would be bringing that against the estate?

MR. POLLOCK:  I think so.

THE COURT:  I'm --

MR. POLLOCK:  It's an awkward posture, or atypical posture, but the trustee, through her counsel, have asked us to hold off in the district court for some six months now while she evaluates what to do about those cases.  We can't continue to hold off.

They have said in the proposed settlement that they would support -- that they would support a continued stay of those actions.  We'd like to get that issue resolved and get it resolved promptly.

THE COURT:  Or -- okay.  I understand.

You were going to make another point, I interrupted

you.

MR. POLLOCK:  Sure.

THE COURT:  I stopped you.

MR. POLLOCK:  So this is a brief point -- yes -- which is about the remand motions.

There are -- back in October of 2019, some seven months ago, Kasowitz Benson, when they were -- on behalf of the trustee in Texas had removed a few actions from the surrogate's court, we think that it's very clear that the surrogate's court has exclusive jurisdiction of those matters.

We had filed a motion to remand them back last fall and the trustee, who is now the New York trustee, still hasn't opposed those motions.  They've also been kicked down the road again and again.  We'd like to get that resolved promptly, as well, and brief those issues simultaneously.

THE COURT: All right.  Okay.  Anything else, Mr. Pollock?  You're done?

MR. POLLOCK:  No.  Thank you, Your Honor.

THE COURT:  Sure.

Mr. Laba?

MR. LABOV:  Thank you, Your Honor.  Paul Labov, Foley & Lardner --

THE COURT:  Labov.

MR. LABOV:  -- on behalf of Dalia Genger.  Yeah, that's fine.  That's fine.

Your Honor, again, you've heard it -- you've heard quite a bit today from Mr. Cavaliere and Mr. Pitta and what this motion looks like.  And Your Honor asked what the settlement portion of the motion was, and honestly, we reviewed it and there's a lot of nasty things in there and tough things to read about my own client.  And so we look at it two levels just like everybody else.

Part of it's a claim sale.  And Mr. Cavaliere points out in the motion itself, he doesn't even know if he owns the claims that he's purporting to sell, what the value of those are.  Those are all things we can address if and when Your Honor schedules this motion to be heard as long as our client, obviously, maintains all of her rights and defenses and counterclaims, so on and so forth.  Again, these things can be addressed in the opposition.

But I think the important thing, Your Honor, to note is that that's the tail wagging the dog.  The 50,000 dollar claim sale portion of whatever this motion is, certainly not a settlement, but whatever this is is really the under -- is really a guise for the loan.  And that is the real issue here in front of Your Honor, and that is the 300,000 dollars, as you've heard now a couple of times, being loaned by the entity that is the subject of a thirty-two-million-dollar fraudulent conveyance action.

What is so striking -- and I gather Your Honor has

read this, but what is so striking about this document, whether it's paragraph 5 of the settlement agreement or paragraph 36 of the actual motion -- and again, we can address all of these things if and when Your Honor schedules this -- it's the level of control that the trustee and her counsel have abdicated to a party that is the subject of a fraudulent conveyance action.

It is really outstanding that the superpriority lien that they want to give on assets, the fact that there is no benefit to the estate, all of these things sort of add up and become -- I want to use a phrase that Mr. Cavaliere used -- part and parcel of what's really happening in front of this Court.  And that is, at all costs, keeping everything jammed up and tied up so that the parties that want to bring value into the estate cannot do it.  And it's right there, it's in black and white.  And that, we think, goes towards the motion to dismiss.  It is not just what Mr. Geron cavalierly said:  oh, it's two things that they mention on their -- that they failed to mention or that they did mention on their pleadings.

This motion itself, whatever this motion is, is really part and parcel of what's happening here, and all we're asking is just to have a hearing on the motion to dismiss just to air it out so that everybody can see, and Your Honor can see, what the issues are.

So I will reserve, obviously, all of the name-calling and nasty things said about my client in the papers.  By the

way, Your Honor, all of those things have been decided by other courts. There are findings of fact that will come out which show that all of this is incorrect.

And we had a discussion the other day -- Mr. Cavaliere mentions it in his papers -- where things were said about my client ending claims against the Brosers, it is concerning to hear the -- I'm sorry, against The Trump Group so they can bring money back into the estate. It is so concerning to hear that because my client has no claims against The Trump Group; never did.

And so it's concerning to the extent that we're not even sure whether the trustee and her counsel have a handle on the facts of this case. And so we are asking for this Court to listen to our case, and whatever the outcome is the outcome is, but that's all we are asking for is our day in court.

THE COURT: All right. Thank you.

I think we've -- is there anyone -- I don't think there's anyone else who is waiting to be heard. Does anyone else wish to be heard?

MR. CAVALIERE: Your Honor, Rocco Cavaliere. If I may be heard briefly --

THE COURT: Oh yes.

MR. CAVALIERE: -- in response.

THE COURT: Yes, please, of course.

MR. CAVALIERE: First, I have to -- I have to say --

well, I'll take the last comment first from Mr. Labov.  he's late to the game, and one of the first comments he made to me when he read the transcript of the March 4th conference was how amazed he was at how much -- and how I -- if you recall, the probably one-hour period outlined for Your Honor back then all of the various actions that were pending.  And he said to me in my first -- the first call to me I was amazed.  You did an unbelievable job.  And now he's telling me I don't have a good grasp of the case.  It's frankly outrageous.

As far as this suggestion by these parties that somehow this is some type of insider deal, the statute itself describes the fact that a trustee can make a loan -- can enter into a loan.  And that's exactly what this is.

And it's often the case where, even in a Chapter 11 -- where there's a dispute between the debtor and the lender who has a pre-petition lien, they continue to provide lending.  And there's a -- later on, they determine whether the lender properly filed the lien, or maybe there was some rental-liability issues.  It's not unusual to have a situation where someone that is a potential target, which they are, providing a loan, to advance the administration of the case.

As far as the other points about somehow this is some sort of lockup, like we're going exactly like they want, this -- I mean, we -- as far as the Manhattan Safety Maine case that Mr. Pollock is talking about, this is not unusual.  We

have a dispute with respect to whether this potential avoidance action is property of the estate or is part -- or someone else seeks to advance it.

Judge Freeman, Magistrate Judge Freeman, has already picked up on that and has said I'm not proceeding without further briefing or a determination. And it's pretty well-established law that when there's a -- when there's a dispute as to whether something belongs to the estate or not, whether it's the party's derivative or if they -- or they're, in this case, claiming that they have the proper standing, that that nondebtor action be stayed because Your Honor is in the best position of determining whether that action should go forward. And in this case, again, as we said, Magistrate Judge Freeman has already determined that that should be stayed. So all we're doing there in this portion of the motion is to simply say we continue to support that to the extent that we need to.

And as far as the surrogate court actions in which -- in which they're suggesting that somehow, we're doing this at the benefit of the Broser entity here, that's not at all the case. I mean, we have breach of fiduciary duty claims against Dalia Genger that have been pending for over ten years. They're just not being decided.

There's another portion of that surrogate court action in which Dalia has filed some type of injunction in which she was stopping The Trump Group from making payment. That also

impacts property of the estate.  So the fact that we would object to the motions to remand is not at all because the Brosers think it's a good idea.  It's because the trustee thinks it's a good idea.  The fact that we laid this out in this way doesn't suggest that that's them controlling what the trustee wants to do.

There is one part of it, though, I understand, where we indicate that well, if they're going to put 300,000 dollars in, we have all these things to do -- and it could be settled before December 31, really.  There could be a settlement with this group on a very favorable determination -- Your Honor would have to make a determination whether it's fair consideration or not -- well before then.

But we at least have presented something to the Court that, at least for the time being, Your Honor I think does need to see some of this, see the record develop before the Court. That's why we were concerned about making these bigger, grander proposals that I just want to point out we were -- the reason why we even went down that path is because the prior trustee decides to go down that path.

And usually, you have two years to really investigate and determine the next path forward, two years from the petition date.  And now we're being criticized that we have to jump into something because the other parties-in-interest want us to do so.  We're taking a very methodical approach to the

case.  We have essentially, through this deal, assigned a significant essential cause of action here against -- I know there's a disagreement from Dalia's counsel, but that's going to be assigned.

And it's true, exactly right.  Whatever rights we have are being assigned.  That's part of the risk that exists because there's an allegation that the breach of fiduciary claim, for instance, doesn't belong to the estate but belongs to the trust.  All we're doing is assigning whatever rights we have.  The defenses that would flow against those claims that -- the entity that's buying these claims would bring, Dalia preserves all those claims.

And so I just -- I did want to just briefly respond because I was a little bit taken aback at the suggestions that somehow this is some type of insider deal.  And I guess -- I mean, I tried to point out before -- I've spoken to the parties about this, too -- one of the key issues for them was that this potential avoidance action not be settled at -- not be settled.  And so we haven't settled this.

It remains in the estate for further deliberations and determination.  And as I said very bluntly in the motion, there's always an opportunity to possibly sell that claim to the Sagi group, which is what they wanted to do before for their own benefit.  They wanted to take it on themselves and recoup all the recoveries for themselves, when there hasn't yet

been a determination as to the allowance of the Sagi group's claims.

And so that was a big problem, frankly, with the deal, and why we were concerned, if we presented one before the Court, that would be dead on arrival.  And in addition, settling with the -- settling with the prior settlement parties on the similar terms that we had -- that the prior trustee had done -- maybe improvements, of course, there was improvements -- was never going to be satisfactory to the Sagi group.

So we have maintained the status quo by this deal if it's approved.  And there's still an opportunity to maximize value, which is what we do in cases.  And it's not up to other parties to determine how cases should be run.

We thought about it long and hard.  Today's not the day, in any event, to really go through the merits of the settlement motions.  Spent a lot of time on it, but we're happy to put forward the proper record at the hearing, once it's scheduled by the Court.

THE COURT:  Okay.  Does anyone else wish to be heard?

MR. PITTA:  Your Honor, Thomas Pitta.  If I could briefly respond to a couple things there.

THE COURT:  You may -- excuse me, Mr. Pitta?  Excuse me, Mr. Pitta?

MR. PITTA:  Yes.

THE COURT:  Brief, very brief.

MR. PITTA:  I will be brief.  I will be brief.  The last thing that Mr. Cavaliere said is that today's not the day to discuss the merits of the motion.  He wants a hearing on that.  And I would say the same thing with respect to our motion to dismiss.  We're not here today to litigate the merits of our motion to dismiss.  We're asking for a hearing on our motion.

THE COURT:  Okay, what's next?

MR. PITTA:  Just one other thing.  There was a comparison made to a lender pre-petition providing a loan -- a DIP loan post-petition and how that's not unusual.  I would just point out that here, ADBG is not a lender to this estate.  It's not the pre-existing lender.  It is a defendant, and it's giving a loan here for the purpose of avoiding having the claims against it litigated, at least for some period of time.

Anyway, that's it, Your Honor.  I just would restate it's time to hear our motion to dismiss, and we would ask that Your Honor schedule a hearing on that together with the settlement, or whatever this motion is described as.

THE COURT:  All right, anyone else?

MR. POLLOCK:  Yes, Your Honor.

UNIDENTIFIED SPEAKER:  Oh, I'm sorry.  Go ahead, I'm sorry.

MR. POLLOCK:  Real briefly, what one point of

agreement does Mr. Cavaliere --

THE COURT:  I'm sorry.  Excuse me.  Pardon me.  Excuse me.  Excuse me.  Identify yourself.

MR. POLLOCK:  I apologize.  Adam Pollock again for the Orly Genger Trust.  And real briefly, one area where Mr. Cavaliere and I appear to agree is he said that the proper procedure in his view would be to have Your Honor make a decision on the stay -- the district court actions.  And we would ask that that hearing be scheduled for very soon, for mid-June, so that we can get that wrapped up and move forward.  Thank you.

THE COURT:  Okay.  Sure.  All right, here's how we're going to proceed.  I'm going to schedule hearings on the settlement and on the motion to dismiss for July the 7th.  I would like the schedule to be such that all of the papers on both of them are fully submitted by June the 26th, right.  And so working backwards, and I think this works, right, is that any responses should be filed by June the 19th and then a reply by the 26th.  Does that work for you guys?

MR. CAVALIERE:  Yes, Your Honor.

UNIDENTIFIED SPEAKER:  That works for me, Your Honor.

MR. LABOV:  That works for Dalia, Your Honor.  Thank you.

THE COURT:  Okay, so that's how we'll -- that's how we'll go there.  And we'll put together a scheduling order and

a minute order, all right.

Now, let me just ask Mr. Pitta.  When will you serve the motion?

MR. PITTA:  Your Honor, we can serve the motion -- well, I think there's some stuff we need -- we can serve it as soon as Your Honor would like us to.  There are open issues relating to the redactions and the sealing of certain exhibits.  I understand --

THE COURT:  Right.  I --

MR. PITTA:  -- (break in audio) us that some of that was discussed in your conference yesterday with him and Mr. Herschmann.  I had sent an email to the parties last night trying to get the confidentiality order finalized.  We have not reached consensus on that, but I think it's important, Your Honor, that some schedule in the very short term be put together with respect to finalizing the confidentiality order and allowing us to serve the parties with the motion to dismiss in full.

THE COURT:  Well, I don't think Mr. Herschmann is on the line.

Oh, Mr. Herschmann, I think -- are you there?  Mr. Herschmann?

UNIDENTIFIED SPEAKER:  He may be muted.

THE COURT:  I think I --

MR. HERSCHMANN:  Your Honor, it's Eric Herschmann.  I

am here.

THE COURT:  Thank you.  Thank you.

I think as we left things yesterday, am I correct that you're in the position, assuming the other folks had no problem with what's in the confidentiality agreement, that from your perspective and the concerns that you've had and that we are in the process of addressing, that we can move forward -- that we can move forward with that?  Am I correct?

MR. HERSCHMANN:  Your Honor, it's Eric Herschmann. Yes, that is correct, Your Honor.  The only thing I wrote to Mr. Pitta earlier this morning as I started going through the motion to dismiss, there are references to the pre-marital agreement in various places.  And I just didn't get to finish all of the exhibits, so I indicated I would have that done by Tuesday.

And just as a follow-up, I asked Mr. Dellaportas yesterday afternoon in an email and again this morning, when he gives me a list of everyone that he provided the pre-marital agreement to that he also just identify when he gave it to them.  I asked him to reply to me twice, so we didn't have to raise it with the Court.  He hasn't done so, but I'd ask that that be included to his list to me.  Thank you.

THE COURT:  All right.  Mr. Dellaportas, you don't have any problem with that; do you?

MR. DELLAPORTAS:  Your Honor, it does create -- well,

two things.  One, Mr. Herschmann left out that in his email to me, he demanded that the list be provided by Memorial Day in the afternoon.  And since this involves coordinating with other law firms, co-counsel, that's impractical.  I think we're fine with providing the list along the schedule that was discussed with Your Honor for the other half of the discovery dispute, which is by next Friday.

Subject to that, in general, I can provide dates, but some of this -- a lot of it was produced while I was at another law firm, so I don't know that I can do the specificity.  And given the contentiousness of this thing, providing dates that may not be a hundred percent accurate seems like it'll only lead to more disputes.  But I can give broad sorts of dates.

MR. HERSCHMANN:  Your Honor, it's Eric Herschmann.  I presume that he emailed my pre-marital agreement.  To whichever firms he emailed it, I'm certain they have the email date.  And if he doesn't want to give it to me once he identifies the parties, if I'm allowed to contact those law firms, I'll get the dates from them with Your Honor's consent.  I don't want to have it, say, June and that's the end of it, if it becomes critical as to when it actually happened.

THE COURT:  All right, so Mr. Dellaportas, if you don't -- you will -- you'll provide, please, Mr. Herschmann with the information as to when -- is it the case that the document would have been emailed?  Because I'm -- or actually,

let me put it this way.  You'll let him know who got it, and then -- and then do you have any objection to Mr. Herschmann reaching out to the law firm to find out when they got it?

MR. DELLAPORTAS:  No, Your Honor.

THE COURT:  Okay.  So Mr. Herschmann, that's how we'll proceed, all right.

MR. HERSCHMANN:  Okay, Your Honor.  Thank you.  As long as the law firms know they have to provide the information, obviously not a problem.

THE COURT:  All right.  Okay.

All right.  And so with that, Mr. Herschmann, I think what you were saying is you're going through the document. You're going to give some comments to Mr. Pitta as it relates to information that you believe is - that should be, at least at this point, held under seal as it relates to the pre-marital agreement.  Is that correct?

MR. HERSCHMANN:  That's correct, Your Honor.  I'm going to go through everything, and I hope to have a response -- if I can get it by Monday to him, I told him I will, but by the latest on Tuesday.

THE COURT:  All right.  Now, Mr. Pitta, where does that leave you?  Because we take care of that aspect of it. Where do you -- where does that put you then as far as getting the document filed?

MR. PITTA:  Your Honor, as I mentioned, I emailed the

counsel to the parties last night.  Not everyone has signed the confidentiality order.  And I did receive a response from Mr. Geron with respect to my email asking people to let us know before the hearing today whether there was any objection to entry of the confidentiality order.  And Mr. Geron said that he would not be in a position to answer on that time line.

So I think we need to work through the confidentiality order.  If Your Honor would indulge us and give everybody a deadline to provide any comments on that, so we can get it signed up and so ordered by the middle of next week, I would hope, we could have the motion served out at that point with all the parties having access to the full exhibits other than the pre-marital agreement.

THE COURT:  All right.

MR. PITTA:  And so that's what I would ask for.

THE COURT:  Okay.  Now, I have seen a copy.  It was provided to me, at least most recently, by Mr. Dellaportas. And it may be in part of the other papers that are on file. But it was a confidentiality agreement that I believe was entered into in the Western District of Texas.  I wasn't sure whether it was the bankruptcy court or the district court.  Is the document that you're talking about -- is that substantially in the same form as the one I've just alluded to?

MR. PITTA:  Your Honor, I'm actually not sure which document you're referring to.  I would actually just ask Mr.

Dellaportas to address that if I could.

MR. DELLAPORTAS:  Sorry.  Yes, Your Honor.  There was -- there was -- while the case was pending in the Western District of Texas, there was a negotiation among, I believe, counsel to Arie Genger -- Texas counsel to Arie Genger and Texas counsel to, I think, Sagi or maybe Dalia with regard to a form of order that would be acceptable.

And there was agreement among Arie Genger, Sagi Genger, Dalia Genger and the Orly Trust as to the form of order.  And I don't think others had signed off at the point at which the case then got transferred to this court.  And no progress has been made since then, I think.

THE COURT:  Okay, so what I'd like to do is Mr. Pitta, you'll -- I guess you've already circulated it.  One of the concerns I have with it -- I don't have a problem with you folks deciding among yourselves what's confidential and super confidential and all of those sorts of things and limiting access to the documents.  I don't have a problem with that.

What I do have a concern about is that once the matter is submitted, that I'm going to be dealing with redacted documents and information that can only be shared with a limited number of people.  As you all know, because you've all done it before, it makes trying these things difficult.  It also makes resolving them difficult as far as whatever would be put in a decision to the extent one was written.

So my point is I would like to reserve the right, once I see everything, if I'm getting documents that are redacted, to raise the issue as to whether or not the information really ought to be redacted.  And I'm very sensitive to the concerns around the prenuptial agreement, but I'm not sure what else is out there.  So with that sort of caveat, I'd like you to move forward.

If you can get comments, Mr. Pitta, by Tuesday, and then you would be -- I guess what -- you then would want to submit the document for the Court to so order it by Wednesday? Is that the thinking, and then you would be filing the papers by Thursday?

MR. PITTA:  Yes, Your Honor.

THE COURT:  Okay, does anyone -- does anyone --

MR. PITTA:  Just one other thing I wanted to clarify on this point is Mr. Cavaliere had also responded to the email I sent and was questioning the trustee's exclusion from the confidentiality stipulation and order.  And I would just say that the only reason that the trustee was excluded is because pursuant to the Code, the trustee is entitled to see everything and does not -- but does not need to receive redacted documents.

THE COURT:  All right.  Okay, so that's how we will proceed as it relates to the motion to dismiss.

Mr. Cavaliere, do you want to -- you want to file the

9019 immediately.  Is that a problem?  You file it by Monday?

MR. CAVALIERE:  I'm sorry if I understood.  The motion's been filed.  It was filed yesterday.  I think Your Honor said --

THE COURT:  Oh, okay.

MR. CAVALIERE:  -- that you're going to prepare a scheduling order, which then I guess I would serve the scheduling order with the motion.

THE COURT:  Okay.  And so what I'd like you to do is to prepare a proposed scheduling order which would call for the hearing that would be on July the 7th, any replies by June the 26th, and any responses by June the 19th.

MR. CAVALIERE:  That's fine, Your Honor.  What time --

MR. OSWALD:  Should I also enter --

THE COURT:  Just a second.

Finish, please, Mr. Cavaliere.

MR. CAVALIERE:  I just -- I'd asked what time on the July 7th?

THE COURT:  Oh, thank you.  11 o'clock.

MR. CAVALIERE:  Okay.

THE COURT:  All right?

MR. CAVALIERE:  Okay, Your Honor.  That's fine.  I'll submit that --

THE COURT:  Thank you.  Mr. --

MR. CAVALIERE:  -- either later today or first thing

Monday morning.

THE COURT:  Terrific.

Mr. Oswald, did you wish to be heard?

MR. OSWALD:  Yes, thank you, Your Honor.  Frank Oswald, Togut, for Arie Genger.  Mr. Pitta indicated that in Texas -- I guess we did for -- Genger counsel there had signed off on that form of order.  Obviously, a lot has happened, and we're talking about the amended dismissal motion not the original.  If I had any additional comments, I'll certainly provide them to Mr. Pitta by Tuesday as well.  Thank you.

THE COURT:  Terrific.  Terrific.

Mr. Pitta, do you wish to be heard again?

MR. PITTA:  Just briefly, Your Honor.  I was wondering if you were thinking that the scheduling order with respect to the motions should also address a discovery schedule?

THE COURT:  Yes, I think it should.

MR. PITTA:  Thank you.

THE COURT:  What do you propose?

MR. PITTA:  Let me just look at the calendar here, Your Honor.  I would suggest that parties should serve any discovery probably by June -- I'm just looking at the calendar now, Your Honor; maybe even sooner -- May 29th, and the discovery would be completed by I guess -- I guess the objection deadline is June 19th?

THE COURT:  All right.  Anyone object to that?

MR. CAVALIERE:  Your Honor, Rocco Cavaliere.

THE COURT:  Yes.

MR. CAVALIERE:  I'm not sure what the -- I guess we would obviously address any discovery disputes consensually. But if we could have until maybe June 1.  This is just me speaking.  If other people want to force discovery to be served by the 29th -- but I think I would prefer just a few more days to determine what kind of discovery that I might want on the motion to dismiss.  And then I think that should hopefully give us enough time, June 1st.

And then what was it, June 19th -- that would mean that we would have discovery -- responses to requests and depositions done by the 19th or is that just -- I'm not sure if Mr. Pitta meant just responses to requests, and we could have depositions after that or if depositions would take place before the 19th.

MR. PITTA:  Well, Your Honor, one -- I'm fine with the June 1st date.  If parties are going to have to file their objections by the 19th, I think it would make sense for any depositions and document production to have been concluded by then so the parties can include the information in their objections.

THE COURT:  Right.  Anyone object to that?

Mr. Oswald, did you wish to be heard?

MR. OSWALD:  Yeah, I was just thinking, Your Honor, in

light of the voluminous files in the litigations that happened, is it really -- is it realistic that we're going to get all this discovery done for a hearing on the 7th?  Obviously, we don't know what this discovery is going to be propounded, but obviously, the amended motion, which I perused with the exhibits, is quite voluminous.  If you're talking depositions as well, not to delay any further -- obviously, these litigations have been going on fifteen years.  But should we think about just maybe moving the schedule back one week?  Subject to --

UNIDENTIFIED SPEAKER:  Well, it'd be a little --

MR. OSWALD:  -- schedule g --

UNIDENTIFIED SPEAKER:  Yeah, it'd be --

MR. OSWALD:  I know you've got July 4th weekend coming off that, too, coming into the July 7th hearing.  I'm wondering perhaps July 14th might make some sense, again, just looking at the history and the volume of paper that seems to come about for every issue in this case regarding these parties.

THE COURT:  All right. Let's see.  Give me a minute.

(Pause)

THE COURT:  Okay.  Apologize for the delay.  Here's what we'll do.

I'm sorry.  Bear with me for a second.

(Pause)

THE COURT:  Okay, so what we'll do is -- I can't push

it a week.  We may push it two weeks, just given the timing.

So what we'll go with is you'll have a hearing on July the

21st.  I'd like it -- I'd like it to be fully submitted by July

the 13th.  All right?

THE COURT:  MR. OSWALD:  Yes.

THE COURT:  Okay, now --

MR. OSWALD:  Yes, sir.

THE COURT:  That would mean -- that would many any

responsive papers would be filed by July the 6th, right?

MR. OSWALD:  Your Honor, I believe that's a federal

holiday, but it's probably fine anyway.

THE COURT:  All right, it's the 7th then.

UNIDENTIFIED SPEAKER:  Yeah, it's the 7th.

THE COURT:  All right, and then -- all right, and then

what do you suggest as far as your discovery?

MR. CAVALIERE:  Your Honor, Rocco Cavaliere on behalf

of the trustee.  I would suggest that discovery, with this

schedule, be completed by June 30th or July 1st.

THE COURT:  Mr. Pitta, is that all right with you?

MR. PITTA:  That works fine for us, Your Honor.

THE COURT:  Does anyone have any problem with that?

All right, Mr. Oswald?

MR. HERSCHMANN:  Your Honor, it's Eric Herschmann.

THE COURT:  Yes.

MR. HERSCHMANN:  If I could just raise one thing that

I think all the lawyers have to keep in mind.

THE COURT:  Right.

MR. HERSCHMANN:  Is that most court stenographers and videographers, as I understand, are not back to work yet.  So there's going to be some logistical cooperation we're all going to need to figure out and see where we would do depositions, and under what safety precautions would need to be taken.

THE COURT:  All right.

MR. HERSCHMANN:  I don't know when -- I don't know when everyone's going to be back on line, but I think we just have to keep all of that in mind.

THE COURT:  Here's what we're going to do.  The 21st -- July 21st is when we'll hear it.  July 13th at noon, that Monday before is when I'll have all of the documents.  I mean, I won't have the reply by then, but I will have had all the responses by the 7th, right, as we discussed.

I'm going to leave it to you guys to speak among yourselves as to how to best address the discovery.  And Mr. Herschmann, your point's well taken.

And Mr. Pitta, you will please, on Wednesday when you are delivering the -- or sending us the confident -- the confidentiality agreement/order, you will please provide us with a proposed scheduling order that will pick up all of these, the dates and what you folks agree among yourselves as it relates to discovery.  All right?

MR. PITTA:  Will do.

THE COURT:  All right.  Now, there is -- is there anyone else who wishes to be heard?

Mr. or Ms. Aboulafia?

MS. ABOULAFIA:  Yes, Your Honor.  Good afternoon, Elizabeth Aboulafia, Cullen and Dykman, co-counsel to Michael Oldner as trustee of the Orly Genger Trust.  I just wanted to raise the issue of scheduling on what we anticipate would be the motion for a comfort order confirming that the automatic stay does not apply to the two district court actions that my co-counsel, Mr. Pollock, spoke about earlier.

We had originally thought that we would request tracking the hearing on the other two motions that were just scheduled.  However, I don't think that we need two months to have those heard.  So we would alternatively request that Your Honor allow us to contact chambers for a hearing date on this discrete issue for some time in mid-June or towards the end of June, whatever Your Honor prefers.

THE COURT:  Well, yes, that's fine.  I was going to address that.

Does anyone else wish to be heard with respect to that issue?  Okay.  All right.

MR. CAVALIERE:  Your Honor --

THE COURT:  I'm sorry.  Yes?

MR. CAVALIERE:  Yeah, I'm sorry.  Rocco Cavaliere on

behalf of the trustee.  Obviously, whatever Your Honor thinks is best is fine with the trustee, but I do note that I just don't know how much discovery is going to be propounded here, how many depositions are going to be required in connection with the settlement motion and motion to dismiss.  So we're going to be pretty busy for most of June and now potentially may have to provide a response to this motion that's being filed.

And we'll find the time, but if it could -- if it's something that could work on parallel tracks with the other matters, I would prefer it, or really be dealt with later, but it sounds like there's a -- I don't see the need for it to go forward at this time.  But I am sensitive to the other side. They want to move the case along.

I just -- if we can -- if the schedule can be -- if we can have that heard also on July 14th, I would prefer it.  But if the Court disagrees --

THE COURT:  No.

MR. CAVALIERE:  -- and wants to have it heard beforehand, I'll certainly make myself available.

THE COURT:  What you'll do is you'll work out a schedule.  No, we're not going to wait until then.  It's going to be pretty busy as it is on the 21st.  What I would ask is for counsel to put their heads together, give us a proposal with respect to the scheduling so we can move that forward.  It

will not be heard on a parallel track with the other two matters.

All right, I see a couple of hands in the air.

MR. CAVALIERE:  Thank you, Your Honor.

THE COURT:  You're welcome.

Mr. Oswald, do you still wish to be heard?

MR. OSWALD:  No, Your Honor, I'm sorry.  Am I still -- I'm just inept at the technology.  Am I still -- got my hand raised --

THE COURT:  That's all right.

MR. OSWALD:  -- on the dashboard?  I apologize.

THE COURT:  All right, Mr. Pitta.  No, you're done.

All right, so I think we're finished.  Is there anything else we need to discuss?

Mr. Cavaliere?

MR. CAVALIERE:  Your Honor, if I may, with respect to the scheduling order I'm providing, obviously, the July 21st -- did you say it was at 11 a.m. as well?

THE COURT:  Yes.

MR. CAVALIERE:  And then July 13th at noon for the replies, July 7th for the objections.  And as far as the discovery deadline, was that something you said we would talk to Mr. Pitta about and be part of a separate order, or would that -- should I include that --

THE COURT:  No.

MR. CAVALIERE:  -- as part of this order?

THE COURT:  No, you should -- no, it should be part of this order.

MR. CAVALIERE:  Okay.

THE COURT:  You should all put your heads together, deal with it now so that we can move the process along.

MR. CAVALIERE:  Okay.

THE COURT:  Okay?

MR. CAVALIERE:  Great, okay.  Thank you very much, Your Honor.

UNIDENTIFIED SPEAKER:  And Your Honor, actually, I'm having --

UNIDENTIFIED SPEAKER:  Thank you, Your Honor.  Have a nice day.  Thank you so much.

UNIDENTIFIED SPEAKER:  Thank you.

THE COURT:  All right, we're done.  All right, great, thanks a lot.

UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

THE COURT:  Sure.  Bye-bye.

(Whereupon these proceedings were concluded at 3:36 PM)

61

C E R T I F I C A T I O N

I, Ellen S. Kolman, certify that the foregoing transcript is a true and accurate record of the proceedings.

_Ellen S. Kolman (signature)_

_____

Ellen S. Kolman (CET-568)

AAERT Certified Electronic Transcriber

eScribers

352 Seventh Ave., Suite #604

New York, NY 10001

Date:  May 27, 2020

| # | | | | |
|---|---|---|---|---|

**#1 (1)**
5:15
**#219 (1)**
4:2
**#222 (1)**
4:4
**#224 (1)**
4:7
**#225 (1)**
4:10
**#232 (1)**
4:13
**#233 (1)**
4:16
**#234 (1)**
4:19
**#235 (1)**
4:22
**#236 (1)**
5:2
**#237 (1)**
5:5
**#604 (1)**
6:22

## A

**aback (1)**
40:14
**ABDG (1)**
30:13
**abdicated (1)**
35:5
**abetted (1)**
17:4
**abetting (2)**
16:8,20
**abeyance (1)**
18:2
**able (1)**
11:12
**ABOULAFIA (4)**
8:8;57:4,5,6
**acceptable (1)**
49:7
**access (2)**
48:12;49:18
**accomplish (1)**
15:5
**Accordingly (1)**
31:23
**account (2)**
18:16;27:21
**accurate (1)**
46:12
**acquiring (2)**
19:16,16
**action (27)**
14:5,22;15:22;
16:3,11,14,22;17:1,

15,21;18:17,24;
21:22;22:4;30:1,14,
25;31:10,24;34:24;
35:6;38:2,11,12,23;
40:2,18
**Actions (13)**
4:19;24:18;27:13;
30:4,5;31:4,15;
32:22;33:8;37:6;
38:17;43:8;57:10
**action's (1)**
16:6
**actual (3)**
12:19;24:7;35:3
**actually (8)**
21:21,21;29:18;
46:21,25;48:24,25;
60:11
**Adam (4)**
5:2;10:15;29:23;
43:4
**ADBG (8)**
5:7;12:8;13:15;
18:9,12,19;19:5;
42:13
**add (2)**
20:1;35:9
**addition (2)**
22:2;41:5
**additional (3)**
14:24;21:4;52:9
**address (9)**
26:10;27:22;
34:11;35:3;49:1;
52:15;53:4;56:18;
57:20
**addressed (2)**
13:6;34:15
**addressing (2)**
26:11;45:7
**administration (4)**
13:18;15:11;
21:20;37:21
**administrative (2)**
21:5;28:7
**advance (3)**
13:18;37:21;38:3
**Adversary (6)**
5:9,13,17,21;6:2;
25:14
**adverse (1)**
27:5
**afternoon (10)**
11:2,3,16,20,21;
22:16;26:4;45:17;
46:3;57:5
**again (12)**
24:11;25:10;
33:14,14;34:1,14;
35:3;38:13;43:4;
45:17;52:12;54:16
**against (22)**
13:7;14:13,15,22;

16:4,9;17:3;20:20;
21:23;27:14;30:5,
21;31:8,17;32:12;
36:6,7,9;38:20;40:2,
10;42:16
**ago (7)**
26:20;27:11;
30:23,25;31:19,19;
33:7
**agree (4)**
21:21,25;43:6;
56:24
**agreed (3)**
21:19;28:2,16
**agreement (19)**
19:14;20:18,19;
22:2,5,19;23:1;
30:20;35:2;43:1;
45:5,13,19;46:15;
47:16;48:13,19;
49:8;50:5
**agreement/order (1)**
56:22
**agrees (1)**
21:19
**ahead (4)**
19:25;29:18;32:4;
42:23
**aided (1)**
17:4
**aiding (2)**
16:8,20
**air (2)**
35:21;59:3
**al (8)**
5:9,10,13,14,18,
18,22;6:2
**allegation (1)**
40:7
**allow (4)**
13:18;23:12;
26:24;57:16
**allowance (1)**
41:1
**allowed (3)**
14:20;24:13;46:18
**allowing (2)**
30:8;44:17
**alluded (1)**
48:23
**along (4)**
22:15;46:5;58:14;
60:6
**alternatively (1)**
57:15
**although (1)**
12:17
**always (4)**
13:21;14:2;20:3;
40:22
**amazed (2)**
37:4,7
**amended (2)**

52:8;54:5
**among (7)**
17:10;25:22;49:4,
8,16;56:17,24
**amount (4)**
14:20;18:4;19:9;
27:18
**amounts (1)**
14:7
**analysis (1)**
31:17
**ANDREW (1)**
9:24
**anticipate (1)**
57:8
**apologize (3)**
43:4;54:21;59:11
**appeal (1)**
16:2
**appeals (2)**
12:24;15:24
**appear (1)**
43:6
**appearance (1)**
11:15
**apply (2)**
17:21;57:10
**approach (2)**
25:16;39:25
**appropriate (2)**
16:25;18:25
**approval (2)**
12:15;26:25
**approve (2)**
27:4,25
**approved (4)**
15:1,19;18:2;
41:12
**arbitrary (1)**
30:15
**area (1)**
43:5
**Arie (8)**
5:7;10:19;12:7,10;
49:5,5,8;52:5
**arms' (1)**
30:18
**around (3)**
18:15;24:21;50:5
**arrival (1)**
41:5
**aspect (2)**
14:6;47:22
**assets (1)**
35:8
**assign (2)**
14:16;20:20
**assigned (3)**
40:1,4,6
**assigning (1)**
40:9
**Associates (2)**
4:23;8:12

**assuming (1)**
45:4
**Attorneys (9)**
8:3,12;9:3,12,20;
10:3,11,19;29:14
**atypical (1)**
32:15
**audio (3)**
28:17,24;44:10
**authority (1)**
20:17
**automatic (2)**
32:9;57:9
**availability (1)**
15:8
**available (1)**
58:20
**Avenue (3)**
6:22;9:4;10:4
**avoidance (9)**
14:5;16:11,14,22;
18:17,24;22:4;38:1;
40:18
**avoiding (1)**
42:15
**aware (1)**
29:4
**awkward (1)**
32:15

## B

**back (15)**
13:22;24:17,18;
27:12,16;28:13;31:1,
14;33:6,11;36:8;
37:5;54:9;56:4,10
**background (1)**
11:22
**backwards (1)**
43:17
**Bankruptcy (6)**
3:14,25;15:16;
17:2;22:25;48:21
**based (2)**
16:21;29:5
**baseless (1)**
23:20
**basis (2)**
28:17;30:6
**Bear (1)**
54:23
**bears (1)**
21:11
**beauty (1)**
14:4
**become (2)**
21:7;35:10
**becomes (1)**
46:20
**beforehand (1)**
58:20
**behalf (18)**

19-01447-jlg   Doc 11   Filed 05/27/20   Entered 05/28/20 09:27:19   Main Document
Pg 63 of 72
ORLY GENGER
Lead Case No. 19-13895-jlg

May 22, 2020

4:4,7,10,13,16,20,
22;5:2;11:17;13:12;
16:19;26:5;31:21;
32:9;33:7,24;55:16;
58:1
**behind (1)**
14:12
**belabor (1)**
24:11
**believes (1)**
23:19
**belong (1)**
40:8
**belongs (3)**
16:23;38:8;40:8
**beneficial (1)**
13:25
**beneficiary (3)**
13:14;16:18;19:20
**benefit (3)**
35:9;38:19;40:24
**Benson (6)**
5:6,17;9:11,19,20;
33:7
**best (4)**
14:3;38:11;56:18;
58:2
**best-case (1)**
21:9
**big (3)**
12:13;28:11;41:3
**bigger (2)**
13:20;39:17
**biggest (1)**
21:1
**bit (2)**
34:2;40:14
**black (1)**
35:14
**bluntly (1)**
40:21
**bogged (1)**
24:15
**both (2)**
26:22;43:16
**Boulevard (1)**
8:5
**BOWEN (1)**
9:25
**Bowling (1)**
3:15
**breach (6)**
16:8,8,21;17:4;
38:20;40:7
**breached (2)**
17:6,9
**break (3)**
28:17,24;44:10
**brief (9)**
29:25;30:7;31:16;
33:4,15;42:1,1,2,2
**briefing (1)**
38:6

**briefly (9)**
23:18,24;28:25;
36:21;40:13;41:22;
42:25;43:5;52:13
**briefs (1)**
32:7
**bring (7)**
17:17;28:13;
31:24,25;35:13;
36:8;40:11
**bringing (1)**
32:11
**brings (1)**
27:20
**Broad (2)**
10:12;46:13
**Broadway (3)**
8:14;9:13,21
**Broser (1)**
38:19
**Brosers (9)**
12:8;18:10;21:23;
30:12,16,19;31:8;
36:6;39:3
**brother (3)**
12:2;14:13;25:7
**brought (2)**
31:19,20
**business (1)**
28:6
**busy (2)**
58:6,23
**buying (1)**
40:11
**Bye-bye (1)**
60:19

---

## C

**calendar (2)**
52:19,21
**call (4)**
13:17;21:16;37:7;
51:10
**calling (1)**
11:13
**can (35)**
13:22;14:19;
15:12,22;21:8;
24:20;28:7;29:15,
17;34:11,14;35:3,22,
22;36:7;37:12,12;
43:10;44:4,5;45:7,8;
46:8,10,13;47:19;
48:9;49:21;50:8;
53:21;58:15,15,16,
25;60:6
**capable (1)**
29:14
**capacity (3)**
16:17;18:8;19:2
**care (1)**
47:22

**Case (52)**
4:2;5:11,19,23;
11:4;12:1,17;13:4,6,
18;14:1,2,6,8,14,25;
15:2,12;17:7;18:11,
12,14;19:13;20:16,
25;21:20;22:19,25;
25:8,9;28:4,6,11;
29:15,19;31:8,17;
36:13,14;37:9,14,21,
24;38:10,13,20;40:1;
46:24;49:3,11;
54:18;58:14
**cases (4)**
16:10;32:18;
41:13,14
**cash (1)**
18:18
**caught (1)**
24:24
**cause (2)**
14:22;40:2
**Cavaliere (64)**
4:7,16,20;11:16,
17,22;18:9,13;19:17,
24;20:1,11,13,15,19;
21:14;22:9,12,21;
23:2,11;26:20;30:1,
24;31:18;34:2,8;
35:10;36:4,20,20,23,
25;42:3;43:1,6,20;
50:16,25;51:2,6,13,
16,17,20,22,25;53:1,
1,3;55:16,16;57:23,
25,25;58:19;59:4,15,
16,20;60:1,4,7,9
**Cavaliere's (1)**
30:16
**cavalierly (1)**
35:16
**caveat (1)**
50:6
**certain (4)**
15:24;16:19;44:7;
46:16
**certainly (6)**
20:25;25:1;27:2;
34:18;52:9;58:20
**chambers (1)**
57:16
**chance (1)**
18:3
**change (1)**
25:7
**Chapter (6)**
11:18;13:4;22:24;
28:4,6;37:14
**cheapened (1)**
29:7
**circulated (1)**
49:14
**circumstance (1)**
27:3

**City (1)**
8:6
**claim (14)**
14:14,20;16:8,9;
17:7;18:12,13,14;
19:12;21:10;34:8,
18;40:8,22
**claiming (1)**
38:10
**claims (26)**
13:7,13;14:16;
15:24;19:15,16;
20:18;27:14,21,22,
23;28:7;31:20,20,22,
24,25;34:10;36:6,9;
38:20;40:10,11,12;
41:2;42:16
**clarify (1)**
50:15
**clear (3)**
13:21;19:24;33:9
**clearly (1)**
13:3
**client (9)**
24:23;27:14,15;
32:9;34:6,12;35:25;
36:6,9
**co-counsel (3)**
46:4;57:6,11
**Code (1)**
50:20
**COHEN (1)**
10:10
**collect (1)**
24:6
**colloquially (1)**
12:1
**comfort (2)**
30:8;57:9
**coming (2)**
54:14,15
**commenced (1)**
21:24
**comment (2)**
29:9;37:1
**comments (6)**
29:1;37:2;47:13;
48:9;50:8;52:9
**compared (1)**
19:10
**comparison (1)**
42:11
**comparisons (1)**
28:4
**Complaint (4)**
5:15;23:23;25:5;
29:2
**completed (2)**
52:23;55:18
**completely (1)**
31:11
**comprised (3)**
12:2,6;18:18

**concern (2)**
24:10;49:19
**concerned (5)**
12:15,20;25:3;
39:17;41:4
**concerning (3)**
36:6,8,11
**concerns (3)**
45:6;49:15;50:4
**concluded (2)**
53:20;60:20
**Conference (9)**
4:2;5:11,19,23;
6:3;11:5;12:20;37:3;
44:11
**conferences (1)**
24:25
**confident (1)**
56:21
**confidential (2)**
49:16,17
**confidentiality (9)**
44:13,16;45:5;
48:2,5,7,19;50:18;
56:22
**confirming (1)**
57:9
**connection (2)**
20:23;58:4
**consensually (1)**
53:4
**consensus (1)**
44:14
**consent (1)**
46:19
**consider (3)**
17:18;25:22,24
**consideration (5)**
12:14;19:6;20:23;
22:6;39:13
**constructive (2)**
15:22;21:22
**consult (1)**
20:24
**contact (2)**
46:18;57:16
**contemplated (1)**
13:3
**contentiousness (1)**
46:11
**context (2)**
25:14;26:10
**contingent (2)**
18:13,22
**continuation (1)**
11:5
**continue (8)**
13:18;14:10;
15:12;17:11;22:3;
32:18;37:16;38:16
**continued (2)**
21:23;32:21
**control (2)**

21:6;35:5
**controlling (1)**
    39:5
**controversial (2)**
    14:6,8
**conveyance (4)**
    27:13;31:8;34:24;
    35:6
**cooperation (1)**
    56:5
**coordinating (1)**
    46:3
**copy (2)**
    22:11;48:16
**correctly (1)**
    20:8
**cost (2)**
    21:3;23:21
**costly (1)**
    13:10
**costs (1)**
    35:12
**counsel (18)**
    11:7,14;14:22;
    16:1,5;21:1,2;27:23;
    32:16;35:5;36:12;
    40:3;48:1;49:5,5,6;
    52:6;58:24
**counterclaims (3)**
    14:12,18;34:14
**couple (5)**
    24:12,18;34:22;
    41:22;59:3
**course (2)**
    36:24;41:8
**Court (148)**
    3:14;11:2,11,21,
    23,24;12:12,18;
    13:24;15:6,8,14,15,
    15,16,24;16:6;17:3;
    18:3,12;19:14,23,25;
    20:3,7,12,14,17;
    21:12;22:7,10,14,18,
    23,24;23:4,7,12,15;
    24:17,25;25:10,22,
    23;26:1;29:20;30:1,
    4,5,9,14,21;31:15;
    32:3,5,14,17,24;
    33:3,9,9,16,19,23;
    35:12;36:13,15,16,
    22,24;38:17,23;
    39:14,16;41:5,19,20,
    23;42:1,9,21;43:2,8,
    12,24;44:9,19,24;
    45:2,21,23;46:22;
    47:5,10,21;48:14,16,
    21,21;49:11,13;
    50:10,14,23;51:5,9,
    15,19,21,24;52:2,11,
    16,18,25;53:2,23;
    54:19,21,25;55:6,8,
    12,14,19,21,24;56:2,
    3,8,12;57:2,10,19,

24;58:17,18,21;59:5,
    10,12,19,25;60:2,5,8,
    16,19
**courts (1)**
    36:2
**Court's (1)**
    15:7
**create (1)**
    45:25
**created (1)**
    21:8
**creditors (6)**
    5:6;11:25;13:25;
    25:8;28:18,18
**critical (1)**
    46:21
**criticized (1)**
    39:23
**CULLEN (2)**
    8:2;57:6
**cycle (1)**
    24:24

### D

**D&K (1)**
    10:3
**Dalia (16)**
    4:14;9:3;10:3;
    12:3;13:7;15:22,25;
    20:20;21:22;33:24;
    38:21,24;40:12;
    43:22;49:6,9
**Dalia's (2)**
    27:23;40:3
**DANIEL (1)**
    10:2
**dashboard (1)**
    59:11
**date (7)**
    19:13;22:14;
    30:15;39:23;46:16;
    53:18;57:16
**dates (6)**
    16:1;46:8,11,13,
    19;56:24
**daughter (4)**
    13:14;19:21;20:7,
    9
**day (6)**
    36:4,15;41:16;
    42:3;46:2;60:14
**days (2)**
    15:7;53:7
**dead (1)**
    41:5
**deadline (3)**
    48:9;52:24;59:22
**deadlines (1)**
    15:23
**deal (15)**
    13:20;14:4;19:4,
    12;26:16,18;27:13,

22,23;37:11;40:1,15;
    41:3,11;60:6
**dealing (1)**
    49:20
**dealt (1)**
    58:11
**Deborah (5)**
    4:8,17,20;11:17,18
**debtor (14)**
    5:5;12:3,3;14:15,
    23;16:5;20:8;21:19;
    23:19;24:5,8;28:3,5;
    37:15
**debtor-in-possession (1)**
    21:17
**debtor's (5)**
    19:20;23:19;
    28:13;29:3,6
**December (6)**
    30:14,22;31:2,5,8;
    39:10
**decide (1)**
    23:15
**decided (2)**
    36:1;38:22
**decides (1)**
    39:20
**deciding (1)**
    49:16
**decision (2)**
    43:8;49:25
**default (2)**
    22:19,25
**defendant (2)**
    28:11;42:14
**defendants (1)**
    31:10
**defenses (2)**
    34:13;40:10
**delay (3)**
    15:12;54:7,21
**deliberations (1)**
    40:20
**delivering (1)**
    56:21
**DELLAPORTAS (9)**
    8:19;45:16,23,25;
    46:22;47:4;48:17;
    49:1,2
**demanded (1)**
    46:2
**depositions (9)**
    20:16;24:19;
    53:13,15,15,20;54:6;
    56:6;58:4
**derivative (2)**
    31:21;38:9
**described (2)**
    12:12;42:20
**describes (1)**
    37:12
**details (1)**
    13:4

**determination (11)**
    13:20;14:19;17:2,
    20;25:25;32:9;38:6;
    39:11,12;40:21;41:1
**determine (5)**
    15:5;37:17;39:22;
    41:14;53:8
**determined (3)**
    13:9;15:9;38:14
**determining (1)**
    38:12
**develop (1)**
    39:16
**different (1)**
    11:25
**difficult (2)**
    49:23,24
**DIP (2)**
    28:4;42:12
**disagree (1)**
    14:1
**disagreement (2)**
    14:2;40:3
**disagrees (1)**
    58:17
**discharge (2)**
    23:23;25:5
**disclose (4)**
    24:1,5,5;29:5
**disclosed (2)**
    25:11;29:3
**discloses (1)**
    24:7
**disclosing (1)**
    24:8
**discovery (20)**
    24:15;25:1,15;
    29:17;46:6;52:15,21,
    23;53:4,6,8,12;54:3,
    4;55:15,17;56:18,25;
    58:3;59:22
**discrete (1)**
    57:17
**discuss (2)**
    42:4;59:14
**discussed (3)**
    44:11;46:5;56:16
**discussion (1)**
    36:4
**discussions (4)**
    13:11,15,19;15:25
**disguise (1)**
    25:5
**dismiss (30)**
    22:1;23:16,18,20,
    22,23,25;24:13;25:2,
    6,24;26:13,19,23;
    27:7,9;28:20;29:2,
    10;35:16,21;42:6,7,
    18;43:14;44:17;
    45:12;50:24;53:9;
    58:5
**dismissal (6)**

21:22,25;22:1;
    25:9;27:1;52:8
**dismissed (1)**
    22:19
**dismisses (1)**
    22:24
**disposition (1)**
    14:5
**dispute (7)**
    24:20,25;25:6;
    37:15;38:1,7;46:6
**disputes (2)**
    46:13;53:4
**disputing (2)**
    14:14;25:7
**disruption (1)**
    23:21
**district (16)**
    15:15;16:6;17:3;
    30:1,4,5,9,14,21;
    31:15;32:17;43:8;
    48:20,21;49:4;57:10
**Doc (11)**
    4:2,4,7,10,13,16,
    19,22;5:2,5,15
**docket (1)**
    15:16
**document (9)**
    18:4;35:1;46:25;
    47:12,24;48:22,25;
    50:10;53:20
**documents (5)**
    49:18,21;50:2,22;
    56:14
**dog (1)**
    34:17
**dollar (2)**
    14:7;34:17
**dollars (17)**
    17:8;18:8,15,20,
    23;20:22;21:10;
    24:3;27:20;28:2,10,
    12;30:16,20;31:11;
    34:21;39:8
**done (11)**
    15:18;28:9;33:17;
    41:8;45:14,21;
    49:23;53:13;54:3;
    59:12;60:16
**DOUGLAS (1)**
    9:8
**down (4)**
    24:15;33:13;
    39:19,20
**Drogin (1)**
    11:17
**due (1)**
    18:20
**duplicative (1)**
    24:22
**during (1)**
    20:16
**duty (6)**

16:9,21;17:4,6,9;
38:20
**DYKMAN (2)**
8:2;57:6

### E

**earlier (4)**
11:6,23;45:11;
57:11
**early (1)**
12:16
**effect (1)**
30:8
**either (2)**
30:25;51:25
**eleven (1)**
21:9
**ELIZABETH (2)**
8:8;57:6
**Ellen (1)**
6:20
**Ellman (3)**
16:4;17:3;31:17
**else (11)**
33:16;34:7;36:18,
19;38:2;41:20;
42:21;50:5;57:3,21;
59:14
**email (6)**
44:12;45:17;46:1,
16;48:3;50:16
**emailed (4)**
46:15,16,25;47:25
**emanating (1)**
14:7
**EMMET (2)**
8:11;26:4
**end (3)**
21:5;46:20;57:17
**ending (1)**
36:6
**endless (1)**
24:24
**enforcement (1)**
24:18
**engaged (2)**
13:11,15
**enormous (1)**
27:18
**enough (1)**
53:10
**enter (2)**
37:12;51:14
**entered (1)**
48:20
**entitled (1)**
50:20
**entity (17)**
12:8;13:12,13;
18:7,10,19;19:16,17,
17;20:4,6,21;30:13,
13;34:22;38:19;

40:11
**entry (1)**
48:5
**envision (1)**
32:7
**Eric (8)**
5:6;9:12,16;12:7;
44:25;45:9;46:14;
55:23
**eScribers (1)**
6:21
**especially (1)**
12:20
**ESQ (11)**
8:8,18,19;9:7,8,16,
24,25;10:7,15,23
**essential (1)**
40:2
**Essentially (6)**
13:6;15:12;19:5;
21:7,7;40:1
**established (1)**
38:7
**estate (23)**
13:10,25;16:12;
17:2;19:3,14;21:8;
27:17,21;28:13,18,
18;31:21;32:12;
35:9,14;36:8;38:2,8;
39:1;40:8,20;42:13
**et (8)**
5:9,10,13,14,18,
18,22;6:2
**evaluates (1)**
32:18
**evaluating (2)**
13:9;30:24
**even (7)**
12:10;29:8;34:9;
36:12;37:14;39:19;
52:22
**event (3)**
22:18,25;41:16
**everybody (3)**
34:7;35:22;48:8
**everybody's (1)**
26:14
**everyone (2)**
45:18;48:1
**everyone's (1)**
56:10
**Exactly (4)**
32:7;37:13,23;
40:5
**example (1)**
24:13
**exchange (2)**
28:9,15
**excluded (1)**
50:19
**exclusion (1)**
50:17
**exclusive (1)**

33:10
**excuse (7)**
32:5,5;41:23,23;
43:2,2,3
**exhibits (4)**
44:7;45:14;48:12;
54:6
**exists (1)**
40:6
**expenses (1)**
21:5
**expressed (1)**
17:14
**extent (5)**
29:16;31:23;
36:11;38:16;49:25

### F

**fact (15)**
24:5,7,9,9;25:4,6,
7,11;26:13;29:2;
35:8;36:2;37:12;
39:1,4
**facts (1)**
36:13
**failed (2)**
24:1;35:17
**failure (1)**
29:5
**fair (1)**
39:12
**fairly (1)**
13:4
**faith (2)**
14:19;22:3
**fall (1)**
33:11
**fancy (1)**
30:18
**far (10)**
12:14;26:18;
37:10,22,24;38:17;
47:23;49:24;55:15;
59:21
**father (1)**
12:7
**favorable (2)**
30:17;39:11
**fear (1)**
24:23
**feature (1)**
21:1
**features (1)**
19:3
**federal (1)**
55:10
**fees (3)**
28:7,10,15
**few (6)**
21:20;22:4;31:18,
19;33:8;53:7
**fiduciary (8)**

16:8,9,21;17:4,6,9;
38:20;40:7
**fifteen (4)**
18:19;24:3;25:18;
54:8
**figure (1)**
56:6
**file (9)**
26:13,24;27:7,9;
28:21;48:18;50:25;
51:1;53:18
**Filed (31)**
4:4,7,10,13,16,19,
22;5:2;13:5;15:17,
20,22;16:7,7;17:19,
25;21:22;22:15;
26:8;27:17;28:23;
29:12;33:11;37:18;
38:24;43:18;47:24;
51:3,3;55:9;58:8
**files (1)**
54:1
**filing (1)**
50:11
**finalized (1)**
44:13
**finalizing (1)**
44:16
**financing (4)**
26:10;27:25;28:1,
2
**find (2)**
47:3;58:9
**finding (1)**
17:5
**findings (1)**
36:2
**finds (1)**
25:10
**fine (10)**
33:25,25;46:4;
51:13,22;53:17;
55:11,20;57:19;58:2
**finish (2)**
45:13;51:16
**finished (1)**
59:13
**firm (7)**
16:20;30:16;
31:11,17,21;46:10;
47:3
**firms (5)**
16:9;46:4,16,18;
47:8
**first (8)**
12:6;30:3;36:25;
37:1,2,7,7;51:25
**Floor (1)**
10:12
**flow (1)**
40:10
**FOLEY (2)**
9:2;33:21

16:8,9,21;17:4,6,9;
38:20;40:7
**folks (3)**
45:4;49:16;56:24
**follow-up (1)**
45:16
**force (1)**
53:6
**forefront (1)**
17:17
**foresee (2)**
24:20;28:7
**form (4)**
48:23;49:7,9;52:7
**forth (2)**
13:11;34:14
**forty (1)**
15:7
**forty-one (1)**
17:8
**forward (17)**
12:16;14:3;15:2;
17:1,23;25:20;32:1,
10;38:12;39:22;
41:18;43:10;45:7,8;
50:7;58:13,25
**framed (1)**
25:13
**FRANK (2)**
10:23;52:4
**frankly (4)**
17:20;27:23;37:9;
41:3
**fraudulent (5)**
27:13;30:24;31:8;
34:23;35:6
**Freeman (3)**
38:4,4,13
**Friday (1)**
46:7
**front (2)**
34:21;35:11
**fruit (1)**
21:11
**full (3)**
25:24;44:18;48:12
**fully (2)**
43:16;55:3
**funder (1)**
18:11
**funders (1)**
12:9
**funding (2)**
15:1;18:16
**funds (2)**
28:5;31:15
**further (4)**
14:5;38:6;40:20;
54:7
**future (3)**
19:4;20:23;29:13

### G

**game (1)**

37:2
**Garden (1)**
    8:6
**GARRITY (2)**
    3:24;11:3
**gather (1)**
    34:25
**gave (1)**
    45:19
**general (1)**
    46:8
**Genger (60)**
    4:5,11,14,23;5:3,5,
    6,7,9,9,13,13,18,22,
    22;6:2,2;8:3,12;9:3;
    10:3,11,19;11:4;
    12:2,3,4,7,10,10;
    13:8;14:13,19;16:4,
    13,18,25;17:6,7,8;
    20:21;21:24;23:9;
    24:1,18;26:5;29:23;
    31:20,24;33:24;
    38:21;43:5;49:5,5,8,
    9,9;52:5,6;57:7
**Genger's (1)**
    16:1
**Geron (8)**
    23:5,6,8,8;29:1;
    35:16;48:3,5
**Geron's (1)**
    29:1
**given (3)**
    25:2;46:11;55:1
**gives (1)**
    45:18
**giving (1)**
    42:15
**goes (1)**
    35:15
**Good (12)**
    11:2,16,20,21;
    14:19;21:14;22:3;
    26:4;37:8;39:3,4;
    57:5
**good-faith (1)**
    13:19
**GP (1)**
    10:3
**grand (2)**
    27:12,15
**grander (1)**
    39:17
**granted (1)**
    26:17
**grasp (1)**
    37:9
**great (3)**
    11:15;60:9,16
**Green (1)**
    3:15
**group (12)**
    12:1;13:22;18:21;
    19:5;27:4,5;36:7,9;

38:25;39:11;40:23;
    41:10
**groups (1)**
    11:25
**group's (1)**
    41:1
**guess (9)**
    19:2;40:15;49:14;
    50:9;51:7;52:6,23,
    23;53:3
**guise (2)**
    23:23;34:20
**guys (2)**
    43:19;56:17

**H**

**half (1)**
    46:6
**hand (5)**
    11:12;19:8;23:5,
    10;59:8
**handle (3)**
    21:19,21;36:12
**hands (1)**
    59:3
**happen (1)**
    31:10
**happened (4)**
    28:1;46:21;52:7;
    54:1
**happening (3)**
    31:4;35:11,20
**happens (1)**
    31:12
**happy (2)**
    11:7;41:17
**hard (1)**
    41:15
**heads (2)**
    58:24;60:5
**hear (9)**
    11:8;26:15;27:7,9;
    29:8;36:7,8;42:18;
    56:13
**heard (22)**
    15:8,19;26:19;
    28:21;34:1,1,12,22;
    36:18,19,21;41:20;
    52:3,12;53:24;57:3,
    15,21;58:16,19;59:1,
    6
**hearing (30)**
    15:6;17:12,24;
    22:13,14;23:22;
    25:25;26:12,22,25;
    27:1,2,3;28:22,23;
    29:10,11;35:21;
    41:18;42:4,7,19;
    43:9;48:4;51:11;
    54:3,15;55:2;57:13,
    16
**hearings (2)**

12:19;43:13
**held (2)**
    18:2;47:15
**help (1)**
    29:16
**helpful (1)**
    12:22
**here's (3)**
    43:12;54:21;56:12
**Herschmann (30)**
    5:6;9:12,16;12:7;
    13:12;14:11;20:5;
    44:12,19,21,22,25,
    25;45:9,9;46:1,14,
    14,23;47:2,5,7,11,
    17;55:23,23,25;56:3,
    9,19
**Herschmann's (3)**
    19:20;20:7,8
**highlight (2)**
    12:21,23
**highlighted (1)**
    16:6
**hire (1)**
    21:2
**history (1)**
    54:17
**hold (2)**
    32:17,19
**holding (1)**
    14:8
**holiday (1)**
    55:11
**homestead (2)**
    14:10;27:14
**HON (1)**
    3:24
**honestly (1)**
    34:4
**Honor (96)**
    11:16,19,20,22;
    12:18,20;13:2;15:5;
    16:3;17:13,16,18,23;
    22:9,12,22;23:3,6,
    24;25:19;26:3,6,9,
    21;27:6;28:25;
    29:11,22;30:8;33:18,
    21;34:1,3,12,16,21,
    25;35:4,22;36:1,20;
    37:5;38:11;39:11,
    15;41:21;42:17,19,
    22;43:7,20,21,22;
    44:4,6,15,25;45:9,
    10,25;46:6,14;47:4,
    7,17,25;48:8,24;
    49:2;50:13;51:4,13,
    22;52:4,13,20,22;
    53:1,17,25;55:10,16,
    20,23;57:5,16,18,23;
    58:1;59:4,7,16;
    60:10,11,13,18
**Honor's (2)**
    29:16;46:19

**hope (2)**
    47:18;48:11
**hopefully (4)**
    15:19;20:15;21:7;
    53:9
**hundred (1)**
    46:12
**husband (1)**
    12:7

**I**

**idea (2)**
    39:3,4
**identifies (1)**
    46:17
**Identify (2)**
    43:3;45:19
**immediately (1)**
    51:1
**impact (1)**
    17:22
**impacts (1)**
    39:1
**implications (1)**
    17:1
**important (2)**
    34:16;44:14
**impractical (1)**
    46:4
**improvements (2)**
    41:8,9
**Inc (2)**
    4:23;8:13
**include (2)**
    53:21;59:24
**included (1)**
    45:22
**incorrect (1)**
    36:3
**incurrence (1)**
    21:4
**Indeed (1)**
    30:15
**in-depth (1)**
    17:15
**indicate (1)**
    39:8
**indicated (4)**
    11:24;17:13;
    45:14;52:5
**indisputable (1)**
    24:4
**indulge (1)**
    48:8
**inept (1)**
    59:8
**infant (3)**
    20:9,12,16
**information (6)**
    46:24;47:9,14;
    49:21;50:3;53:21
**injunction (1)**

38:24
**insider (3)**
    31:12;37:11;40:15
**instance (4)**
    12:1,13,15;40:8
**instances (1)**
    12:11
**instead (1)**
    27:16
**intend (1)**
    19:12
**intention (1)**
    20:25
**interrupted (1)**
    32:25
**into (8)**
    27:20;28:13;
    35:13;36:8;37:13;
    39:24;48:20;54:15
**invalid (1)**
    26:15
**investigate (1)**
    39:21
**Investment (2)**
    4:23;8:12
**involve (1)**
    24:19
**involved (2)**
    12:11;14:23
**involves (1)**
    46:3
**IRA (2)**
    10:2,7
**issue (13)**
    14:10;18:24;
    23:24,25;25:13,14;
    32:22;34:20;50:3;
    54:18;57:8,17,22
**issues (14)**
    12:24;21:20;
    23:11;24:16;25:9,15,
    17;29:17,25;33:15;
    35:23;37:19;40:17;
    44:6

**J**

**JAMES (1)**
    3:24
**jammed (1)**
    35:12
**job (1)**
    37:8
**JOHN (1)**
    8:19
**Joint (1)**
    5:5
**JR (1)**
    3:24
**JUDGE (6)**
    3:25;11:2;32:6;
    38:4,4,13
**judgment (1)**

14:15
**July (16)**
    43:14;51:11,18;
    54:14,15,16;55:2,3,
    9,18;56:13,13;58:16;
    59:17,20,21
**jump (1)**
    39:24
**June (14)**
    43:16,18;46:20;
    51:11,12;52:21,24;
    53:5,10,11,18;55:18;
    57:18;58:6
**jurisdiction (1)**
    33:10

**K**

**Kasowitz (5)**
    5:6,17;9:20;14:23;
    33:7
**KASOWTIZ (2)**
    9:11,19
**keep (3)**
    26:12;56:1,11
**keeping (1)**
    35:12
**kept (1)**
    14:12
**key (2)**
    31:10;40:17
**kicked (1)**
    33:13
**kind (4)**
    12:21;22:5;29:8;
    53:8
**knows (1)**
    24:17
**Kolman (1)**
    6:20
**Krinsky (2)**
    11:17;28:8
**Krinsky's (2)**
    28:10,15
**KURLAND (1)**
    9:24

**L**

**Laba (1)**
    33:20
**Labov (8)**
    4:13;9:7;33:21,21,
    23,24;37:1;43:22
**laid (1)**
    39:4
**LARDNER (2)**
    9:2;33:22
**large (1)**
    13:4
**largest (1)**
    31:13
**last (12)**

16:3;17:12;23:10,
    22;24:11;25:4;
    26:14;33:11;37:1;
    42:3;44:12;48:1
**late (1)**
    37:2
**later (4)**
    19:13;37:17;
    51:25;58:11
**latest (1)**
    47:20
**LAW (9)**
    10:2;16:9;31:11;
    38:7;46:4,10,18;
    47:3,8
**lawyers (2)**
    16:17;56:1
**lead (2)**
    13:19;46:13
**least (10)**
    14:3;17:2;24:23;
    28:16;30:21;39:14,
    15;42:16;47:14;
    48:17
**leave (2)**
    47:22;56:17
**left (2)**
    45:3;46:1
**lender (10)**
    18:6,6,9;19:2;
    31:12;37:15,17;
    42:11,13,14
**lending (2)**
    18:7;37:16
**length (1)**
    30:18
**less (1)**
    27:17
**Letter (7)**
    4:4,7,10,16,22;5:5;
    30:8
**level (1)**
    35:4
**levels (1)**
    34:6
**Lexington (1)**
    10:4
**liability (1)**
    37:19
**lien (5)**
    18:22,22;35:7;
    37:16,18
**liens (1)**
    18:25
**light (1)**
    54:1
**liked (1)**
    18:5
**limited (1)**
    49:22
**limiting (1)**
    49:17
**line (4)**

11:19;44:20;48:6;
    56:10
**lined (1)**
    25:21
**list (4)**
    45:18,22;46:2,5
**listen (1)**
    36:14
**literally (1)**
    31:10
**litigate (3)**
    31:1,7;42:6
**litigated (3)**
    25:14,17;42:16
**Litigation (8)**
    5:7;12:9;18:11;
    23:20;24:7,10;
    30:21;31:13
**litigations (4)**
    12:9;24:17;54:1,8
**little (2)**
    40:14;54:11
**LLC (4)**
    5:7;6:21;10:3;18:9
**LLP (9)**
    5:17;8:2,11;9:2,
    11,19,20;10:10,18
**loan (17)**
    13:16,17;19:1,5;
    21:16,17,18;22:6,25;
    28:14;34:20;37:12,
    13,21;42:11,12,15
**loaned (1)**
    34:22
**lockup (1)**
    37:23
**logistical (1)**
    56:5
**long (3)**
    34:12;41:15;47:8
**longer (1)**
    24:12
**look (3)**
    17:23;34:6;52:19
**looking (3)**
    25:16;52:21;54:16
**looks (1)**
    34:3
**lot (8)**
    27:17;29:6,14;
    34:5;41:17;46:9;
    52:7;60:17
**love (1)**
    15:6

**M**

**Magistrate (2)**
    38:4,13
**Maine (1)**
    37:24
**maintained (1)**
    41:11

**maintains (1)**
    34:13
**major (1)**
    12:24
**makes (3)**
    15:11;49:23,24
**making (2)**
    38:25;39:17
**malpractice (4)**
    16:7,17,21;31:23
**Manhattan (1)**
    37:24
**many (3)**
    12:19;55:8;58:4
**March (1)**
    37:3
**MARTIN (1)**
    8:11
**MARVIN (3)**
    8:11;26:4,4
**matter (5)**
    11:3;15:25;23:9,
    14;49:19
**matters (5)**
    15:14;18:1;33:10;
    58:11;59:2
**maximize (1)**
    41:12
**May (16)**
    3:18;11:23;13:19,
    20;14:1,23;29:18;
    36:20;41:23;44:23;
    46:12;48:18;52:22;
    55:1;58:7;59:16
**maybe (6)**
    37:18;41:8;49:6;
    52:22;53:5;54:9
**McDermott (1)**
    19:19
**mean (9)**
    17:5;20:1;32:10;
    37:24;38:20;40:16;
    53:11;55:8;56:15
**meant (2)**
    17:16;53:14
**meantime (2)**
    15:10;18:25
**Memorial (1)**
    46:2
**mention (3)**
    35:17,18,18
**mentioned (5)**
    30:3,15;31:18,18;
    47:25
**mentions (1)**
    36:5
**merits (5)**
    26:18,19;41:16;
    42:4,6
**methodical (1)**
    39:25
**Michael (5)**
    5:21;8:3;9:25;

29:24;57:6
**middle (1)**
    48:10
**mid-June (2)**
    43:10;57:17
**might (5)**
    14:22;21:17;31:7;
    53:8;54:16
**milestones (1)**
    21:18
**million (9)**
    14:15;17:8;18:15,
    18,19,23;21:9;24:3;
    28:12
**mind (2)**
    56:1,11
**minimum (1)**
    24:20
**minute (2)**
    44:1;54:19
**minutes (1)**
    31:19
**Missry (1)**
    16:5
**Monday (4)**
    47:19;51:1;52:1;
    56:14
**money (1)**
    36:8
**monies (1)**
    30:6
**month (2)**
    11:6,24
**months (15)**
    12:18;22:4;27:8,8,
    8,9,10,10;28:16,21;
    31:3,19;32:17;33:7;
    57:14
**More (4)**
    23:12;29:6;46:13;
    53:7
**morning (3)**
    45:11,17;52:1
**most (7)**
    14:6,8;18:1,19;
    48:17;56:3;58:6
**mother (4)**
    12:3;13:8;27:14,
    16
**motion (93)**
    13:2,5,17,17;15:7,
    13,19,19;17:19,25;
    18:2;19:24;20:2;
    22:1,15,16,23;23:16,
    18,20,22,23,25;
    24:13,14;25:2,5,21,
    24;26:7,9,10,11,13,
    14,16,17,19,23,23,
    24,25;27:1,7,9,17,
    24;28:1,4,20,23;
    29:1,4,10,12;30:17;
    31:7,25;32:8;33:11;
    34:3,4,9,12,18;35:3,

15,19,19,21;38:15;
40:21;42:4,6,7,8,18,
20;43:14;44:3,4,17;
45:12;48:11;50:24;
51:8;52:8;53:9;54:5;
57:9;58:5,5,7
**motions (10)**
12:19;15:17;
24:24;30:2;33:5,13;
39:2;41:17;52:15;
57:13
**motion's (1)**
51:3
**move (9)**
15:1;32:1;43:10;
45:7,8;50:6;58:14,
25;60:6
**movement (1)**
25:20
**moving (2)**
32:10;54:9
**much (5)**
13:3;37:4;58:3;
60:9,14
**multiple (3)**
24:19;25:8,9
**muted (1)**
44:23
**myself (1)**
58:20

## N

**name (2)**
19:19;23:8
**name-calling (1)**
35:24
**nasty (2)**
34:5;35:25
**near (1)**
29:12
**need (12)**
29:8,16;38:16;
39:15;44:5;48:7;
50:21;56:6,7;57:14;
58:12;59:14
**needs (3)**
28:5,24;31:2
**negotiate (3)**
14:11,17,18
**negotiated (1)**
22:6
**negotiation (1)**
49:4
**negotiations (2)**
19:22;20:4
**New (12)**
3:16,16;6:23;8:15;
9:5,14,22;10:5,13,
21;11:10;33:12
**next (5)**
22:4;39:22;42:9;
46:7;48:10

**nice (1)**
60:14
**night (2)**
44:12;48:1
**nine (1)**
28:21
**nondebtor (4)**
30:6;31:15,15;
38:11
**nondebtors (2)**
30:5,5
**nonrefundable (1)**
20:22
**noon (2)**
56:13;59:20
**note (3)**
11:14;34:16;58:2
**noted (1)**
11:23
**notes (9)**
18:20,23;24:1,2,5,
6;25:11;29:3,6
**notice (2)**
22:14,15
**notwithstanding (1)**
26:12
**number (7)**
11:4;12:9;15:13,
21,23;19:15;49:22
**NY (9)**
6:23;8:6,15;9:5,
14,22;10:5,13,21

## O

**object (4)**
15:18;39:2;52:25;
53:23
**objection (5)**
21:25;27:2;47:2;
48:4;52:24
**objections (4)**
12:24;53:19,22;
59:21
**obviously (12)**
15:6;20:3;34:13;
35:24;47:9;52:7;
53:4;54:3,5,7;58:1;
59:17
**o'clock (1)**
51:19
**October (1)**
33:6
**off (5)**
32:17,19;49:10;
52:7;54:15
**OFFICE (2)**
10:2;22:17
**offset (1)**
19:11
**offsets (1)**
18:20
**often (1)**

37:14
**old (1)**
20:13
**Oldner (4)**
5:21;8:3;29:24;
57:7
**once (4)**
41:18;46:17;
49:19;50:1
**One (28)**
3:15;10:20;12:1;
13:6;16:3,18;19:3;
22:18;24:20;26:6;
30:1,2;32:2;37:2;
39:7;40:17;41:4;
42:10,25;43:5;46:1;
48:23;49:14,25;
50:15;53:17;54:9;
55:25
**one-hour (1)**
37:5
**only (8)**
12:18;23:24,24;
28:6;45:10;46:12;
49:21;50:19
**onto (1)**
14:9
**open (1)**
44:6
**operating (2)**
28:3,5
**operations@escribersnet (1)**
6:25
**opportunity (4)**
12:23;14:17;
40:22;41:12
**opposed (2)**
26:22;33:13
**opposition (1)**
34:15
**order (24)**
28:5;29:7;43:25;
44:1,13,16;48:2,5,8;
49:7,10;50:10,18;
51:7,8,10;52:7,14;
56:23;57:9;59:17,
23;60:1,3
**ordered (1)**
48:10
**orders (1)**
24:24
**original (1)**
52:9
**originally (1)**
57:12
**Orly (28)**
5:3,5,22;8:3;
10:11;11:3;12:4,10;
13:8;16:4,13,18,24;
17:6,7,8;20:21;
21:24;23:9;24:1;
25:6;29:23;31:19,20,
24;43:5;49:9;57:7

**Orly's (1)**
31:25
**OSWALD (16)**
10:23;51:14;52:3,
4,5;53:24,25;54:12,
14;55:5,7,10,22;
59:6,7,11
**others (1)**
49:10
**ought (1)**
50:4
**out (18)**
15:23;16:1;28:19;
30:20;34:9;35:22;
36:2;39:4,18;40:16;
42:13;46:1;47:3,3;
48:11;50:6;56:6;
58:21
**outcome (2)**
36:14,14
**outlined (1)**
37:5
**outrageous (1)**
37:9
**outset (1)**
26:6
**outside (1)**
20:23
**outstanding (1)**
35:7
**over (2)**
21:6;38:21
**own (5)**
21:1,2,3;34:6;
40:24
**owned (3)**
13:13;18:10;19:17
**owns (1)**
34:9

## P

**page (1)**
31:7
**paid (2)**
18:15,19
**paper (1)**
54:17
**papers (7)**
22:11;35:25;36:5;
43:15;48:18;50:11;
55:9
**paragraph (2)**
35:2,2
**parallel (3)**
24:14;58:10;59:1
**parcel (3)**
13:16;35:11,20
**Pardon (1)**
43:2
**Park (1)**
9:4
**part (23)**

13:6,16;14:8,13;
15:4;18:23;19:3,6,7;
21:14,16;22:5;
27:24;34:8;35:11,
20;38:2;39:7;40:6;
48:18;59:23;60:1,2
**particular (2)**
17:15;27:3
**parties (23)**
11:8;12:5;17:24;
24:15;25:17;27:19;
28:12;29:15;31:15;
35:13;37:10;40:16;
41:6,14;44:12,17;
46:18;48:1,12;
52:20;53:18,21;
54:18
**parties-in-interest (1)**
39:24
**party (4)**
23:13;28:14,16;
35:6
**party's (1)**
38:9
**past (2)**
25:18;26:18
**path (5)**
14:3;15:2;39:19,
20,22
**Paul (3)**
4:13;9:7;33:21
**Pause (2)**
54:20,24
**pay (2)**
28:10,15
**paying (3)**
30:16,19;31:11
**payment (2)**
19:12;38:25
**Peeta (1)**
26:2
**Pending (10)**
4:19;12:17;15:13;
16:4,6;18:1;25:23;
37:6;38:21;49:3
**Penn (1)**
10:20
**people (4)**
11:13;48:3;49:22;
53:6
**percent (1)**
46:12
**perfect (2)**
15:11;16:2
**perhaps (1)**
54:16
**period (2)**
37:5;42:16
**periodically (1)**
20:24
**perspective (3)**
12:17;15:11;45:6
**perused (1)**

19-01447-jlg   Doc 11   Filed 05/27/20   Entered 05/28/20 09:27:19   Main Document
Pg 69 of 72
ORLY GENGER
Lead Case No. 19-13895-jlg

May 22, 2020

54:5
**petition (1)**
39:23
**phrase (1)**
35:10
**Piazza (5)**
4:8,17,20;11:18,20
**Piazza's (1)**
11:18
**pick (1)**
56:23
**picked (1)**
38:5
**Pitta (44)**
4:4,10,22;8:18;
26:2,3,4;30:15;31:6;
34:2;41:21,21,23,24,
25;42:2,10;44:2,4,
10;45:11;47:13,21,
25;48:15,24;49:13;
50:8,13,15;52:5,10,
12,13,17;53:14,
17;55:19,20;56:20;
57:1;59:12,23
**place (2)**
19:1;53:15
**places (1)**
45:13
**Plaza (1)**
10:20
**pleadings (1)**
35:18
**please (5)**
36:24;46:23;
51:16;56:20,22
**plenty (1)**
26:15
**PM (2)**
3:19;60:20
**point (20)**
16:18;24:10,11;
25:4,12,19;26:7;
31:6;32:1,25;33:4;
39:18;40:16;42:13,
25;47:15;48:11;
49:10;50:1,16
**points (4)**
23:17;29:25;34:8;
37:22
**point's (1)**
56:19
**Pol (1)**
32:3
**Pollock (24)**
5:2;10:10,15;
16:24;17:14,18,20;
29:21,22,23;32:4,5,
13,15;33:2,4,17,18;
37:25;42:22,25;43:4,
4;57:11
**portion (4)**
34:4,18;38:15,23
**portray (1)**

29:1
**posed (1)**
23:21
**Position (5)**
5:5;16:13;38:12;
45:4;48:6
**possibility (1)**
13:22
**possible (1)**
17:25
**possibly (1)**
40:22
**post-petition (1)**
42:12
**posture (3)**
32:11,15,16
**potential (16)**
13:7;14:5,12,22;
16:10,14,22;18:17,
24;19:1,10;22:4;
30:3;37:20;38:1;
40:18
**potentially (3)**
16:12;17:22;58:6
**practice (1)**
15:13
**precautions (1)**
56:7
**preclude (1)**
32:10
**pre-existing (1)**
42:14
**prefer (4)**
15:18;53:7;58:11,
16
**prefers (1)**
57:18
**pre-marital (5)**
45:12,18;46:15;
47:15;48:13
**premise (2)**
16:10,22
**prenuptial (1)**
50:5
**prepare (2)**
51:6,10
**pre-petition (2)**
37:16;42:11
**presented (2)**
39:14;41:4
**preserves (1)**
40:12
**President (1)**
18:21
**press (3)**
12:16;23:17;25:12
**pressing (1)**
23:14
**presume (1)**
46:15
**Pre-trial (1)**
6:3
**pretty (3)**

38:6;58:6,23
**primarily (1)**
20:5
**prior (6)**
14:22;16:5;24:22;
39:19;41:6,7
**probably (3)**
37:5;52:21;55:11
**problem (8)**
41:3;45:4,24;47:9;
49:15,18;51:1;55:21
**problems (1)**
26:15
**procedure (1)**
43:7
**proceed (7)**
11:9;24:13;30:9;
31:3;43:13;47:6;
50:24
**proceeding (9)**
5:9,13,17,21;6:2;
17:12;21:23;25:15;
38:5
**proceedings (1)**
60:20
**proceeds (1)**
17:21
**process (2)**
45:7;60:6
**produced (3)**
24:21,22;46:9
**production (2)**
24:23;53:20
**progress (2)**
11:25;49:12
**promissory (1)**
24:2
**promptly (2)**
32:23;33:14
**proper (3)**
38:10;41:18;43:6
**properly (1)**
37:18
**property (4)**
16:12,14;38:2;
39:1
**proposal (1)**
58:24
**proposals (3)**
12:13,22;39:18
**propose (2)**
30:7;52:18
**proposed (6)**
30:4,11,12;32:20;
51:10;56:23
**proposing (1)**
32:1
**propounded (2)**
54:4;58:3
**protective (1)**
24:24
**provide (9)**
22:10;37:16;46:8,

23;47:8;48:9;52:10;
56:22;58:7
**provided (7)**
18:16;19:6;21:18;
28:11;45:18;46:2;
48:17
**providing (5)**
37:20;42:11;46:5,
11;59:17
**purchase (1)**
13:12
**purely (1)**
23:20
**purportedly (1)**
24:2
**purporting (1)**
34:10
**purpose (1)**
42:15
**pursuant (1)**
50:20
**pursue (6)**
13:10;14:17,17;
16:16,19;19:8
**push (4)**
15:22;16:1;54:25;
55:1
**put (13)**
13:24;15:2;30:7;
31:25;39:8;41:18;
43:25;44:15;47:1,
23;49:25;58:24;60:5
**putting (1)**
28:14

## Q

**Quentin (1)**
8:5
**questionable (1)**
30:11
**quickly (3)**
30:7,10;31:16
**quite (2)**
34:2;54:6
**quo (1)**
41:11

## R

**raise (8)**
11:12;12:24;
23:10,21;45:21;
50:3;55:25;57:8
**raised (2)**
23:25;59:9
**rather (2)**
14:15;23:14
**Re (1)**
11:3
**reached (2)**
12:6;44:14
**reaching (1)**

47:3
**read (3)**
34:6;35:1;37:3
**ready (1)**
25:21
**real (4)**
31:9;34:20;42:25;
43:5
**realistic (1)**
54:2
**really (23)**
14:8,25;16:22;
17:14,15;21:1,10,19;
22:5;23:22;25:5,10;
34:19,20;35:7,11,19;
39:10,21;41:16;
50:3;54:2;58:11
**reason (3)**
17:10;39:18;50:19
**reasons (1)**
17:11
**recall (1)**
37:4
**receivable (1)**
21:8
**receive (4)**
20:22;28:2;48:2;
50:21
**received (1)**
28:12
**recently (1)**
48:17
**recollection (1)**
18:6
**record (4)**
23:8;29:23;39:16;
41:18
**recoup (1)**
40:25
**recover (2)**
21:7,8
**recoveries (5)**
19:9,11;20:24;
21:10;40:25
**redacted (4)**
49:20;50:2,4,21
**redactions (1)**
44:7
**references (1)**
45:12
**referred (1)**
12:1
**referring (1)**
48:25
**refresh (1)**
18:5
**regard (3)**
16:16;21:2;49:6
**regarding (1)**
54:18
**regrouped (1)**
13:1
**related (2)**

21:23;23:17

**relates (4)**
47:13,15;50:24;
56:25

**relating (1)**
44:7

**relation (1)**
18:21

**relatively (3)**
12:16;19:10;29:12

**relevance (1)**
25:15

**relevant (1)**
24:21

**remains (1)**
40:20

**remand (5)**
15:17;30:2;33:5,
11;39:2

**remember (1)**
20:8

**removed (2)**
15:14;33:8

**rental- (1)**
37:18

**repeat (1)**
22:21

**replies (2)**
51:11;59:21

**reply (3)**
43:18;45:20;56:15

**Report (4)**
4:13,19;5:2;16:7

**reported (1)**
14:21

**represent (1)**
23:9

**representative (1)**
20:5

**representing (1)**
16:17

**represents (1)**
16:24

**request (3)**
25:10;57:12,15

**requests (2)**
53:12,14

**require (1)**
24:25

**required (1)**
58:4

**reserve (2)**
35:24;50:1

**resolution (4)**
15:3;19:4;24:25;
25:23

**resolved (4)**
25:9;32:22,23;
33:14

**resolving (1)**
49:24

**respect (13)**
11:8;13:15;21:16,

21;24:25;38:1;42:5;
44:16;48:3;52:14;
57:21;58:25;59:16

**respectfully (1)**
31:16

**respond (4)**
26:17;28:25;
40:13;41:22

**responded (1)**
50:16

**response (5)**
26:14;36:23;
47:19;48:2;58:7

**responses (5)**
43:18;51:12;
53:12,14;56:16

**responsive (1)**
55:9

**restate (1)**
42:17

**result (1)**
16:15

**retain (3)**
14:4,4,25

**review (1)**
18:4

**reviewed (1)**
34:4

**revisiting (1)**
25:16

**ridiculous (1)**
29:9

**right (57)**
11:2;15:2;16:16;
20:9,12,17;21:12;
22:7,18;23:4,10;
24:6;26:1,9;29:20;
33:16;35:14;36:16;
40:5;42:21;43:12,16,
17;44:1,9;45:23;
46:22;47:6,10,11,21;
48:14;50:1,23;
51:21;52:25;53:23;
54:19;55:4,9,12,14,
14,19,22;56:2,8,16,
25;57:2,22;59:3,10,
12,13;60:16,16

**rights (4)**
20:20;34:13;40:5,
9

**risk (3)**
12:14;13:10;40:6

**road (1)**
33:13

**Rocco (8)**
4:7,16,19;11:16;
36:20;53:1;55:16;
57:25

**Room (1)**
10:4

**Roosevelt (1)**
8:5

**run (4)**

20:25;22:17;28:5;
41:14

**S**

**Safety (2)**
37:24;56:7

**Sagi (18)**
4:4,10,22;8:12;
12:1,2;13:22;14:13,
13;24:18;25:12;
26:5;27:4;40:23;
41:1,9;49:6,8

**Sagi's (1)**
25:10

**sale (4)**
13:17;26:9;34:8,
18

**same (6)**
26:22,25;27:3;
31:16;42:5;48:23

**satisfactory (1)**
41:9

**saw (1)**
13:2

**saying (4)**
25:19;30:18;31:7;
47:12

**scale (2)**
13:3;27:15

**scattered (1)**
25:16

**scenario (2)**
21:9,17

**schedule (12)**
15:6;42:19;43:13,
15;44:15;46:5;
52:15;54:9,12;
55:18;58:15,22

**scheduled (6)**
17:25;25:21;
29:11;41:19;43:9;
57:14

**schedules (6)**
24:2,4;29:3,6;
34:12;35:4

**scheduling (12)**
15:5;23:11,15;
43:25;51:7,8,10;
52:14;56:23;57:8;
58:25;59:17

**seal (1)**
47:15

**sealing (1)**
44:7

**second (2)**
51:15;54:23

**seeking (1)**
30:8

**seeks (1)**
38:3

**seems (4)**
28:1;30:14;46:12;

54:17

**SEGAL (2)**
10:18,18

**self-determination (1)**
16:15

**sell (2)**
34:10;40:22

**sending (1)**
56:21

**sense (5)**
13:7;15:11;26:21;
53:19;54:16

**sensitive (2)**
50:4;58:13

**sent (2)**
44:12;50:17

**sentences (1)**
24:12

**separate (1)**
59:23

**September (1)**
26:14

**serve (7)**
22:15;44:2,4,5,17;
51:7;52:20

**served (2)**
48:11;53:6

**settle (4)**
20:18;22:3;26:23;
27:15

**settled (5)**
26:8;39:9;40:18,
18,19

**settlement (31)**
12:6;13:2,2,16;
14:7;18:2;19:7;
21:13,16;23:13,14;
26:24,25;27:4,12,20,
25;30:4,11,12;31:1;
32:20;34:4,19;35:2;
39:10;41:6,17;
42:20;43:14;58:5

**settlement's (1)**
15:1

**settling (4)**
21:12,15;41:6,6

**seven (2)**
28:16;33:6

**seventeen (3)**
18:15,18;28:12

**Seventh (1)**
6:22

**shared (1)**
49:21

**short (1)**
44:15

**show (1)**
36:3

**sic (1)**
30:13

**side (3)**
12:5;22;58:13

**signal (1)**

25:2

**signed (4)**
48:1,10;49:10;
52:6

**significant (6)**
12:14,14;14:25;
21:10;24:15;40:2

**silly (1)**
29:8

**similar (1)**
41:7

**simply (2)**
29:2;38:15

**simultaneously (2)**
28:22;33:15

**situation (1)**
37:19

**six (3)**
12:18;31:3;32:17

**sixteen (1)**
18:15

**small (1)**
19:10

**smaller (1)**
13:3

**sold (1)**
27:24

**solely (1)**
29:5

**Solutions (1)**
11:11

**somehow (5)**
27:18;37:11,22;
38:18;40:15

**someone (2)**
37:20;38:2

**soon (4)**
15:16;17:25;43:9;
44:6

**sooner (1)**
52:22

**sorry (14)**
22:21;23;26:2;
31:19;36:7;42:23,
24;43:2;49:2;51:2;
54:23;57:24,25;59:7

**sort (3)**
35:9;37:23;50:6

**sorts (2)**
46:13;49:17

**sounds (1)**
58:12

**speak (5)**
11:11;12:23;
23:11,13;56:17

**SPEAKER (10)**
42:23;43:21;
44:23;54:11,13;
55:13;60:11,13,15,
18

**speaking (1)**
53:6

**specifically (1)**

23:12

**specificity (1)**
46:10

**SPELFOGEL (1)**
9:8

**spent (2)**
18:5;41:17

**spoke (2)**
23:10;57:11

**spoken (1)**
40:16

**sponte (1)**
22:24

**stage (2)**
12:16;27:6

**stall (1)**
30:20

**standing (2)**
16:18;38:10

**standpoint (1)**
23:19

**started (4)**
11:13,15;15:25;
45:11

**state (1)**
15:24

**stated (1)**
20:2

**States (2)**
3:14;22:8

**Status (5)**
4:13,19;5:2;16:7;
41:11

**statute (1)**
37:11

**stay (10)**
17:20;21:23;30:3,
6,13;31:14;32:10,21;
43:8;57:10

**stayed (6)**
17:12,13,16;
25:23;38:11,14

**staying (1)**
25:24

**stenographers (1)**
56:3

**still (6)**
13:4;33:12;41:12;
59:6,7,8

**stipulation (1)**
50:18

**stopped (1)**
33:3

**stopping (1)**
38:25

**strategy (1)**
21:6

**Street (1)**
10:12

**striking (2)**
34:25;35:1

**struck (1)**
30:23

**structure (1)**
12:21

**stuff (1)**
44:5

**sua (1)**
22:24

**subject (6)**
15:7;18:20;34:23;
35:6;46:8;54:10

**submit (2)**
50:10;51:23

**submitted (3)**
43:16;49:20;55:3

**substantially (1)**
48:22

**substantive (1)**
25:20

**substantively (1)**
23:25

**successful (1)**
15:3

**sue (2)**
16:20;28:16

**suggest (5)**
31:16;39:5;52:20;
55:15,17

**suggesting (1)**
38:18

**suggestion (1)**
37:10

**suggestions (1)**
40:14

**Suite (1)**
6:22

**sum (1)**
17:23

**super (1)**
49:16

**superpriority (1)**
35:7

**support (4)**
21:25;32:21,21;
38:16

**supposedly (1)**
27:24

**sure (13)**
17:14;23:7,15;
33:2,19;36:12;
43:12;48:20,24;
50:5;53:3,13;60:19

**surprise (2)**
20:2;23:18

**surrogate (4)**
15:14,15;38:17,23

**surrogate's (2)**
33:8,9

**T**

**tactic (2)**
23:21;24:10

**tail (1)**
34:17

**talk (2)**
17:15;59:22

**talking (6)**
16:11;18:11;
37:25;48:22;52:8;
54:6

**target (2)**
31:13;37:20

**Tarter (4)**
11:17;28:8,10,15

**technology (2)**
11:11;59:8

**tee (1)**
30:9

**telling (1)**
37:8

**ten (1)**
38:21

**term (1)**
44:15

**terms (4)**
23:15;24:8;30:17;
41:7

**Terrific (3)**
52:2,11,11

**Texas (6)**
33:8;48:20;49:4,5,
6;52:6

**thanks (1)**
60:17

**theory (2)**
17:3,8

**thinking (4)**
32:8;50:11;52:14;
53:25

**thirty (1)**
15:7

**thirty-two-million-dollar (2)**
18:17;34:23

**Thomas (6)**
4:4,10,22;8:18;
26:4;41:21

**though (1)**
39:7

**thought (3)**
22:12;41:15;57:12

**thoughts (1)**
11:8

**Three (5)**
20:13;23:17;
26:20;30:23,25

**Thursday (1)**
50:12

**tied (1)**
35:13

**till (1)**
31:2

**times (1)**
34:22

**timing (1)**
55:1

**today (7)**
11:10;15:5;31:1;

34:2;42:6;48:4;
51:25

**today's (3)**
22:13;41:15;42:3

**together (6)**
29:11;42:19;
43:25;44:16;58:24;
60:5

**TOGUT (2)**
10:18;52:5

**TOKAYER (2)**
10:2,7

**told (4)**
26:20;27:6,11;
47:19

**Torres (5)**
5:6,17;9:11,19,20

**touched (2)**
30:1;31:6

**tough (1)**
34:5

**towards (3)**
15:2;35:15;57:17

**TPR (1)**
8:12

**track (1)**
59:1

**tracking (1)**
57:13

**tracks (1)**
58:10

**transaction (2)**
13:23;31:12

**Transcribed (1)**
6:20

**transcript (1)**
37:3

**transfer (1)**
30:24

**transferred (1)**
49:11

**transferring (1)**
19:15

**transparent (1)**
20:3

**tried (1)**
40:16

**TRP (1)**
4:23

**true (1)**
40:5

**Trump (5)**
14:7;18:21;36:7,9;
38:25

**Trust (26)**
5:3,7;8:4;10:11;
12:4;13:8,13;15:22;
16:13,14,19,23;17:6;
19:15,18,18,19,20;
20:17;21:22;29:23;
31:24;40:9;43:5;
49:9;57:7

**Trustee (47)**

5:21;8:3;11:7,14,
18;12:6;13:1,8;
15:17;16:4,12,25;
17:7;18:8,8;19:18;
20:4,20,21;21:19,24;
22:8,10;25:20;28:2,
9,14,15;29:24;30:12;
32:16;33:8,12,12;
35:5;36:12;37:12;
39:3,6,19;41:7;
50:19,20;55:17;
57:7;58:1,2

**Trustee's (3)**
22:17;30:20;50:17

**try (6)**
11:10,12;14:16,
18;22:3,3

**trying (4)**
15:4;28:13;44:13;
49:23

**Tuesday (4)**
45:15;47:20;50:8;
52:10

**turn (1)**
13:22

**twice (1)**
45:20

**two (19)**
11:25;15:14;24:1,
1;25:11;29:2,5,25;
30:4;34:6;35:17;
39:21,22;46:1;55:1;
57:10,13,14;59:1

**two-and-a-half (1)**
27:11

**two-party (1)**
25:6

**type (6)**
13:23;17:19;
21:17;37:11;38:24;
40:15

**U**

**ultimate (1)**
19:12

**unbelievable (1)**
37:8

**under (8)**
19:14;20:18,19;
22:19,25;34:19;
47:15;56:7

**understood (1)**
51:2

**UNIDENTIFIED (10)**
42:23;43:21;
44:23;54:11,13;
55:13;60:11,13,15,
18

**United (2)**
3:14;22:8

**unusual (3)**
37:19,25;42:12

ORLY GENGER
Lead Case No. 19-13895-jlg

May 22, 2020

**up (15)**
18:23;21:8,9;23:5;
25:21;27:18;30:9;
35:9,12,13;38:5;
41:13;43:10;48:10;
56:23
**update (1)**
11:6
**upfront (1)**
20:22
**upon (1)**
16:20
**use (1)**
35:10
**used (2)**
28:10;35:10
**using (1)**
11:10
**usually (1)**
39:21

**V**

**value (6)**
14:24,25;24:8;
34:10;35:13;41:13
**valued (1)**
24:2
**various (2)**
37:6;45:13
**vetted (1)**
22:7
**videographers (1)**
56:4
**view (3)**
25:11;26:21;43:7
**voiced (1)**
24:11
**volume (1)**
54:17
**voluminous (2)**
54:1,6

**W**

**Wachtel (1)**
16:5
**wagging (1)**
34:17
**wait (1)**
58:22
**waiting (1)**
36:18
**waived (1)**
19:5
**wants (4)**
17:13;39:6;42:4;
58:19
**way (6)**
11:22;19:11;
30:18;36:1;39:5;
47:1
**Wednesday (2)**

50:10;56:20
**week (3)**
48:10;54:9;55:1
**weekend (1)**
54:14
**weeks (5)**
26:20;27:11;
30:23,25;55:1
**weigh (1)**
17:18
**welcome (1)**
59:5
**well- (1)**
38:6
**weren't (1)**
17:14
**Western (2)**
48:20;49:3
**what's (8)**
18:7;27:16;31:4;
35:11,20;42:9;45:5;
49:16
**Whereupon (1)**
60:20
**whichever (1)**
46:15
**white (1)**
35:15
**whole (1)**
27:17
**William (1)**
19:19
**willing (1)**
28:22
**wish (7)**
36:19;41:20;52:3,
12;53:24;57:21;59:6
**wishes (2)**
25:12;57:3
**within (1)**
15:7
**without (1)**
38:5
**wondering (2)**
52:13;54:15
**work (9)**
11:12;22:3;29:15,
17;43:19;48:7;56:4;
58:10,21
**worked (2)**
13:1;19:1
**working (2)**
29:15;43:17
**works (4)**
43:17,21,22;55:20
**worthless (1)**
27:21
**worthy (1)**
26:17
**wrapped (1)**
43:10
**written (1)**
49:25

**wrote (1)**
45:10

**Y**

**Yann (1)**
23:8
**year (1)**
26:14
**years (9)**
20:13;24:17,19;
25:18;28:13;38:21;
39:21,22;54:8
**yesterday (10)**
13:5;15:20;17:25;
22:16;28:23;29:12;
44:11;45:3,17;51:3
**York (11)**
3:16,16;6:23;8:15;
9:5,14,22;10:5,13,
21;33:12
**young (1)**
20:9

**Z**

**Zeichner (4)**
16:4;17:3;31:17,
21

**1**

**1 (1)**
53:5
**100 (1)**
8:5
**10001 (1)**
6:23
**10004 (1)**
10:13
**10016 (1)**
9:5
**10019 (2)**
9:14,22
**10119 (1)**
10:21
**10170 (1)**
10:5
**10271 (1)**
8:15
**11 (4)**
28:4;37:14;51:19;
59:18
**11530 (1)**
8:6
**120 (1)**
8:14
**13th (3)**
55:4;56:13;59:20
**14th (2)**
54:16;58:16
**15 (1)**
31:7

**1633 (2)**
9:13,21
**19-01444-jlg (1)**
5:9
**19-01445-jlg (1)**
5:13
**19-01446-jlg (1)**
5:17
**19-01447-jlg (1)**
5:21
**19-13895 (1)**
11:4
**1993 (5)**
5:3,22;8:4;10:11;
29:23
**19th (7)**
43:18;51:12;
52:24;53:11,13,16,
19
**1st (3)**
53:10,18;55:18

**2**

**2:04 (1)**
3:19
**20-01010-jlg (1)**
6:2
**2019 (1)**
33:6
**2020 (1)**
3:18
**21st (5)**
55:3;56:13,13;
58:23;59:17
**22 (1)**
3:18
**2400 (1)**
10:4
**24th (1)**
10:12
**26th (3)**
43:16,19;51:12
**29th (2)**
52:22;53:7

**3**

**3 (1)**
22:16
**3.2 (1)**
14:15
**3:36 (1)**
60:20
**300,000 (8)**
18:8;28:2,10;
30:16,19;31:11;
34:21;39:8
**300,000-dollar (2)**
19:9;28:14
**30th (1)**
55:18
**31 (1)**

39:10
**31st (2)**
30:14,22
**32.3-million- (1)**
14:6
**352 (1)**
6:22
**36 (1)**
35:2

**4**

**4.5 (2)**
18:23,23
**420 (1)**
10:4
**4th (2)**
37:3;54:14

**5**

**5 (1)**
35:2
**50,000 (3)**
20:22;27:20;34:17
**5th (1)**
11:23

**6**

**60 (1)**
10:12
**6th (1)**
55:9

**7**

**7 (4)**
11:18;13:4;22:24;
28:6
**727 (2)**
25:13,13
**7th (9)**
43:14;51:11,18;
54:3,15;55:12,13;
56:16;59:21

**9**

**90 (1)**
9:4
**9019 (6)**
24:14;25:21,23,
25;26:7;51:1
**973406-2250 (1)**
6:24

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net